1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,          )
                                        )
5              Plaintiff,         )
                                        )
6    V.                          )  No. 03-CR-43-H
                                        )
7    QUINTON PHILLIP SHRECK,          )
                                        )
8              Defendant.          )

9

10

11

12           REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                HAD ON APRIL 15, 2004

14                EVIDENTIARY HEARING

15

16

17   BEFORE THE HONORABLE SVEN ERIK HOLMES, Chief Judge

18

19   APPEARANCES:

20   For the Plaintiff:      Mr. Chad A. Greer
                             Ms. Susan Morgan
21                           Assistant United States Attorney
                             3460 United States Courthouse
22                           Tulsa, Oklahoma 74103

23
     For the Defendant:      Mr. Allen B. Smallwood
24                           Attorney at Law
                             1310 South Denver
25                           Tulsa, Oklahoma

Glen R. Dorrough
UNITED STATES COURT REPORTER

2

1   (APPEARANCES CONTINUED)

2   For the Defendant:       Mr. William G. LaSorsa
                        Jones, Givens, Gotcher & Bogan, P.C.
3                         15 East 5th Street, Suite 3800
                        Tulsa, Oklahoma 74103
4

5                    -   -   -   -   -

6                    CONTENTS

7                                    Page No.

8   WITNESSES CALLED ON BEHALF OF DEFENDANT:

9   DONALD HOLLOWAY

10      Direct Examination by Mr. Smallwood................4

11      Cross-Examination by Mr. Greer....................21

12      Redirect Examination by Mr. Smallwood..............25

13  DEAN BOLAND

14      Direct Examination by Mr. Smallwood................32

15      Cross-Examination by Mr. Greer....................98

16      Redirect Examination by Mr. Smallwood.............115

17      Recross-Examination by Mr. Greer..................117

18  DONALD HOLLOWAY (Called by the Court)

19      Examination by the Court..........................121

20      Cross-Examination by Mr. Smallwood................129

21      Cross-Examination by Mr. Greer....................130

22      Recross-Examination by Mr. Smallwood..............132

23  ARGUMENT:

24      By Mr. Smallwood..................................145

25      By Mr. Greer......................................151

3

1                    PROCEEDINGS

2                    April 15, 2004

3          THE COURT:  Please be seated.  The Court calls the

4   case of United States vs. Quinton Shreck.  Could counsel please

5   identify themselves for the record.

6          MR. GREER:  Your Honor, Chad Greer and Susan Morgan on

7   behalf of the United States.

8          THE COURT:  All right.

9          MR. SMALLWOOD:  Allen Smallwood and William LaSorsa on

10  behalf of Mr. Shreck who is personally present as well, Your

11  Honor.

12          THE COURT:  All right, in your judgment, Mr. Greer, on

13  behalf of the United States, how best should we proceed here

14  today?

15          MR. GREER:  Your Honor, I think probably the best way

16  to proceed would be to allow the parties to argue as to the

17  vagueness or overbreadth the doctrine and if that leads to the

18  testimony of Mr. Boland and cross-examination of such

19  testimony, then I think that might be the best way to proceed.

20          THE COURT:  All right.  Should we proceed with the

21  evidence first and then based on that evidence we will go to

22  argument?

23          MR. GREER:  Your, Honor, that is fine with the

24  Government.

25          THE COURT:  All right.  Mr. Smallwood, does that make

4

1   sense to you, sir?

2        MR. SMALLWOOD:  That's what I anticipated, Your Honor.

3        THE COURT:  All right.  In that case you are

4   recognized, Mr. Smallwood.  You may proceed.

5        MR. SMALLWOOD:  Judge we would call Detective Donald

6   Holloway.

7        THE COURT:  All right.  Would the witness please come

8   forward and be sworn.

9                    DONALD HOLLOWAY

10  Called as a witness on behalf of the defendant, being first

11  duly sworn, testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. SMALLWOOD:

14   Q.  State your name and occupation for the record please?

15   A.  Donald Holloway.  I'm a police officer for the City of

16  Tulsa.

17   Q.  Pardon me, sir, I didn't hear you?

18   A.  Donald Holloway, I'm a police officer with City of Tulsa.

19   Q.  And how long have you been employed as a police officer

20  for the City of Tulsa?

21   A.  14 years.

22   Q.  What is your educational background?

23   A.  I attended the University of Oklahoma and also Central

24  State University in Edmond, and I've attended a lot of law

25  enforcement through the police academy here in Tulsa and

5

1   graduated that in 1989.

2   Q.  Since you've been a law enforcement officer, what areas of

3   law enforcement have you been involved with?

4   A.  I worked patrol divisions for the first five years.  After

5   that I went misdemeanor investigations working out of the

6   Uniform Division Southwest, I did it that for two years, then

7   went and worked fraud/forgery for six months and then went to

8   our sex crime crimes unit and worked in that unit as a

9   detective for five years and for the last three years I have

10   been assigned to cyber crimes unit.

11   Q.  Cyber crime unit?

12   A.  Yes.

13   Q.  That's basically crimes dealing with computers, the

14   internet and that sort of thing?

15   A.  Yes, sir.

16   Q.  Have you focused on any particular area of crimes

17   involving computer technology?

18   A.  My area that I work is crimes against people, which would

19   involve threats, harassing e-mails, child pornography and sex

20   crimes against children on the internet.

21   Q.  What about fraud on the internet?

22   A.  I do work some of that, but my main area of focus is what

23   we call victim crimes which are the crimes I said.

24   Q.  Do you have any degree in computer science?

25   A.  No, I do not.

6

1   Q.  What is the nature of your education or training in area

2   of computer technology?

3   A.  I attended the National White Collar Crime Commission's

4   basic data recovery and analysis course.

5   Q.  When was that?

6   A.  It would have been in 2000 and -- I believe in 2000.

7   Q.  In 2000?

8   A.  Yes.

9   Q.  And was that your first focused computer technology

10  educational course?

11  A.  Yes, it was.

12  Q.  Okay.  Continue please.

13  A.  I've also attended the Oklahoma Council on Law Enforcement

14  Education and Training basic computer investigations course and

15  that was in, I believe also 2000.  I've also attended numerous

16  seminars in the last three years dealing with computer crimes

17  and I've worked with the High Tech Crime Investigators

18  Association, the Oklahoma Chapter, and we have monthly meetings

19  with other computer crimes investigators around the state and

20  talk about computer forensics.

21  Q.  How many investigation have you been involved in that

22  dealt specifically with alleged child pornography?

23  A.  I'd say in the last eight years probably around a 150.

24  Q.  150?

25  A.  Yes.

7

1   Q.  Have you ever been, with your educational and training

2   background, have you ever taught any courses in computer

3   technology?

4   A.  No.

5   Q.  Have you ever taught any courses that in any way deal with

6   visual or digital imaging in reference to computer technology

7   or the internet?

8   A.  No.

9   Q.  Have you taken any courses that specifically deals with

10   digital or visual imaging, and the internet specifically with

11   reference or focusing on alleged child pornography?

12   A.  Yes, most of the classes that I attended dealt with that

13   type of topic as far as the digital images of child

14   pornography.

15   Q.  And how many hours, I know you can't tell be exactly, but

16   how many hours of instruction would you have had that dealt

17   specifically with the area of digital or digital imaging

18   focusing on child pornography?

19   A.  It's hard to estimate.  I'd say probably around two or

20   three hundred hours.

21   Q.  But you've never taught any courses in that regard?

22   A.  No, sir.

23   Q.  Were you one of the investigating officers in this case?

24   A.  Yes I was.

25   Q.  There is a companion state case in Rogers County, is there

8

1   not?

2   A.  Yes, there is.

3   Q.  Were you also involved in that investigation?

4   A.  Yes.

5   Q.  Will you tell the Court what you did regarding your

6   investigation as it pertains to this case?

7   A.  I was contacted by investigator Deborah Beatty with the

8   Rogers County Sheriff's Office.  She advised me that they had

9   seized several computers in relation to a case that they were

10   investigating.  And she requested that I conduct a forensic

11   examinations on the computers and other computer media that

12   they had recovered.

13   Q.  And when you reference conducting a forensic examination

14   on computers, have you had any training on how to do that?

15   A.  Yes, I have.

16   Q.  Why would you need to have training in how to conduct a

17   forensic investigation on computer information?

18   A.  It's an area that you have to have training and experience

19   in.  You have to go through the training to get the expertise

20   and know how the computer software that you use works, how to

21   properly take apart a computer to retrieve the hard drive and

22   then how to recover the information off of that, as well as

23   other media, like floppy disks or CD/ROMs.

24   Q.  Why is it important to know the appropriate technique to

25   obtain information from software, floppy disks or hard drives

9

1   off computers?

2    A.  So you don't damage or alter the media that you're working

3   on.

4    Q.  And so it's your testimony that a person ignorant of the

5   appropriate technique, in attempting to investigate a computer,

6   or hard drive, or floppy disk, or software, could damage that

7   or alter that inadvertently?

8    A.  Yes, you could.

9    Q.  And how much training have you had in how to conduct those

10   investigations regarding retrieving that type of information?

11    A.  It's the training that I listed earlier, the National

12   White Collar Crime Commission as well as the CLEETS class that

13   they offered and the ongoing job training.  I've attended a

14   software seminar for Encase.  I went through the training unit

15   on that, how to use that software.

16    Q.  And where did you conduct this forensic investigation of

17   the computers involved in this case?

18    A.  At our office here in Tulsa.

19    Q.  The Tulsa Police Department?

20    A.  The cyber crimes unit which is actually housed on TU, it's

21   not at the downtown police station.

22    Q.  You were not involved in the actual seizure of these

23   computers from Rogers County?

24    A.  No, I wasn't.

25    Q.  You were not involved in any investigation or examination

10

1  of those computers that might have occurred in Rogers County?

2   A.  Did I do any of the examination in Rogers County, is that

3  what you're asking me?

4   Q.  Yes.

5   A.  No, I didn't.

6   Q.  Do you know what was done there when those computers were

7  seized by some other law enforcement officer?

8   A.  They were seized, put in their property room and then

9  delivered to me.

10   Q.  Do you have any information that any type of forensic

11  investigation was conducted on the computers or any of their

12  attendant hard drive or software there in Rogers County by

13  someone other than you?

14   A.  No.

15   Q.  When you first saw these computers or this technology, was

16  there anything about it which would lead you to believe that

17  anybody else had conducted any kind of investigation of those

18  items?

19   A.  No, I didn't see anything like that.

20   Q.  What would you expect to see if that had occurred?

21   A.  The boxes would have possibly been open, the hard drives,

22  you can tell by the dust and the ways the screws are inside the

23  box, when the hard drives are moved you can usually tell if

24  that's been disturbed in any way.  That's what you look for.

25   Q.  If a person completely ignorant of the technology, such as

11

1  me, were told to go to this location and seize these computers,

2  what could I do inadvertently to damage the integrity of the

3  images or the information contained?

4  A.  Turn it on.

5  Q.  Turn it on?

6  A.  Yes.

7  Q.  Merely turning it on?

8  A.  Yes.  That could start altering dates.

9  Q.  And you don't know if it was turned on there or not do

10  you?

11  A.  I do not.

12  Q.  Was there anything about your investigation which would

13  lead you to believe that it had been turned on, as you describe

14  it, there at the scene by someone other than you?

15  A.  No.

16  Q.  Would there be any record made of that so that you could

17  have detected that?

18  A.  Yes, based on the images we recovered you would have seen,

19  possibly seen dates changed, dates and times changed, that the

20  dates were after the seizure, that the date that the file was

21  accessed would have been after the seizure and, that would have

22  let you know that something happened, and I did not see

23  anything like that.

24  Q.  Is there a general protocol to follow when you conduct

25  your forensic investigation that would apply to all computer

12

1   hardware or software?

2   A.  There's guidelines.  Given certain circumstances you may

3   have to go outside those guideline parameters, but pretty much

4   it's a straightforward guideline that you follow.

5   Q.  Was there anything about these particular computers that

6   you saw which would cause you to have any concern about

7   conducting an investigation outside those guidelines?

8   A.  No.

9   Q.  And would you briefly describe what those guidelines are

10  in the sense of telling us also how you conducted this

11  investigation?  What you did, tell us what you did?

12  A.  If we're dealing with a computer hard drive, first you

13  remove the hard drive from the computer.  We use what is called

14  Encase software to make an image of the hard drive, and that

15  image is just a carbon copy of the actual hard drive.  It's

16  sector-by-sector of the hard drive.

17  Q.  And have you had specific training on how to do that?

18  A.  Yes, I have.

19  Q.  And you follow the protocol that you have been taught when

20  doing that?

21  A.  Yes.

22  Q.  Okay.  What next did you do?

23  A.  After the image is completed we put the original evidence

24  back inside the original suspect computer and then we work off

25  the image that we made and that's where we do our examination

13

1  on.  That way we do not alter the original evidence in any way.

2  Q.  So at this point in the investigation, after you have

3  removed the hard drive and you said copied it?

4  A.  Yes.

5  Q.  Is copy a correct technical term?

6  A.  It's what, we call a mirror image but --

7  Q.  As opposed to copy?

8  A.  Yes, it's just general terms.  It's a copy, I mean it's an

9  exact sector-by-sector copy of that original hard drive.

10  Q.  Okay.  But the jargon is to refer to that as a mirror

11  image?

12  A.  Yes.

13  Q.  And you did so?

14  A.  Yes.

15  Q.  Returned the original hard drive to the computer?

16  A.  Yes.

17  Q.  At that point in time had you viewed any of the images on

18  the hard drive?

19  A.  No.

20  Q.  What did you do next?

21  A.  We take the image that we made, put that into our forensic

22  machine.  We use Encase to go through the hard drive and look

23  at the files.

24  Q.  Pardon me, you said Encase?

25  A.  Yes, E-N-C-A-S-E.

14

1   Q.  And that describes a particular technique or…

2   A.  That's a software program.  It's a forensic software

3   program.

4   Q.  And that description Encase is generally accepted

5   throughout the industry?

6   A.  Yes.

7   Q.  Okay.  So if I talking to a Philadelphia detective he

8   would know, with your expertise, he would know what Encase

9   software was?

10   A.  He should.  And there's other software that you can use,

11   but Encase is pretty well nationally recognized.

12   Q.  Okay.  What did you do next?

13   A.  You look at files and folders that are contained on that

14   hard drive.

15   Q.  And did you do that?

16   A.  Yes.

17   Q.  How long did that take?

18   A.  The number of computers and the floppy disks as well as

19   other media we had, it took approximately two or three weeks.

20   It takes a long time.

21   Q.  Two or three weeks?

22   A.  Yes.

23   Q.  And I know -- I'm not going to hold you to an exact

24   number, Detective Holloway, but can you tell us about how many

25   total images you saw on this hard drive?

15

1   A.  Are you talking all images all totaled?

2   Q.  Yes, sir.

3   A.  As far as image files of pictures, there's usually

4   anywhere from 50 to 75,000 pictures per hard drive depending on

5   the size of the hard drive and what's on it, but it's 500,000

6   or more probably on all of the media together.

7   Q.  And to the best of your memory, you at least glanced at

8   all of those?

9   A.  Yes.

10  Q.  And what percentage of that, using you figure, half a

11  million you say, 500,000, what percentage of that would have,

12  in your opinion, contained what you have described as possible

13  child pornography in your opinion?

14  A.  I don't have an exact number off the top of my head but I

15  would say probably around 500 to 750.  Just an estimate.

16  Q.  500 to 750?

17  A.  Yes.

18  Q.  I'm not real good at decimals but that's far less than one

19  percent of the total, isn't it?

20  A.  I would guess, yes.

21  Q.  Okay.  Through some of the discovery documents, Detective

22  Holloway, you refer uniformly to these images that you have

23  referenced these 500 to 750 images, as possibly child

24  pornography or appeared to be child pornography.  You qualified

25  that somewhat.  Why do you do that?

16

1   A.  Just based on my -- what I have seen.  If I don't know

2   that this photo is part of a series that's been identified I

3   will call it possible or apparent child pornography.

4   Q.  Why do you refer to it that way?

5   A.  Just you look at the image.  To me it looks like it's a

6   minor under 18.  To me that's apparent child pornography.

7   Q.  Of course you don't know exactly, based upon your training

8   and experience, you don't know exactly what you're looking at

9   at that point in time, do you?

10   A.  You know, I look at the images and then I usually give

11   that back to the investigator to conduct further examination or

12   investigation if needed.

13   Q.  You are familiar with what's known as virtual child

14   pornography?

15   A.  I've heard that term, yes.

16   Q.  What do you understand that to be?

17   A.  It would be a computer generated picture of a child

18   engaged in sexual activity.

19   Q.  Which might in fact not be an actual child engaged in

20   sexual activity at all, correct?

21   A.  That's possible, yes.

22   Q.  Have you not previously testified that simply by

23   eyeballing a digital image or looking at a digital image, you

24   can't say if what you're looking at is an actual child or a

25   computer generated child or an altered image of a real child,

17

1   can you?

2   A.  Not with a hundred per certainty, no.

3   Q.  How would -- do you know if anybody who can do that?

4   A.  You can take a picture and you can tell if it's been

5   altered based on the pixels in the picture.  That can be done.

6   There's experts that can do that.  I personally cannot.

7   Q.  I'm talking about this Detective Holloway.  I didn't mean

8   to interrupt you.  I go to my computer, I plug whatever

9   somebody has told me to plug into and an image comes up that

10  I'm looking at.  It appears to be a 10-year-old child engaging

11  in sexual activity with a 25-year old person.  By merely

12  looking at that, whether you're Detective Holloway, or me, or

13  my client, would any of us be able to know if that involved the

14  sexual exploitation of an actual child or was an altered image

15  involving an actual child or an entirely computer generated

16  image of an actual child?

17  A.  If it's a picture of what depicts a child engaged in

18  sexual activity, in my opinion that is child pornography.

19  Q.  Are you aware of holding in United States Supreme Court of

20  Ashcroft vs. The Free Speech Coalition?

21  A.  I said my opinion was that that is child pornography.

22  Q.  Okay.  But are you aware, Detective Holloway, that the

23  United States Supreme Court has determined that it is perfectly

24  legal for citizens to possess under the First Amendment virtual

25  child pornography if it does not involve the sexual

18

1    exploitation actual children, are you aware of that?

2    A.  I'm not aware of that exact statute, no.

3    Q.  You're not aware of that holding in that case?

4    A.  I don't know all the legal ramifications of that.  I'm

5    not -- that's not my area of expertise at all.

6    Q.  So your description of child pornography would be any

7    image which depicts what appears to be a minor child engaging

8    in explicit sexual conduct either with another child or with an

9    adult?

10   A.  Yes.

11        THE COURT:  Mr. Smallwood, let me ask.  The question

12   before Mr. Smallwood wanted to get your legal opinion was

13   simply when you look at it can you tell the difference?

14        THE WITNESS:  Between a real and a fake picture?

15        THE COURT:  Yes.

16        THE WITNESS:  It depends a lot on the picture.  I mean

17   you can't really tell with a hundred percent certain.  I mean,

18   you can look at the shadows and the pixel difference based on

19   the shadowing of the picture and the different colors.  You can

20   tell a lot of times by that, yeah, you can look at that and

21   know, but not with a hundred percent certainty, no, sir.

22        THE COURT:  So if somebody laid down several virtual

23   photographs in front of you, you wouldn't be able to know with

24   any certainty they were virtual versus than actual?

25        THE WITNESS:  No, I could not.

19

1       MR. SMALLWOOD:  I'm sorry, do you have any further

2   questions, Your Honor?

3       THE COURT:  Go ahead.

4       MR. SMALLWOOD:  I didn't mean to interrupt you, Judge.

5       THE COURT:  If you guys want to just carry on without

6   me.

7       MR. SMALLWOOD:  No comment.

8   Q.  (By Mr. Smallwood)  Following up on the Judge's questions,

9   are you aware of any technique, software, program, machine,

10  filter, anything that would aid any citizen in looking at an

11  image, a digital image on a computer screen to determine if

12  that image depicted and actual child being sexually exploited

13  in explicit sexual conduct or a virtual image?

14  A.  I'm not aware of one, no.

15      THE COURT:  Mr. Smallwood, isn't that what we're here

16  today to talk about?

17      MR. SMALLWOOD:  That's correct, Your Honor.

18      THE COURT:  And I'm not sure how much more he's going

19  to provide in that regard.

20      MR. SMALLWOOD:  Not very much, Judge.

21      THE COURT:  All right.

22      MR. SMALLWOOD:  If I might approach a witness with an

23  exhibit, Your Honor?

24      THE COURT:  Yes, go ahead.

25      MR. SMALLWOOD:  This is out of context, Your Honor.

20

1  This is Defendant's Exhibit No. 40.

2        THE WITNESS:  Thank you.

3  Q.  (By Mr. Smallwood)  Detective Holloway, these are

4  documents that we received, the defense received through the

5  discovery process.  Are you familiar with these documents?

6  A.  Yes, I am.

7  Q.  They are labeled, stapled together labeled Defendant's

8  Exhibit No. 40.  They are Bate stamp numbered Pages 194 there

9  through 201 at the bottom of the right-hand corner of each

10  page.  Beginning with Bates stamp number of that document 197,

11  the top of that under Child Identification Report contains what

12  I would describe as a disclaimer.  What's your opinion of what

13  that statement is?  It begins "the following does not

14  constitute a verification."

15  A.  Right.

16  Q.  What is that, what does that mean to convey?

17  A.  That means to me that just based on their report you can't

18  assume that that's a child victim, you need to contact the

19  actual investigator who contacted the child what's this

20  document is for, is to let us know who the actual investigator

21  is that can identify the series.

22  Q.  Okay.  And that disclaimer is contained on that document

23  even though there is a significant amount of personal

24  information.  We've got a series named Kathy; agency, National

25  Crime Intelligence Service; investigator, Michele Daniels with

21

1 a phone number and an e-mail number, but the Government still

2 cannot -- does not determine that that's actual verification

3 that that involved an actual child, right?

4 A. That is -- the way I used this was through, we sent

5 the pictures to Baltimore and they were looked at. They

6 identified them as being known series. They also responded

7 that this was -- the place in Baltimore was with the FBI.

8 Q. Okay. But the citizen looking at a computer screen

9 doesn't have any access to that data or information base, does

10 he?

11 A. No.

12 MR. SMALLWOOD: May I have just a second, Your Honor?

13 THE COURT: Go ahead.

14 MR. SMALLWOOD: I pass the witness, Your Honor.

15 THE COURT: All right.

16 MR. SMALLWOOD: We would offer Defendant's Exhibit 40,

17 Your Honor.

18 THE COURT: All right.

19 MR. GREER: No objection, Your Honor.

20 THE COURT: Without objection it will be admitted. Go

21 ahead, Mr. Greer, your witness, sir.

22 MR. GREER: Thank you.

23 CROSS-EXAMINATION

24 BY MR. GREER:

25 Q. Detective Holloway, very briefly. In regards to what

22

1   counsel had asked you in relation to an image, a virtual image

2   of child pornography do you recall that line of questioning?

3   A.  Yes.

4   Q.  And in that vein, have you had occasion to see for

5   yourself an actual image of a -- or excuse me, an image of a

6   virtual child?

7   A.  Not that I know of.  I've never seen one.

8   Q.  And are you aware of the current state of technology in

9   relation to creating a virtual child by computer?

10   A.  I'm somewhat aware, yes.

11   Q.  And from your knowledge what is the state of that

12   technology?

13   A.  It's pretty much in its infancy, it's still being learned.

14   It takes quite a bit of expertise and knowledge and specific

15   computer equipment to do that.

16   Q.  And are you aware -- well, I'll withdraw that.

17         MR. GREER:  If I could just have one moment, Your

18   Honor?

19         THE COURT:  Go ahead.

20   Q.  (By Mr. Greer)  So when you were responding to those

21   questions by counsel as to virtual child pornography or images

22   of virtual child pornography --

23         MR. SMALLWOOD:  Your Honor, I'm going to object to

24   this definition unless we can get a definition out of Ashcroft

25   of what virtual child pornography is.

23

1       THE COURT:  Well, first we're going to let him ask the

2   question and then we can talk about objecting to it.  Who

3   knows, you may agree with the question.

4       MR. SMALLWOOD:  I'm sorry, Judge, I thought he was

5   finished.  I apologize to counsel.

6       THE COURT:  Go ahead, Mr. Greer.

7   Q.  (By Mr. Greer)   In relation to an image of virtual child

8   pornography, that question asked to you by counsel, were you --

9   when you responded that you could not tell a difference if

10  images were laid out in front of you, were you referring to the

11  fact that you could not tell a computer generated child from an

12  actual child in a photograph?

13  A.  That's correct, yes.

14  Q.  And can you or have you ever -- let me ask you this, have

15  you ever been seen a virtual child?

16      THE COURT:  Now Mr. Smallwood, do you want me to

17  strike that response from the record and grant your objection,

18  sir?

19      MR. SMALLWOOD:  I withdraw my objection.

20      THE COURT:  Who knew, right.

21  Q.  (By Mr. Greer)  Let me ask you this.  Have you ever, in

22  your experience that you have testified to, seen an image of a

23  virtual child created by a computer?

24  A.  Not that I'm aware of, no.

25  Q.  And are you aware of why it is you have not seen such an

24

1  image in the experience that you have had?

2  A.  Like I said, I think this is still an evolving field and

3  the expertise and the time that it would take to create one

4  would limit a normal person from being able to do that.

5  Q.  And would that knowledge assist you if you were viewing

6  digital images in determining, in making, in forming an opinion

7  of whether or not that the image contained an actual child or

8  some virtually created child?

9  A.  Would you say that again?  I'm sorry.

10  Q.  Yes.  Would that opinion, that information you have

11  developed, would that assist you in determining whether in an

12  image there was a virtual child or a real child?

13  A.  No.

14  Q.  Have you been made aware of the state of technology in

15  regards to films through Hollywood and so forth in regards to

16  computer generated images?

17  A.  Yes.  Yes.

18  Q.  What have you been made aware of in regard to the state of

19  the technology in that area?

20  A.  With Hollywood and the money they have and the expertise

21  and the equipment they have, they haven't even got it down very

22  good yet.  You can tell by watching a video or a film that the

23  video is, you know, the video, the animated object is put onto

24  the video later, you can tell a difference in it.  It's just

25  not there yet.  I mean, it's good.  Hollywood can do it with

25

1   all of their money, but a normal layperson would probably not

2   be able to create a video like that?

3    Q.  And in regard to moving pictures or a movie, is there a

4   difference in evaluating that versus a single image in

5   determining whether you are viewing virtual child pornography

6   or actual child pornography?

7   A.  Yes.

8   Q.  What is that distinction?

9   A.  Based on the movement of the persons or objects in the

10  video, and also the shadowing, the skin color and the tint

11  would make a difference to me.  I think you could pretty easily

12  discern the difference.

13   Q.  From your experience is it equally as difficult, easier or

14  more difficult to create a virtual, virtual child pornography

15  in a movie setting versus an image?

16   A.  It would be easier to do an image, I believe.

17        MR. GREER:  Just one moment, Your Honor.

18        THE COURT:  All right.

19        MR. GREER:  I pass the witness, Your Honor.

20        MR. SMALLWOOD:  Just briefly.

21        THE COURT:  Mr. Smallwood, go ahead.

22                    REDIRECT EXAMINATION

23  BY MR. SMALLWOOD:

24   Q.  Detective Holloway, are any of the images charged in this

25  indictment moving images, video, moving images?

26

1   A.  No.

2   Q.  They are all static, are they not?

3   A.  Digital picture?

4   Q.  But they're static, they're not moving?

5   A.  Yes.

6   Q.  Are you familiar with Photoshop software?

7   A.  I've never used it but, yes, I'm aware of it.

8   Q.  What do you understand it to be?

9   A.  You can create pictures, alter pictures, inlay pictures on

10  top of pictures.

11  Q.  You're using the term "picture".  Are you using that in a

12  technical sense or lay general sense?

13  A.  Just a general sense.

14      MR. SMALLWOOD:  Okay.  That's all, Your Honor.

15      THE COURT:  Mr. Greer, anything further, sir?

16      MR. GREER:  No, Your Honor, thank you.

17      THE COURT:  Let me ask you this, sir:  Would you agree

18  that the day, as a technological matter that the day may well

19  come when it is simply not possible to distinguish between real

20  and virtual images?

21      THE WITNESS:  The way technology is that would not

22  surprise me.

23      THE COURT:  Do you have an opinion as to whether, with

24  respect to still photographs at least, whether that day is here

25  or you just don't have -- don't know?

27

1          THE WITNESS:  I can't say for certainty.  It's on its

2    way.  I think people are getting better at it.  But like I said

3    it goes back to the expertise of the person doing it.  A normal

4    layperson would have a difficult time doing that.

5          THE COURT:  Right.  But the question is whether -- I

6    mean, it's a big industry, right?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And certainly if somebody were able to

9    produce virtual images, thus avoiding any liability for

10   viewers, right?

11         THE WITNESS:  Yes.

12         THE COURT:  That would be an enormous market

13   incentive, right?

14         THE WITNESS:  Yes, it would.

15         THE COURT:  And presumably somebody with that kind of

16   market incentive could get their capital investment back

17   because the market is so huge, right?

18         THE WITNESS:  Yes.

19         THE COURT:  All right.  So I'm just trying to

20   determine whether from where you sit and what you've seen,

21   whether you believe generally -- and we're going to hear more

22   testimony on it -- but generally whether the day is here, or

23   whether you don't know the day is here, or you believe the day

24   is not here?

25         THE WITNESS:  I'm not -- I don't know if it is here or

28

1  not, sir.

2         THE COURT:  But you feel it coming?

3         THE WITNESS:  I feel it coming on, yes.

4         THE COURT:  All right.  Anything further, Mr.

5  Smallwood, of this witness?

6         MR. SMALLWOOD:  No, Your Honor.

7         THE COURT:  Mr. Greer, anything further, sir?

8         MR. GREER:  No, Your Honor.

9         THE COURT:  All right.  Thank you, sir, you may step

10  down.  I appreciate it.

11         THE WITNESS:  Thank you.

12         THE COURT:  All right.  You may call your next witness

13  sir.

14         MR. SMALLWOOD:  Your Honor, may I have a brief minute

15  to discuss with you and counsel an exhibit housekeeping matter?

16         THE COURT:  All right.  Go right ahead.

17         MR. SMALLWOOD:  If I may approach the bench -- not the

18  bench.

19         THE COURT:  Yes, go ahead.  Do you-all need to talk

20  about something first?

21         MR. SMALLWOOD:  No, we can do this in open court.

22         Your Honor, I intend offering through there Mr. Boland

23  what he have marked as Defendant's Exhibit 33.  I would ask to

24  be able to explain that to you a little bit as well to counsel.

25  This is a -- Exhibit 33 is a compilation of Exhibits 1 through

29

1    31.  Now, Exhibits 1 through 31 each will be presented to the

2    Court, and it's my understanding that Mr. Boland has burned two

3    CDs of all of these individual exhibits which we're going to

4    ask be made a part of the record for record purposes.  These

5    are images.  Exhibit No. 33 contains 1 through 31 images from

6    each of those individual exhibits, and I will be referencing

7    those for the Court and counsel's benefit.  I would also

8    reference to you on the back, Judge, of this exhibit, since Mr.

9    Boland was a little fearful of putting these in his computer

10   bag going through an airport check out -- and Mr. Boland will

11   testify that none of these images involve any sexual

12   exploitation of minor children.  However, I would like to

13   caution the Court and anybody who might be present in the court

14   that you're going to see some images which we certainly feel

15   like are dead bang ringers for actual pornography.  I wanted to

16   make that as a disclaimer, if you will, Judge.

17        And what we choose to do, we will offer Defendant's

18   No. Exhibit 33 but at the appropriate time we're also going to

19   offer the CD which will contain all of the images in Exhibits 1

20   through 31.  I don't know if the Court wants to view all of

21   those before admitting those into the record.  Mr. Boland will

22   testify that those, they contain all of the Exhibits 1 through

23   31 about which he's going to testify and which the Court will

24   see.  But I've never done this kind of record before and I

25   don't know exactly how the Court chooses to proceed.

30

1          THE COURT:  Well, I'm not in the habit of doing this

2     kind of record myself, but which is why I thought that the

3     authorities submitted by the United States were extremely

4     helpful in this regard this is United States vs. Marchand

5     because that went to what appeared to me to be a very similar

6     circumstance and desire on the part of the court there to try

7     to develop the appropriate record and in so doing the Court

8     took some issue with the fact that some of the images produced

9     there were clothed and, therefore, didn't have the same

10    probative value if it had been if they were not.  I guess what

11    I'm basically saying is that there's -- like taking fishhook

12    out of your hand, there's no way to pull it back out, you've

13    got to push it all the way through, so I think all we can do is

14    hook it up and go.

15          From the standpoint of the United States, does that

16    make sense to you Mr. Greer?  And Ms. Morgan, provided this

17    case as well, as far as -- I mean, I think that the only choice

18    for purposes of the record is to simply put on the whole stuff

19    and go from there.  Right?

20          MR. GREER:  Agreed, Your Honor.

21          THE COURT:  All right.  Go ahead, sir.

22          MR. SMALLWOOD:  Call Mr. Dean Boland to the witness

23    stand, Your Honor.

24          THE COURT:  All right.  Would the witness please come

25    forward and be sworn.

31

1                    DEAN BOLAND

2  Called as a witness on behalf of the defendant, being first

3  duly sworn, testified as follows:

4       MR. SMALLWOOD:  Your Honor, may I address the Court

5  briefly?

6       THE COURT:  Yes, go ahead.

7       MR. SMALLWOOD:  Before I begin Mr. Boland's testimony

8  I hope we have the screen back here which I asked your crew to

9  set up for me.  I may -- I'm not going to try to turn my back

10  to the Court, but I may need to be referencing that screen

11  while I examine.

12       THE COURT:  All right.  That will be fine.  And I

13  actually have a screen here which I anticipate will be the --

14       MR. SMALLWOOD:  But this is going to be the only

15  screen I'm going to have, Judge, I think, from to view from the

16  podium.

17       THE COURT:  All right.  Go ahead, sir.  Now, would you

18  be better off if the podium were at the end of the jury box?

19  We could do that certainly.

20       MR. SMALLWOOD:  Judge, I might be better off if the

21  podium could be over here at the end of the Government's table,

22  if that would be possible?

23       (Off-the-record discussion in reference to relocating

24  the lectern.)

25       THE COURT:  All right.  Does the microphone work from

32

1   there?

2          THE BAILIFF:  Yes, sir.

3          THE COURT:  Is that better for you, Mr. Smallwood?

4          MR. SMALLWOOD:  That's fine, Judge.  That will work

5   fine.

6          THE COURT:  All right.

7                    DIRECT EXAMINATION

8   BY MR. SMALLWOOD:

9   Q.  State your name and occupation, please, sir?

10   A.  My name is Dean Boland.  I'm a licensed attorney in the

11   state of Ohio and I also run a consulting firm that specializes

12   in consulting to lawyers and law firms about technology issues.

13   Q.  I have handed you what's been marked as Defendant's

14   Exhibit No. 34.  I have provided the Court a copy as well as

15   counsel, it's a four page document that purports to be your CV.

16   You're familiar with that, are you not?

17   A.  Yes.

18   Q.  You created that document?

19   A.  I did.

20   Q.  Is it accurate through the current date?

21   A.  It is.

22   Q.  In addition to what is contained on Defendant's Exhibit

23   No. 34, have you been qualified as an expert witness in the

24   area of digital imaging in any courts?

25   A.  Yes, I have.

33

1   Q.  And in what courts and when?

2   A.  Twice as a coincidence in the month of March -- and

3   actually three times in the month of March in three criminal

4   cases in the State of Ohio.  I was qualified as an expert

5   witness in digital imaging and computers generally.  All three

6   of those cases dealt with similar issues as this case, that is

7   the allegation that an individual possessed digital images of

8   what the government felt were child pornography.

9   Q.  And those are three separate case?

10   A.  Yes, three separate criminal cases one Portage County,

11   Ohio, one in Summit County, Ohio, and one in Columbiana County,

12   Ohio.

13   Q.  And those determinations were made by three separate

14   courts?

15   A.  Yes, that's correct.

16       MR. SMALLWOOD:  Your Honor, I believe the Government

17   and I have a stipulation to the admissibility of Defendant's

18   Exhibit No. 34, obviously giving the Government the right to

19   cross-examine that document in lieu of going through everything

20   on it.  Do I state that correctly?

21       MR. GREER:  Yes.

22       THE COURT:  All right, go ahead.

23   Q.  (By Mr. Smallwood)  Do you have a degree in computer

24   science?

25   A.  No, I do not.

34

1    Q.  Do you teach any areas of computer science?

2    A.  Yes.

3    Q.  And what do you teach and where do you teach that?

4    A.  For about three years now I've been an adjunct professor

5    of technology at Cleveland State University Law School in

6    Cleveland, Ohio.  And prior to that I spent, I'm trying to

7    recall, two or three years teaching at Case Western Reserve

8    University School of Law, which is my alma mater from where I

9    graduated in 1995.  And in both locations I taught the

10   identical two courses which were designed by me at the request

11   of the staff or the dean of the Case Western Reserve University

12   Law School.  The first semester of each year I teach a course

13   called you "Computers and the Law" which deals with each week a

14   different type of computer crime, how it's prosecuted, the

15   federal and state statutes that are involved, as well as

16   federal and state cases and unresolved issues with that area of

17   crime.  In the second semester of every year, which is the

18   semester I'm in now, I teach course entitled "Electronic

19   Evidence" which deals with a host of issues, some of which you

20   touched upon this morning with Detective Holloway.  Forensic

21   analysis of computers, properly seizing and searching

22   computers, digital images that are found on a computer and how

23   they're handled.  And each semester since the fall of 2001,

24   I've had a class session each one of those semesters,

25   specifically on the Free Speech Coalition case along with the

35

1   issues attendant to that case.

2   Q.  Do you work with a consulting company?

3   A.  Yes, I have my own consulting company, as I had mentioned

4   earlier, that provides consulting on a range of issues beyond

5   just the digital imaging.  I have forensic analyst experts who

6   work for me in a subcontracting relationship.  Law firms hire

7   me to try and guide them through the process of how they obtain

8   electronic evidence off of the computers and I go out and find

9   the experts they need if I'm not the person they're interested

10  in, because it's not necessarily a digital image issue, and

11  then I assist them with both legal and technological issues

12  through that process.

13   Q.  What is your personal experience with digital imaging

14  technology?

15  A.  I've been involved in photography as a hobby for 15 or 20

16  years now.  My father and I started many years ago when he was

17  still alive in just regular film photography.  I had stint of

18  actually developing my own photographic images in a darkroom

19  that I tried to design in my home, and for the past five years

20  or so I have been doing both photography and digital imaging

21  professionally as a part-time hobbyist but also presenting or

22  combining digital images for presentations at weddings,

23  graduation parties, for organizations as well as capturing,

24  modifying and editing digital images for use in materials that

25  were of benefit to clients of mine who were candidates for

36

1    judicial offices as well as other political offices in the

2    Cleveland area, and I continue to do that to this day, along

3    with owning a digital camera for several years and compiling

4    just family digital images as well and editing those as need be

5    for whatever sort of personal purposes.

6    Q.  Are photographic images and digital images the same thing?

7    A.  They are not.

8    Q.  Distinguish for the Court or state to the Court, give your

9    opinion to the Court what the basics of film photography are?

10    A.  Okay.  A film -- photograph as I define it can only be

11    created in one way, and that is a material is placed in the

12    back of a camera, most often today it's plastic, which is the

13    film, covered with a chemical that's reacting to light -- most

14    often used is silver halide -- and when the shutter of that

15    camera opens, light hits that plastic material, the silver

16    halide reacts and creates a negative image on the film which

17    all of us are familiar with.  That negative is then put into an

18    enlarger and light is passed through the negative, an image is

19    then projected on to photo-sensitive paper which is what a lot

20    of us are familiar with, Kodak paper, what they try to

21    advertise that you use, and then a print of that negative is

22    created and then for whatever purpose that's used.

23        That basic steps I just brought you through is the

24    only way to create photographs.  There's not any method.

25    There's different chemicals that can be used, there's different

37

1   exposure times, types of cameras, certainly, but the basic

2   process of that development and the chemicals that are used

3   there is the only way you can create print from photography.

4    Q.  Would it be an accurate statement then in the sense of

5   photographic images to describe the negative as the original?

6    A.  Yes.

7    Q.  And the prints would be the copies?

8    A.  Yes.

9    Q.  Are you familiar with technology involving the alteration

10   of photographic negatives?

11   A.  Yes, I am.  That's --

12   Q.  Is that easy to do?

13   A.  It is not.

14   Q.  Describe what it's difficult.

15   A.  The way that photographic negatives, after they have been

16   captured in a camera, to be altered, there has to be some

17   chemical in one type of alteration or paint or oils that are

18   applied right to the surface of the negative itself.  A common

19   example you will see in publications is a black and white shot

20   of a child running down the street on an Easter day, for

21   example, and then person will go in afterwards, and using

22   special oils that adhere to a negative they might paint a color

23   for the child's hat and purse that they are carrying and their

24   shoes, and they will make an interesting composition of what

25   appears to be black and white image, but yet have some color

38

1   components.  That, when it's photography, is done by actually

2   painting on the negative.

3    Q.  Manually, by hand?

4    A.  Exactly.  Therefore, if someone were suspicious about a

5   print having come from an altered negative, all they need to do

6   is, either with their eye or under a microscope examine that

7   negative and they would see that type of evidence of an

8   alteration having been made.

9    Q.  So anybody with any degree of expertise in that area would

10   have little difficulty in determining an altered photographic

11   negative?

12    A.  Yes.  And I think even just the average person, if you

13   just throw it under a microscope, would see things that

14   wouldn't look right to their eye.  And to do such an alteration

15   in a way that's undetectable to the next viewer is exceedingly

16   difficult and would take someone with a lot of photographic

17   experience and a lot of equipment to do that.

18    Q.  What is a digital image and how does it differ from a

19   photograph?

20    A.  Digital images are created in one of three ways.  As

21   opposed to photograph which has one method way to be created,

22   digital images have three.  One is a digital camera that can

23   capture an image just like a film camera but captures it in a

24   digital format.  The second way would be a scanner upon which

25   you can put an object or a print photograph and then scan it

39

1  in.  It's now a digital image.

2   Q.  Let me ask you there.  Once what everybody acknowledges is

3  a print from a photographic negative -- and is "digitize" the

4  correct word?

5   A.  Yes, that's accurate.

6   Q.  Does that former photograph, once it is digitized, lose

7  it's characteristics as the photograph and then become a

8  digital image?

9   A.  Yes.  It's two different things.  I tell my students and

10  in the CLE programs that I teach to lawyers and others, there's

11  no such thing as photograph on the internet.  There can't be

12  one.  The only things people see on the internet are digital

13  images.

14   Q.  They may have started life as a photograph?

15   A.  May have, but they're not -- you can't see a photograph on

16  the internet because your monitor is only capable of displaying

17  electronic files and are in pixels that show up there.  It

18  can't display a paper photograph that you can touch and hold

19  and walk around the room with.

20   Q.  Does the term "original" basically have any meaning when

21  we are talking about digital images?

22   A.  It doesn't.  The reason it doesn't is because of the

23  ability, when a digital image is captured one in one of those

24  three years -- oh, let me, I left one of the ways out following

25  your last question.  The third way a digital image can be

40

1   created is a blank screen upon which someone uses software to

2   attempt to digitally paint whatever it is in their imagination

3   they want to paint on a screen.  That's a third way that a

4   digital image can be created.

5          Now as to your question here, the fact that there is

6   no real original is because a digital image can be copies

7   infinitely without any degradation in the quality.  If I

8   captured a digital image of this courtroom, I could copy it for

9   as many people that are in this room, hand them a all CD or

10  whatever copy that I gave it to them in, and if they looked at

11  that image, every pixel would be identical.  A forensic

12  analysis of that image would reveal that nothing has been

13  altered between the various copies because a computer can copy

14  this information endlessly without degradation whereas even in

15  print photography a negative can't make an exact print every

16  time.  There's dust in the air, the paper is not uniformly

17  created, there's chemicals can react slightly differently or

18  they can run low on their consistency, et cetera.  I mean, it

19  might take a microscope to detect those variances but a

20  negative can never make 15 absolutely identical prints, whereas

21  digital imaging you could make as many identical prints as you

22  want.  Identical -- I'm sorry, copies of that electronic image.

23  Q.  Can digital images be altered?

24  A.  Yes, easily.

25  Q.  In what ways?

41

1   A.  There's an infinite number of ways they can be altered.

2   It's limited by the imagination of the person the type of

3   software they either purchased or was given to them freely when

4   they bought their computer or their monitor or whatever product

5   they purchased.  If they want to spend a little bit of time

6   they can make some alternations rather quickly, many of which

7   are undetectable.  If they want to spend more time and are

8   graphic artists or people who do images for covers of

9   magazines, those folks who spend 4 and 6 and 8 hours a day

10   doing this they can make, as I said, an infinite number of

11   alterations to that image.

12   Q.  Is it proper to use the terms "fake" or "real" when we're

13   talking about digital imaging?

14   A.  No, it isn't.

15   Q.  Why?

16   A.  Well, because an image, a digital image can be altered.

17   That doesn't necessarily make it fake.  And here would be the

18   example.  I capture a digital image of this courtroom, and then

19   using tools in the software that I have here today, Photoshop,

20   there's a blurring tool that's in amongst the hundreds of tools

21   available there.  I blur slightly some object in that digital

22   image.  We now have an altered a image but it's not fake.

23   Everyone who was captured in the original image is still there,

24   that's who they are et cetera.

25        Another sort of more sort of dramatic example would be

42

1    to take a portrait of someone from maybe the chest up, let's

2    say, standing with their suit and tie on and then just select

3    the head as it appears in the digital image and alter the

4    proportions of their head make it look sort of like a

5    panovision, make it look narrower wider.  To someone who knows

6    that individual they're still recognizable, but you can

7    obviously tell, your eye would tell something's been changed.

8    That's not a fake image in the sense that it's not that person

9    but it's clearly an altered image.

10    Q.  How would you analyze a digital image to attempt to

11    determine if any alterations had been made to the image as it

12    began life?

13    A.  The overwhelming majority of those analyses would be

14    visual, something that someone with a lot of photographic

15    experience could also do.  You would look at do shadows not

16    seem to fit, are there objects in the scene that appear like

17    they were placed there, is light hitting from multiple

18    directions when in most photographs, especially naturally

19    composed photographs.  Light comes a single source, it doesn't

20    come from 15 different directions.  You would look to see if

21    there is objects that are discolored, one shoe is a different

22    color than another things -- and then again, you would just

23    sort of the do the it doesn't look right analysis as well and

24    say I can't say why, but this person's eyes don't look the

25    same, or their hair looks like they've got a wig on, et cetera.

43

1   But you should go through brightness values contrasts.  If one

2   part of scene is in focus and something right next to it is out

3   of focus, cameras don't work that way.  The focus generally

4   starts in one locations and gets -- lessens as it goes away

5   from the center of the lens.  So you would have to go through,

6   basically, a bunch of visual analyses, but in the end all you

7   would be able to say is I've found what I think are evidence of

8   alterations.  You clearly wouldn't be able to say this is a

9   fake image.  These people weren't really in that image, the

10  bushes weren't there like they're depicted, the sun wasn't

11  there like it's depicted, you really can't say that.  All you

12  can say is it appears to have been altered.

13       MR. SMALLWOOD:  Calling the Court and counsel's

14  attention to Defendant's Exhibit No. 33.  We initially

15  mismarked it, Your Honor, as 34, but I think your copy should

16  be marked correctly as 33.

17  Q.  (By Mr. Smallwood)  What is this exhibit?

18  A.  That is what's called a contact sheet that was produced to

19  sort of be a reference guide for the exhibits that we're using

20  here today.  I produced that contact sheet, and as you pointed

21  out, I put the information on the back just as a hopeful

22  protection for myself in the event that I was traveling

23  somewhere, and especially in the airport the other day and

24  someone -- I was randomly picked to search my bag and if they

25  pulled that out it would have been likely that I would not have

44

1   been able to attend today had that happened.

2   Q.  And what software did you use to create this document?

3   A.  This was created in Photoshop CS, which was the eighth

4   version of Photoshop software, the first version by that name

5   coming out in 1990.  And it's the industry leading software

6   package for photo and image editing along with web site design.

7        MR. SMALLWOOD:  May I approach your clerk, Your Honor?

8        THE COURT:  Yes, go ahead.

9        MR. SMALLWOOD:  May I approach the witness, Your

10  Honor?

11        THE COURT:  Yes, go ahead.

12  Q.  (By Mr. Smallwood)   Mr. Boland, I want to hand you what

13  has been marked for purposes of identification as Defendant's

14  Exhibit 37.  We're in the process of preparing copies for the

15  Government.  The original of that publication is with the

16  Court.  Would you describe what Exhibit 37 is?

17  A.  Yes.  I belong to an organization called the National

18  Association of Photoshop Professionals.  It's an organization

19  that people pay an annual fee to join so that they can share

20  techniques, new ideas, tips and tricks that are available for

21  use with the Photoshop software.  And this magazine you see

22  here is a publication that I receive, I think, eight times a

23  year, which is full of all kinds of information about not only

24  Photoshop, the software itself, but add-on products which

25  extend the usefulness of Photoshop as well as tutorials that

45

1   explain the infinite number of things you can do when designing

2   digital images with this product.

3    Q.  Is this publication owned by Photoshop?

4    A.  No.

5    Q.  It has -- the title of the publication is the same as the

6   title of the software?

7    A.  It is.  The publication is dedicated solely to that

8   software package and with good reason as I mentioned, because

9   it is of the number one image editing software worldwide, so

10   there are hundreds of thousands, if not millions, of users of

11   various versions of this software currently.

12    Q.  And you indicated the version that you're going to be

13   describing here today with these images was what you believed

14   to be version number 8?

15    A.  Yes, it's version number 8.

16    Q.  When did you purchase this particular version of this

17   software?

18    A.  My recollection is about six months or ago or so that this

19   version came out and I had version 7 before that.

20    Q.  What did you pay for version 8?

21    A.  It was $650.  I got a little discount for being in this

22   organization.

23    Q.  And do you know or can you tell Court in the area where

24   you live and work, Cleveland, Ohio, how many people have and

25   use this particular version of Photoshop software?

46

1   A.  I wouldn't know the stats of how many they've sold, but I

2   have 20 or 30 both friends, colleagues and actual clients who

3   this is their main software program they use to actually make a

4   living.  If they didn't have this software program they

5   wouldn't be able to do what they're doing.  They are graphic

6   artists, multimedia designers.  I myself am doing it to design

7   both print and on-line imaging as well, so I really couldn't

8   calculate the number.  All I can tell you that it is so

9   ubiquitous that it's actually becoming a verb in newspaper

10  articles where they call image editing "photoshoping" an image.

11  Q.  Go through Exhibits 37-A through H and describe what those

12  are?

13  A.  37-A is a letter from the editor of this particular

14  publication that highlights in the first sentence that over

15  2000 individuals attended a recent seminar on just this

16  software product and another seminar similar to that is going

17  to be held in September of this year.

18          MR. SMALLWOOD:  Your Honor, you have the original

19  document.  That's Page 10 --

20          THE WITNESS:  Oh, my apologies.

21          MR. SMALLWOOD:  -- of your publication.  I'm sorry.

22          THE COURT:  All right, I've got it.  Go ahead.

23  Q.  (By Mr. Smallwood)   Exhibit 37-B, do we have a page

24  number on that Mr. Boland for the Court?

25  A.  I'm looking at Page 18 and this is just a sampling of the

47

1   various Photoshop seminars that are constantly circling the

2   United States providing intensive workshop atmospheres for

3   people who use Photoshop to extend their skills.

4   Q.  And that was 37-B?

5       THE COURT:  That's C.

6   A.  Mine's not marked but...

7       THE COURT:  If you are looking at Page 13, it's 37-B.

8       MR. SMALLWOOD:  Yes, that's correct, Your Honor.

9   Q.  (By Mr. Smallwood)   What about 37-C?

10   A.  I was just referring to Page 18 which, I guess, is 37-C.

11   Q.  What about the preceding page which should be entitled

12   Exhibit 37-B?

13   A.  I don't have that one with me at the moment.

14       THE COURT:  Well, that's not the preceding page

15   immediately.  That's Page 13.  He was on Page 18 which is 37-C?

16       MR. SMALLWOOD:  I'm sorry, Judge, I'm referencing my

17   preceding exhibit numbers.  May I approach the witness?

18       THE COURT:  Yes.  Do you need this one here to --

19       MR. SMALLWOOD:  Judge, I would prefer that you keep

20   that if you would.

21   Q.  (By Mr. Smallwood)  If you would describe that to the

22   Court so the Court can view the original publication page?

23   A.  I'm looking at 37-B right now, and this is one of the very

24   common ads that's in this magazine, and they change with each

25   edition.  And this particular package is what's known as a

48

1   plug-in.  And plug-ins are individuals who noted --

2        MR. SMALLWOOD:  That's Page 13, Your Honor, I'm sorry,

3   of your publication.

4        THE COURT:  Right.

5   Q.  (By Mr. Smallwood)  Go ahead, please.

6    A.  This is individuals who've noted that there's some feature

7   of Photoshop that if it was just extended a little bit would

8   provide even more functionality for its users.  And this one

9   you see here is plug-in which allows you to create, as it says,

10  photo realistic digital lighting and shading effects, with the

11  idea being here that the software is designed so that when the

12  user views the finished image, it doesn't appear as if sunlight

13  was injected or shadows were moved, it appears that nothing was

14  changed.  It just has a very pleasing-to-the-eye composition of

15  light and shadows.  And that software helps automate that

16  process for people who are making digital images and want to

17  fix an image that didn't have the right light and shadows when

18  it was captured.

19   Q.  To make it undetectable as having been altered?

20   A.  Yes, that's the point of that software, is to make shadow

21  and light alterations that aren't detectable, otherwise it's

22  not very helpful to print that in magazines or on web sites

23  when the image looks put together by an amateur with obvious

24  light sources that don't belong there.

25   Q.  I call the witness' attention to Exhibit 37-D.

49

1       MR. SMALLWOOD:  Your Honor, that's Page 20 of your

2   publication.

3   Q.  (By Mr. Smallwood)  What does that depict?

4   A.  37-D is the first page of a tutorial which is a common

5   feature of this magazine, and this tutorial continues on to

6   pages -- well, starting at Page 20 and going forward.  And one

7   of the examples it provides you here is that you can take a

8   digital image and when you're finished make it appear to be a

9   print photograph that was scanned in and is actually slightly

10  bent and had been scanned in a scanner as opposed to originally

11  starting as a in digital image.  It allows you to create that

12  false sense in the viewer's eye that what they are looking at

13  is something different than what it really started as.

14  Q.  It's really a digital image which attempts to create the

15  illusion that it's a an image of a photograph?

16  A.  Exactly.

17  Q.  Calling your attention, sir, to Exhibit 37-E.

18      MR. SMALLWOOD:  Your Honor, that's pages 30 and 31 of

19  your publication.

20  Q.  (By Mr. Smallwood)  What is that?

21  A.  37-E is an example.  It's a second edition of a three-part

22  series by an individual who is well known in this Photoshop

23  community, Bert Monroy, for his ability to create photo

24  realistic backgrounds.  And what you're looking at in the black

25  and white is more easily seen in the copy that the Judge has.

50

1   It's what appears to be an outside photograph of this Oakland

2   theatre, or whatever they're purporting it to be, with various

3   neon lights and bulbs sticking up.  And the reality is

4   everything you're looking at on that page was completely

5   created in Photoshop software and the pages following this

6   Exhibit 37-E details some of the tips and hints of how to

7   create photo realistic objects that are contained in that

8   image.

9   Q.  Calling our attention to 37-F --

10      MR. SMALLWOOD:  Your Honor, that's Page 46 of your

11  publication.

12  Q.  (By Mr. Smallwood)  What does that reflect?

13   A.  This is the beginning of a tutorial, which as it says,

14  helps you compensate for flash and backlighting errors in an

15  image that you have captured where you have too much shadow in

16  the foreground and a light source from the background and it

17  washes out the person or the objects in the foreground, their

18  faces, et cetera.  And it explains to you how to use Photoshop

19  to correct that problem in the digital image in such a way that

20  it would be undetectable to the next user.  And I would like to

21  point out that the author of this, Deke McClelland, is probably

22  the most well-known author of Photoshop manuals.  He is a

23  author of a book called the Photoshop bible which every edition

24  of Photoshop that comes out he writes a knew version of that

25  manual, and it's a thousand pages long and only begins to tell

51

1  you all of the different tools in Photoshop and how they can be

2  used.

3  Q.  I direct your attention to 37-G.

4     MR. SMALLWOOD:  Your Honor, that's Page 52 of your

5  publication.

6  Q.  (By Mr. Smallwood)  What is that?

7  A.  Page 52, 37-G is a help to those who have purchased the

8  newest version of Photoshop, and because it's so knew, trying

9  to give them some ideas of some of the automated tools that are

10  built into this version that weren't in the previous version,

11  and the ones they are talking about in this tutorial is a

12  shadow highlight command which allows you to take an image,

13  again, with the strong backlighting that has put the faces in

14  shadow, and make a few quick alteration and the faces now come

15  out of shadow in a way that, again, it's undetectable to the

16  viewer who views the resulting image.

17  Q.  Calling your attention, Mr. Boland to 37-H.

18     MR. SMALLWOOD:  Your Honor, Page 60 of your

19  publication.

20  Q.  (By Mr. Smallwood)  What does that reflect?

21  A.  This is a tutorial about vacation photos.  And as you can

22  see, the first digital image there shows the child on top of

23  the adult's shoulders or on their back with their faces in

24  shadow because of the strong backlighting, and through a few

25  alterations in Photoshop you can bring out the light on their

52

1  faces and compose a more pleasing vacation photo than the one

2  you had that you started with.

3          MR. SMALLWOOD:  Your Honor, we would offer Defendant's

4  37-A through 37-H. Obviously the Government has the right to

5  cross-examine.

6          MR. GREER:  No objection, Your Honor.

7          THE COURT:  All right.  Now, has the United States had

8  an opportunity to see it in this version, sir?

9          MR. SMALLWOOD:  No, sir, they have not.

10          THE COURT:  All right, let me hand that down to the

11  United States to take a look at that --

12          MR. GREER:  Thank you, Your Honor.

13          THE COURT:  -- for purposes -- you can take it back to

14  your table and we will proceed.

15          MR. GREER:  Thank you.

16          THE COURT:  All right, go ahead, Mr. Smallwood.

17          MR. SMALLWOOD:  May I approach the witness?

18          THE COURT:  Yes, go ahead.

19  Q.  (By Mr. Smallwood)  I hand you what's been marked for

20  purposes of identification as Defendant's Exhibit 35.  The

21  Court has the original complete publication.  What is

22  Defendant's Exhibit 35?

23  A.  That is the complete publication of the Star tabloid

24  publication that's common in grocery stores, et cetera.  And I

25  purchased this at the airport in -- I don't know if it was-- I

53

1   think it was in Cleveland before I left to come here yesterday

2   and the reason I did was I had initially purchased the Wall

3   Street Journal to just read and pass the time and there was an

4   article in yesterday's Wall Street Journal in which the Star

5   magazine admitted that this cover photo that's on this magazine

6   has been digitally altered.  Demi Moore, the actress who

7   appears to be wearing a white dress is actually wearing a dress

8   that's colored chocolate brown, and the individual next to her,

9   her boyfriend, Ashton Kutcher, is on the cover apparently

10   wearing a white suit outfit, and that outfit is actually

11   colored pink.  And they admitted altering, digitally altering

12   these images in a way that obviously viewers can't tell, to

13   make the white theme go with their story that these two are

14   going to be getting married.

15          MR. SMALLWOOD:  May I approach, Your Honor?

16          THE COURT:  Yes, go ahead.

17   Q.  (By Mr. Smallwood)  I'm going to hand you what's been

18   marked for purposes of identification as Defendant's Exhibit

19   No. 36.  Is that a copy of the Wall Street Journal article you

20   mentioned?

21   A.  Yes, it is.  And the reason that I brought this with me is

22   because I didn't realize -- after looking through the news

23   stand I saw the cover of this magazine, amongst others, sitting

24   there, and until I read the Wall Street Journal, I was not able

25   to tell and still can't tell that these images on the cover of

54

1   this magazine were edited to severely from dark brown to white.

2   It wasn't apparent to me and that's why when I read this Wall

3   Street Journal I brought it along with that tabloid to just

4   demonstrate that even a person who looks at digital images all

5   day long and does it for a regular, as part of my living, I was

6   fooled very easily.

7        MR. SMALLWOOD:  Your Honor, we would offer Defendant's

8   Exhibits 35 and 36.

9        THE COURT:  All right.  Without objection they will be

10  admitted.

11   Q.  (By Mr. Smallwood)  Referencing again, Mr. Boland

12  Defendant's Exhibit No. 33.  Will you queue up your technology

13  there and go through in as rapid a fashion as you can, without

14  truncating your testimony, Defendant's Exhibits No. 1 through

15  31 and describe what those are and how they have been treated

16  by you?

17   A.  Defendant's Exhibit 1, which I'm bringing up on the screen

18  now, is what appears to be two individuals, two females on the

19  edge of what appears some body of water and the individuals'

20  faces on this digital image that I created are actually the

21  faces of two minors who are famous actresses, Mary-Kate and

22  Ashley Olsen, the Olsen twins.  I took their faces off another

23  image and merely superimposed them over a starting image.  And

24  I'll back this off so you can see the starting image that I

25  started with.  As you'll note your eye, although it might think

55

1   there's a body of water in front of them, the divider in the

2   middle of that image was inserted by me as well as the

3   reflection at the bottom of that screen.  It's merely a copy of

4   the lower portion of the existing image and then applying some

5   filters to that copy to make it appear as if it's under water.

6   In --

7    Q.  Before you continue.  All of these images that you're

8   going to testify in 1 through 31 were created by you with this

9   Photoshop software?

10   A.  That's correct.

11   Q.  Okay.  Continue please.

12   A.  Or they were -- to qualify that, or they were images I

13   started with and then modified in Photoshop.

14   Q.  With this software?

15   A.  Yeah, I didn't create any of the images, so to speak.  The

16   starting images were just ones that I started with downloading

17   from the internet, et cetera.

18   Q.  Okay.

19   A.  So the reflection was created by me.  And as you'll notice

20   as I click on this last layer, the female depicted at the top-

21   most portion of the image, you'll see her face change.

22   Q.  Is this the original image you started with?

23   A.  The starting image, we're not there yet, no.

24   Q.  Okay.

25   A.  So that face of one of the Olsen twins, who's a minor, was

56

1   superimposed over these obviously naked female bodies that are

2   here.  And then if I click the second layer below that you will

3   see the face on the lower female change as well.

4         I want to note here that the two faces of the Olsen

5   twins that are used to cover these two images is actually the

6   same face of only one girls I copied in two different

7   locations.  And why I did that is to show you that based on the

8   hair and other way their bodies are positioned, your eye

9   doesn't tell you that this is an identical face in two

10  different spots.  They look different to your eye, when in

11  reality its the same face copied twice.

12        Finally, we're at the black and white version of the

13  starting image with the actual -- the image I started with,

14  with the faces as you see them.  And then, finally, what you're

15  seeing now is a color version which is the image I started

16  with.  You see a red sort of padded material that these two

17  individuals are posed on, et cetera.  I started with that and I

18  ended up with the Olsen twins posing naked above what appears

19  to be some body of water.

20  Q.  The original image you have started with, where did you

21  obtain that?

22  A.  I just downloaded that off the internet doing a search

23  with a search engine to find suitable images to demonstrate how

24  easy it is to alter them in an undetectable way.

25  Q.  Okay.  Go to Defendant's Exhibit No. 2, please.

57

1   A.  Number 2 is three apparently identical images except for

2   one alteration that's made, and that is the face in each one of

3   these images is different.  If you'll --

4   Q.  But the torso from the neck down is the same image?

5   A.  In fact, even the hair, everything.  And as you can see by

6   examining these, there's no obvious border around the faces to

7   indicate that they were plopped onto someone else's body.  And

8   anyone being asked to determine which one of these is the

9   quote/unquote "starting image" that's not been altered and

10   which ones are the altered ones would have to guess.  You can

11   apply shadows and shading using tools in Photoshop that are as

12   convincing as the shadows, shading and light that was in the

13   original digital image.

14         But just to clarify this for the Court, the face that

15   is in the upper left-hand corner is of a volleyball player and

16   a part-time model, Gabrielle Reece.  The face in the center

17   image is of some anonymous person that was captured in an image

18   that I downloaded from a stock photo web site, and the lower

19   right-hand corner image is the face of Britney Spears, the pop

20   singer.  The only one of these images that was not altered is

21   the one in the one in the upper left-hand corner Gabrielle

22   Reece.  That was an image I started with from the internet that

23   purports to be her posing for that picture.  The ones, the

24   faces are just inserted, superimposed to make it appear as if

25   it's someone else.

58

1   Q.  How much time did it take you in Defendant's No. 1 and

2   No. 2 to create these images?

3   A.  Well, Defendant's Exhibit Number 1 probably took me half

4   an hour or 45 minutes, I would estimate.  It's quite awhile ago

5   that I created that.  This image here --

6   Q.  Number 2?

7   A.  Defendant's Exhibit No. 2 probably took the same amount of

8   amount of time, between 15 minutes or a half hour, because all

9   I was doing was selecting the faces of these two individuals

10  from other images, putting them into the existing image that

11  is -- that I started with that appears to be Gabrielle Reece,

12  and then just doing a little bit of adding shadows and some

13  colorations to make them appear this bluish tint that you see

14  here.

15  Q.  Okay.  Go to number 3 please.

16  A.  Number 3 is designed to have the appearance that it's

17  actually an exhibit from a criminal case.  There is the

18  designation of United States vs. Spool, a criminal case number

19  and exhibit number and age of the female that's depicted at

20  being age 13.

21  Q.  And that would be to create the illusion for someone who

22  viewed that, is this was actually an exhibit in a federal

23  criminal case of child pornography?

24  A.  Exactly.  Someone marketing child pornography would have

25  an advantage to say to whoever their customer was, this is, I

59

1  can prove to you this is real, it's got exhibit case numbers

2  listed all over it.  It was somehow surreptitiously removed

3  from a case file, so you can rely on the fact that this is

4  actual child porn.

5    Q.  Okay.

6    A.  And what you'll see is actually the image is in color.  I

7  backed off one of the layers that changes it instantly into a

8  to color image, and in fact the person's face that is depicted

9  there is that of a minor, but you'll notice a few changes when

10  I clicked off the images.  Her head disappears, an actual

11  apparent adult face appears and the breast size of the female

12  in the picture has now grown.  She goes from what appears to be

13  a flat-chested female to a female with a developed breast.  In

14  addition, you see a thin line of pubic hair near the lower

15  portion of her body that's simply just wiped out in Photoshop,

16  there giving the illusion that this is prepubescent minor who

17  hasn't even developed pubic hair.  In addition the words at the

18  bottom are completely removed.  I put those in.  And when I

19  click here you'll see this is the starting image for the minor.

20    Q.  This is the starting image for Defendant's Exhibit No. 3.

21    A.  Correct.

22    Q.  Where was in a obtained?

23    A.  That was obtained from teen model web site where parents,

24  for some reason, have decided to allow their children to be

25  photographed in bikinis and various evening wear for purposes

60

1  of, they claim, trying to get a modeling contract for their

2  daughter.

3   Q.  Okay.

4   A.  And then finally the starting image at the bottom.  This

5  is the starting image of what appears to be adult pornography

6  that was then modified to include this minor.

7   Q.  And about how long did it take you to put that together?

8   A.  This image probably took me a little longer than the other

9  ones.  I would say 45 minutes is probably a good estimate.

10   Q.  Okay.  Defendant's Exhibit No. 4, and what is the

11  significance number 4?

12   A.  Okay.  The significance of number four is the ability of

13  Photoshop to create things that don't even exist at all in the

14  world.  This image appears to be some sort of a carving in

15  marble or stone, perhaps taken from an Egyptian tomb or Mayan

16  artifact, et cetera.  The reality is this image is created by

17  merely creating a layer that appears to be marble and what you

18  see now on the screen is what appears to be the digital image

19  of a tattoo on someone's arm or leg, or wherever it is, and

20  then the marble texture is created in Photoshop.  That is not a

21  digital image of marble in the sense that I captured it with a

22  digital camera.  Photoshop just created those patterns and

23  thousands more are available around the internet.  And then I

24  overlaid it with a blending mode, it's called in Photoshop,

25  which makes that now look like an embossed or a carved-in-stone

61

1  image that doesn't even exist.  Now, why this is significant is

2  because it allows you to put artifacts into existing digital

3  images that appear to the eye to have existed there all the

4  time, carvings and embossed material that wasn't actually

5  there.

6  Q.  How long did it take you to put that one together?

7  A.  That one probably took me about 10 minutes or so.

8  Q.  Okay.  Number 5 please?

9  A.  Number 5 is a digital image fairly well-known photograph

10  that was taken --

11  Q.   That's the sailor bending over the nurse on Victory Over

12  Japan Day, August 15th, 1945?

13  A.  Yes, that's a digital image of that photograph because, of

14  course, digital images weren't around at that time.  And what

15  this is designed to illustrate is that I've numbered --

16  Q.  Pardon me once again though.  This began life as

17  photograph?

18  A.  That's correct.

19  Q.  But it was digitized by you placing it, scanning it into a

20  computer?

21  A.  Actually, I downloaded this off the internet.  Someone

22  else created it, digitized it, I didn't.

23  Q.  Once that was done it's lost its characteristics as a

24  photograph and now has become a digital image subject to all of

25  the alterations that this software can apply?

62

1   A.  Absolutely.

2   Q.  Okay.  Continue please?

3   A.  So I've broken the image up into eight quadrants to

4   demonstrate that even within a single image, some of these

5   quadrants have been altered by me and some I've left in their

6   format as the image started when I received it, downloading it

7   on the internet, and even staring at this as long as a person

8   wants to stare at it, it's impossible to detect all of the

9   alterations and be able to determine whether something belongs

10   there or doesn't belong there, et cetera.  For example, your

11   eye quadrants might be drawn to quadrants 1, 4 and 6 because

12   they have different color than other quadrants, but there's

13   nothing about this image to tell you if those three quadrants

14   are the color of the starting image or is it the other

15   quadrants which appear to be more black and white instead of

16   sepia-toned are the original -- is the starting image the way

17   it laid out.  And when I click off that first layer I now have

18   lines going to each one of the quadrants demonstrating what was

19   removed and you can read those and starting with quadrant

20   number 1, I changed the color and those other two sepia-toned

21   quadrants, I just altered them in Photoshop.  I changed the

22   contrast in the upper right-hand corner.  I removed the tie off

23   of the sailor who is depicted in the third quadrant there, and

24   then I changed the brightness ever so slightly in quadrant

25   number 5.  I removed some white specks in the lower left-hand

63

1   quadrant.  And the only quadrant that was unchanged from the

2   starting image is the number 8 in the lower right-hand corner.

3    Q.  Are you able with this software to do that to virtually

4   any photograph that becomes a digital image?

5    A.  Yes.  The techniques I'm applying apply to any digital

6   image.

7    Q.  Number 6 please?

8    A.  Number 6 is the only exhibit as a starting image that I

9   can tell you is a real image.

10   Q.  Why is that?

11   A.  Because I captured this image with my digital camera last

12   summer while my daughter's soccer team was playing soccer

13   outdoors.

14   Q.  Is it a fair statement to say that the only person who

15   could say that an image is the starting image or can testify to

16   its authenticity, if you will, would be a person who

17   participated in the creation of that image?

18   A.  That's correct.  And that's why this other Exhibit 35 I

19   brought to you today, because if I were presented with that

20   magazine and asked to give an expert opinion as to whether

21   those images of those two individuals on the cover of that

22   magazine were altered or not, had I decided I was going to just

23   eyeball it and say no, there's been no alteration, I would have

24   been tricked as well.  That's why I don't enter into the area

25   of guessing about other people's digital images, whether

64

1    they're unaltered, altered, whether those people exist or not,

2    because unless I participated in the creation of the image, I

3    don't know.

4     Q.  Okay.  What do we have with number 6?

5     A.  Okay.  What we have here is what your eye is telling you

6    is several the several players, one about to kick a ball, and

7    the reality is the right most player was inserted by me.  And

8    that player is actually, now that I point it out you will

9    probably notice, is actually a copy of the left most player

10   whose entire body is seen in the scene, seen in the image.  I

11   copied her body, moved it over to the other side of the image,

12   cut off her leg, which is kicked back behind her, and moved it

13   down toward the grass.

14          Now analyzing this image, another thing that you will

15   notice is there is no shadow underneath that other player,

16   something that might not necessarily be evident to

17   non-photographic expert, the just regular user who downloaded

18   this off the internet, but now that you can see, we have

19   sunlight coming and creating shadows on all the rest of these

20   players but not this player I inserted.

21          Next what you'll see if you look in the for foreground

22   is the grass.

23    Q.  Pardon me.  Could you have created a shadow with that

24   person?

25    A.  Oh, absolutely.  I could copy the shadow that was existing

65

1   in the image.  Here, I'll do it right now.  I'm using one of

2   the many, what they call selection tools.  I just select an

3   existing shadow that is coming off of one of the other players.

4   I'll copy that shadow and now we have another layer with that

5   shadow in it.  And as you can see, you'll see I'm dragging with

6   a appears to be grass and a shadow and I just set it on the

7   edge of her foot.  And what your eye now tells you is that's

8   shadow behind her.

9   Q.  And if that particular shadow that you dragged over was

10  too long or too short, you could easily lengthen or shorten it?

11  A.  Yes there's, again, myriad tools to do that.  I now have

12  that shadow captured in a selection box, I've made it shorter,

13  and I could actually select it and make it much longer.  It

14  doesn't matter, I could make it wider change the size of it.  I

15  can alter it to any shape I want.

16  Q.  What else is significant about number 6?

17  A.  Well, what's significant about number 6 is that while if

18  you look in the foreground the entire foreground of grass that

19  you're viewing is not the grass that was in the original image.

20  I copied and pasted other pieces of grass and painted over.

21  You can faintly see the outline of the soccer field, white

22  lines that border the field.  And then lastly what the your eye

23  might not have even told you yet, is that when I click off that

24  final image the entire background up above and behind these

25  players was inserted by me.  What you're now looking at, the

66

1   lowest layer of this image is the actual unaltered digital

2   image I captured with my camera.

3    Q.  And I take it you can erase all of the foliage, add more

4   foliage, change the color of the grass from green to dormant as

5   you choose?

6    A.  Yes.  And one other thing I wanted to point out is that as

7   I'm switching between the second most, second to the last layer

8   and the final layer, which is of the actual image, you will

9   notice another player comes into the scene who is attempting to

10   kick this ball at the same time as player number 4 is.  And

11   this is one of the things about, that's risky about individuals

12   attempting to visually examine an image and determine whether

13   it's been altered or not.  If you look carefully at this player

14   who is about to kick the ball, her back is unusually straight

15   in that image which might tell a digital imaging expert, hmm,

16   that could be an altered image because people's backs are not

17   that straight, she was cut and pasted out of another image.

18   But what you're looking at is the light, the settings on my

19   camera, the way I took that picture, that how she looks.  That

20   is an actual unaltered image but yet to your eye appears

21   altered.  And that's the trick of trying to do this with your

22   eyes.  It's just not reliable.

23    Q.  It appears as though we jump from number 6 to number 8.

24   Is there a number 7?

25    A.  No, there isn't.  My mistake there.

67

1  Q.  Okay.  Let's go to number 8.

2      MR. SMALLWOOD:  I would ask the record reflect there

3  is no Defendant's Exhibit No. 7 in Defendant's Exhibit 33.

4  Q.  (By Mr. Smallwood)  Number 8 please.

5  A.  This is Exhibit No. 8 is just designed to show the

6  filters, some of the filters in Photoshop.  You can take an

7  existing digital image and then apply various filters to it.

8  And what you're looking at here doesn't even appear to be a

9  photograph or a digital at all in the sense of a photograph

10  that was scanned in.  It could well have been a painting or

11  some other piece of art out of someone's imagination.  Here's

12  another version of it which makes it look like it's almost a

13  plaster cast of a female body.  The next is applying a filter

14  which makes it appear like a female body behind a piece of

15  glass, some sort of window or divider.  The next makes

16  individual look like their body has been created plaster and it

17  has a bright light coming from one direction which was not

18  present in the previous versions.  And then finally here this

19  makes the individual's body perhaps having been photocopied

20  from some print publication or taken from a movie still, a

21  image taken out of a movie.  And then finally this is the

22  starting image that I began with to make all of those filter

23  alterations.  So that just shows you some of the power of the

24  tools in Photoshop to transfer what appears to be a real

25  person, an actual image of a person into something that looks

68

1   like artwork.

2    Q.  Let's take number 9 and number 10 together, Mr. Boland.

3   What are those?

4    A.  Okay.  Number 9 and 10 are alterations I made to a now

5   famous image of Janet Jackson and her wardrobe error.

6    Q.  Malfunction.

7    A.  Her malfunction.  And let me show you Defendant's Exhibit

8   10.  And when you look at this image, what's not apparent to

9   the viewer, obviously, are a whole host of alterations which

10   were made to the digital image I downloaded.  For example, now

11   that I'm clicking this first layer, you'll notice a piece of

12   hair from the left side -- I'm sorry, the right side of the

13   image disappears.  And now that I've pointed it out, if you

14   look carefully you can where I got that hair from.  It's

15   exactly from this side of the image, the left side.  I copied a

16   piece of her existing hair and just painted it over the -- and

17   just copied it over to the other side of the image.

18         In addition, there's another piece of hair that your

19   eye didn't notice 'til I just clicked it off, that's going down

20   the right of the image.  And in fact, what appears to be her

21   left breast on the right side of the image, is not in fact real

22   at all.  That was copied from the other side of the image and

23   pasted there.  The right covering over her right breast on the

24   left side of the image was merely copied from the left side and

25   moved over.  I'll show you how I moved that.  You can now see

69

1   I'm moving that covering which was over where her breast was

2   exposed, and if you look carefully this covering is an

3   identical, symmetrical match to the covering on the right side

4   of her body and that's because I just copied the right side,

5   flipped it around and moved it.  I'll flip it back to show you.

6          Now you can see, I've put them below each other, the

7   right-hand side of the image which her breast appears to be

8   covered, I just copied that identical breast plate or breast

9   covering, whatever it's called and then turned it, moved it to

10  the other side of the image, raised it up slightly so your eye

11  doesn't see the symmetry and then made it look like that was

12  the starting image, which of course it wasn't.

13         And then finally her hands, which you wouldn't have

14  noticed 'til now, are actually in a different position than the

15  image I started with and what you are looking with now is the

16  starting image.

17         So I was able to cover her breast, move her breast,

18  change her arms, add hair, do all kinds of manipulations that

19  are not going to be detectable to the next using user.

20  Q.  Defendant's Exhibit No. 11.

21  A.  Number 11 demonstrates -- this is an image I downloaded

22  again from a stock photo web site.  The female you see depicted

23  there is obviously, to your eye, just copied in three different

24  places.  The -- what this demonstrates is that even taking

25  objects out of the same image, it's impossible to, for an

70

1   expert much less an average user, to say which one of those is

2   the quote/unquote "original one."  Which one of these images of

3   this female were in that location with the starting image.  And

4   if you tried to pick one of them, you would even be further

5   fooled because the actual starting image is this one.  None of

6   those three in the image that you saw, that I altered, were in

7   fact where that female was in the image I started with.  She

8   was copied and moved everywhere.

9   Q.  This is the image you started with?

10   A.  I started with this image, and what you're looking at now

11   is the image that I've altered.  So for someone to come into

12   that image and say okay, I can tell you to a reasonable degree

13   of scientific certainty that the middle model is the real one

14   and the other two are copies, it's just not possible for them

15   to do so, because what they wouldn't have known is that none of

16   those are the ones that I started with.  That's the one I

17   started with, far off to the right.

18   Q.  It doesn't appear that we have a No. 12.

19        MR. SMALLWOOD:  I would ask that the record reflect

20   that there is no Defendant's Exhibit No. 12.

21   Q.  (By Mr. Smallwood)  I ask you to look at No. 13.

22   A.  13 was designed to look like a mock-up of a child porn web

23   site that was trying to encourage individuals to see this

24   image, click on some icon on that image to perhaps download it

25   or subscribe.  And what this image appears to be is, or what it

71

1   claims to be is a minor named Lena, under age six, engaged in a

2   sex act some male whose body off the side of the image.  The

3   reality is no such thing.  I started with this image, which was

4   downloaded off the internet, of what appears to be a male penis

5   coming in from the left side of the image and then juxtaposed

6   it with this image downloaded off the internet, which appears

7   to be a minor eating a doughnut.

8           Neither one of these images did I create, so I don't

9   know if it's really a minor eating a doughnut.  It just that's

10  what it appeared to me when I downloaded it off the internet.

11  That was Exhibit 13.

12   Q.  And how much time did it take you had to create that?

13   A.  That one probably took me about 20 minutes, 25 minutes to

14  create.

15   Q.  Okay.  Where is your skill level, in your opinion, of 10

16  being the best in the world, one being -- or zero being me?

17  Where would your skill level be?

18   A.  I'm probably a five or six at this point in Photoshop.

19  And I'll tell you why.  I bet you there's nobody who will

20  declare themselves a ten, because this software is designed to

21  serve an entire market full of needs.  There are people who

22  will spend their entire career and they will spend it just in a

23  few sections of the Photoshop software and that's all they are

24  really going to need to use.  And others will spend it in a

25  different section and won't really have familiarity with the

72

1  rest.

2          So to get to a ten, like the individual who wrote that

3  Photoshop bible, is probably something that's not practical for

4  the overwhelming majority of users, because they are using this

5  to earn a living in a specific area of art or media.

6   Q.  And the applications of this software are so enormous it

7  would be extremely difficult for one person to be a -- a 10

8  expert on -- in everything?

9   A.  That's correct, but it's extremely easy for you to be an

10  expert in small chunks of the software, because using it

11  repetitively over a few days you will obtain the skills you

12  need to do those kinds of alterations.

13   Q.  Okay.  No. 14, please.

14   A.  Defense Exhibit 14 appears is made to appear as if it's a

15  minor with a collar around her neck that says the word slave

16  and there's an indication at the bottom of the image that this

17  image comes from a web site called slave minors dot com.  The

18  reality is just like images -- any other image you'd see on the

19  internet, you can't trust that the words that are across the

20  bottom of that image were put there by the person who is

21  sending you the image, or the place you are downloading the

22  image from.  I inserted those words across the bottom.  I, in

23  fact, inserted the face into this image and now you see a color

24  version of what appears to be a minor underneath these two men.

25  And what you'll find is, now you are looking at the starting

73

1   image one, which appears to be a minor just sort of yelling

2   into the camera with some snow in the background.

3        And then finally, starting image two, which is an

4   apparent adult female with a totally different look on her

5   face, and her breasts are of a larger size than the initial

6   black and white image that you're seeing now.

7   Q.  And would appears to be sexually mature --

8   A.  Exactly and there's just a few changes that need to be

9   made by painting right on the image, that will cause the breast

10  size to be reduced to what appears to be a prepubescent

11  flat-chested female.

12  Q.  Can you do that for us?

13  A.  Yes.  Let me copy this image, copy this layer and I'll

14  show you how that's done.

15       One of the other tools in Photoshop of this version

16  and the previous version is called a healing brush and you just

17  click along the outline of this woman's breast a few times and

18  it begins to eliminate the apparent shadows which make her

19  breasts seem large and developed.  And after a few strokes of

20  doing this, you now notice that what appears to be a breast

21  that's coming up out of her chest as if it's a developed breast

22  is now shrinking into her chest, or appears to be, and becoming

23  flatter and flatter as we go.

24       And then the other change that could be made is the

25  selection of both of the apparent nipples in this image and

74

1   then just reduce the contrast of those down so they are not so

2   dark brown which would indicate an adult female and make them

3   lighter in color which would indicate a prepubescent or under

4   age 18 female.

5   Q.  Can that be done?

6   A.  Yes.  So now I'm just selecting an area roughly around

7   where this adult, apparent adult female has that nipple and

8   then selecting around this one.  And then there's a function

9   called levels in Photoshop.  And as I move this slider you will

10  notice that the color begins to get faint.  I just moved it

11  just a touch and when I select off of that, you now see that

12  the nipples have gotten more faint, they are not as dark brown

13  color indicating an adult female.  They are starting to

14  indicate under age 18 or some person whose has just hit

15  puberty.

16  Q.  And if anybody, from the work that you just did, could

17  determine some sort of imperfection there, that easily by

18  spending more time, a little more time, it could be completely

19  eliminated by you?

20  A.  Absolutely.  And as I mentioned, determining an alteration

21  doesn't mean a fake image anyhow.  There's a tool here, for

22  example, this smudging tool, and if I just take it across this

23  image and do something like this and smudge that, now to your

24  eye something looks wrong with that image.  It clearly looks

25  altered, but that is still that female and that's still her

75

1   body that I started with in that image and still those

2   individuals hovering over her.  An alteration has been made

3   that's obvious to anyone and yet, you can't say the image isn't

4   real.  It's still the starting image with that smearing that's

5   been put over the top of it.

6   Q.  Okay.

7   A.  So even a bad fake, let's say, on the internet, where you

8   say to yourself I can clearly see, in my opinion, that this is

9   a child's head put on an adult's body, that doesn't mean

10  anything as far as determining whether it's an actual minor or

11  not, because you can alter the image to appear to be fake and

12  trick the person into thinking that what they are not-- what

13  they are looking at is fake.

14  Q.  Number 15, please.

15  A.  15 is a us use of a collage of images.  What -- the words

16  along the top indicate "Britney Spears Outdoor Blowjob."  The

17  reality is, this is a very, quite famous image of Britney

18  Spears that I -- now here's a color version of it, there's the

19  text removed.  And I started with this image which appears to

20  be Britney Spears and Madonna at an award show doing some

21  performance where, and it was it was well publicized in the

22  media, they both stopped in the middle of the performance and

23  participated in an open mouth kiss with each other.  And just

24  using that image and going over this starting image, which is a

25  different person, in the park, apparently involved in sexual

76

1  activity with an adult male, and just overlaid Britney Spear's

2  face right into that image, to make it appears as if it's her.

3  Q.  And you could have taken the-- well, we'll get to that.

4       Number 16, please?

5  A.  Number 16 is using an image that's on, pretty much

6  everyone's computer who is in the room here, and that is

7  desktop wallpaper image that ships with Windows, and the point

8  of this is to demonstrate the ability to make reflections and

9  color changes.  Again, this appears to be nearby a body of

10  water with leaves and trees in the background and the reality

11  is that the divider I put in there that's very subtle, that

12  tricks your eye into thinking there's a boarder between water

13  and land is nonexistent, and the image is actually more

14  brightly colored, and the reflection was a copy of the lower

15  portion of the image.  And what we're seeing now is the

16  starting image that I just took out of the Windows operating

17  system.

18  Q.  Okay, number 17, please.

19  A.  17 demonstrates that the ability to apply one of the many

20  filters in Photoshop called a stamp filter, which disables you

21  from looking at this image in determining if this is a drawing

22  out of someone's imagination, or if this is an actual digital

23  image of a real person that had a filter applied to it.

24       So when you back off the image, what you will see is,

25  now this version is a poster filter, which makes the image

77

1   appear, again, not necessarily a photograph or a digital image

2   that was altered, but maybe someone who drew something to make

3   it look like a poster.  And then next, you will notice this is

4   what appears to be the digital image of a minor under the age

5   18, engaged in sexual activity, relatively flat-chested,

6   nipples are sort of a peach color as opposed to developed ones,

7   and notice her hips all of a sudden get wider when the next

8   layer appears.  And you are able to recreate the folds in these

9   sheets and things that are on the bed quite easily by copying

10  other sections.  And then finally, you're still not looking at

11  the starting image, now you're looking at the starting image,

12  which has apparently fully developed breasts and you can see

13  some hint of pubic hair in the lower area.  In addition, her

14  hair is actually blond in the starting image and it goes down

15  around her shoulder, whereas in the altered image there is no

16  hint of that all and she appears a brown-haired female.

17  Q.  About how long did it take you create this?

18  A.  That one probably, again, about 45 minutes, half hour,

19  somewhere in that range.

20  Q.  Okay number 18, please?

21      THE COURT:  Mr. Smallwood, why don't we stop here, if

22  we could, and then we will take our break for lunch at this

23  time.

24      MR. SMALLWOOD:  Very well, Judge.

25      THE COURT:  I'm to be at the Clerk's Office barbecue

78

1    down at 12:15 with an out-of-town guest who is with us.  So why

2    don't we break at this time and we'll come back at -- why don't

3    we come back at 10 minutes after 1:00, does that work for

4    everybody?

5          MR. SMALLWOOD:  That's fine, Judge.  Do you-- is it

6    your custom to lock your courtroom?

7          THE COURT:  We will if that--

8          MR. SMALLWOOD:  I would prefer that it remain

9    unlocked.

10          THE COURT:  All right, we'll secure the courtroom

11    then, once everybody has vacated it.  All right.

12          Anything else before we break on behalf of the United

13    States, Mr. Greer?

14          MR. GREER:  No, Your Honor.

15          THE COURT:  Mr. Smallwood, anything?

16          MR. SMALLWOOD:  No, sir.

17          THE COURT:  All right.  We'll come back at 10 minutes

18    after one.  We'll be in recess.

19          (Recess).

20          THE COURT:  Please be seated.  I apologize for

21    starting late, but I was trying to get them to redraw the

22    winners at the barbecue, but they said something about

23    principles of fairness that I didn't fully understand or

24    appreciate.

25          In any event, Mr. Smallwood, you may continue your

79

1  examination, sir.

2      MR. SMALLWOOD:  Thank you.

3  Q.  (By Mr. Smallwood)  Mr. Boland, do you understand you are

4  still on the witness stand and you are still under oath?

5  A.  Yes, I do.

6  Q.  I believe we finished with Defendant's Exhibit No. 17,

7  would you go to Defendant's Exhibit No. 18?

8  A.  Yes.  18 in the first frame that you're seeing here, the

9  first layer, again, appears to be something that could be on a

10  web site enticing someone to call and perhaps have an internet

11  phone conversation with a 13-year-old hottie, as is written

12  across the front of this image of what appears to be a minor

13  reclining back without her clothes on and her legs spread, and

14  there's even a web site address at the bottom encouraging

15  people to go there to have a conversation with her.

16  Q.  Who created those docu -- those im -- those words?

17  A.  Those words were put on the image by me.  In fact, I'm

18  going to click off the first layer and it's actually, the

19  starting image was color, as opposed to black and white, and

20  just a simple alteration in Photoshop converts any color image

21  to black and white instantly.

22      In addition, the words you see across the bottom and

23  the middle were inserted by me.  And in fact, what you're going

24  to notice now is if you look carefully at the eyes of this

25  apparent minor, they just opened.  So through Photoshop I was

80

1   able to paint over where her eyes are and undetectable to your

2   eye, it looks like she is reclining with her eyes closed.

3   Actually, the starting image is what appears to be eyes open.

4   And then now you see the last layer is the image I started

5   with.  Obvious pubic hair in the lower region of her body and

6   large, larger fully developed breast of an apparent adult or

7   close to an adult.

8        And also, here is an example of what can be done in

9   Photoshop.  This is a version where I simply shortened her

10  torso by scaling the image from left to right, which then

11  again, makes her appear to be a shorter person, which is

12  indicative of a minor as opposed to a taller person who would

13  be an adult.

14  Q.  Can you give an example of further software applications

15  which would change the body proportions?

16  A.  I don't understand your question.

17  Q.  Such as hips, or breasts, or...

18  A.  Yes, the scaling can be done just the way I demonstrated

19  on one of the previous examples, where you select an object and

20  then can squeeze it in and out.

21       I'll do a rough example here of how you can make her

22  hips appear to be more narrow.  You simply would take a

23  selection of, perhaps at this point where her leg meets her

24  hip, try and round it off in this fashion and then when you

25  select that area, you choose from a nearby area of these

81

1   apparent sheets, you select that area and then just go painting

2   right through your selection point.  Now I've done this kind of

3   quickly, so you're going to see sort of a chunk out of her leg.

4   But as you can see, you begin to make her hips narrower and

5   then if you smooth, smooth these areas out, you can start

6   seeing that it begins to give you the illusion that it's a more

7   narrow hipped female as opposed to the one that was there

8   before.

9   Q.  So, with spending 15, 20 minutes, half an hour, whatever

10  was necessary, you could take what I might describe as a busty,

11  robust, obviously adult female, with wider hips and larger

12  breasts and change those proportions anyway you saw fit?

13   A.  Yes, and obviously for a person who is trying to trick

14  people on the internet, or wherever, that what they are looking

15  at is the image of a minor, they would do those things that

16  would make the image appear to be a younger person, so the

17  examples you gave would be appropriate.

18   Q.  Would you go to Defendant's Exhibit No. 19, please.

19   A.  No. 19 is just to show how quickly some of these

20  alterations can be made.  The alteration you're going to see

21  here to this apparent female took me not more than 10 minutes.

22  And you're looking at the altered image and here's the starting

23  image.  So what you see appearing when I click on the starting

24  image is not only a pair of sunglasses in her hair, which were

25  totally absent from the altered image, but her breast size now

82

1   appears to be that of an adult.  And in addition, if you look

2   carefully at the bottom of the image, her hips have -- are

3   narrow here and they've widened, now giving the impression that

4   this is a post-pubescent female who has widened hips, as

5   opposed to a simple alteration now makes her look like her hips

6   are almost going straight down as if she's prepubescent.

7        So it's very easy and fast to make those kind of quick

8   alterations.

9   Q.  Okay, go to number 20, please.

10   A.  Number 20 has text written across the bottom of it that

11   says real girls young porn dot net.

12   Q.  And you put that on there?

13   A.  No, actually I didn't.  And that's the point of using this

14   image is compared to the other ones I have demonstrated, you

15   don't know until I tell you, did I add that text or was it

16   added in the image that I started with.  This happened to be in

17   the image that I started with.  And it's not a black and white

18   image, it's actually color, as well as, what appears to be a

19   relatively flat-chested, pigtailed girl who could be a minor.

20   This starting image has a female with fully developed breasts

21   posing in that fashion.

22   Q.  Number 22, please.

23   A.  Number 22 is another sort of more detailed example of what

24   can be passed off as an exhibit from a criminal action against

25   some individual accused of possessing child porn.  It has some

83

1  fake case information.  It claims that this person's name is

2  Mindy Smith, age 8, et cetera.  And as you would assume, all of

3  that text was inserted by me into the bottom of that image and

4  in fact the starting image, you'll probably recognize as one of

5  the ones that used in a prior creation.

6   Q.  With the snow in the background?

7   A.  Correct.  So her face is there and the actual starting

8  image that was the adult porn image is this one.  So merely by

9  editing this existing image of a minor, and then inserting it

10  into this image and putting some text at the bottom, you begin

11  to -- and now I've added another level which shows even a

12  defendant's exhibit sticker to make it even more realistic that

13  this was from a criminal matter.  In fact, it's the same color

14  blue as the stickers that are on the exhibits sitting next to

15  me.  And I just grabbed a digitized legal document off the

16  internet which had a defendant's exhibit sticker on it and then

17  I just cut it and pasted it right onto this digital image.

18   Q.  Okay, No. 23, please.

19   A.  Now this is an example of not superimposing a minor's face

20  into an adult body, but taking, what you're going to discover

21  its, first of all, it's a color image, it's not black and white

22  as it started.  But this is the top half of what appears to be

23  a minor's body that is super -- and this is the starting image

24  that I worked with to get the resulting image you see here and

25  it's superimposed over what clearly appears to be an adult

84

1   female in the lower half of her body.  So there, too, if you

2   will, unaltered images that are then placed together to give

3   the appearance of a person who doesn't exist.  A minor such as

4   this, with this individual, a male, in the image interacting

5   with her doesn't exist.  It's just the superimposing of a minor

6   on top of an adult's body.

7   Q.  Okay, number 24, please.

8   A.  The stock photo web site I downloaded this from, the

9   individual who created this claimed that it was a digitally

10  painted upper half of a female body.  Now --

11  Q.  Not an actual human body at all?

12  A.  Right, that was their claim, that this was some photo-

13  realistic painting they had done.  And when you edit this,

14  first that blue cast is not the starting image.  The starting

15  image is not even this version here, it's actually the one you

16  are looking at now.

17      So with a few clicks of the mouse, you can obscure

18  what appears to be a digitally painted upper half of a female

19  body and make it look now like it's a photograph in a dark

20  room.

21  Q.  Okay, Number 26, please.

22  A.  This image was presented demonstrate how many things in an

23  image that your eye will tell you are not, don't belong in the

24  image, how many were altered and how many weren't.  And what

25  your eye might tell you is that both the car label and the line

85

1   across the car look like they don't belong.  But what your eye

2   can't possibly recognize is, if you notice in this upper

3   right-hand corner, you'll notice the tint on that wood of that

4   house is going to change.  It gets slightly more green.  And

5   now more dramatically, look in the center section here, the

6   color has gone from a pale brown tan to a bright fire engine

7   red.  And then finally, the white car you are looking at is not

8   actually colored white, in the starting it was yellow.

9          And this is -- these are very simple changes to make,

10  changing the color of virtually any object in the image in such

11  a way that, again, you looking at it without me telling you,

12  those things would be undetectable.

13  Q.  But you could make those same changes on eye color?

14  A.  Yes.

15  Q.  Put fingernail polish on a person's fingernails?

16  A.  Easily, yes.  It's a matter of taking the time to select

17  around those portions of the image and you can recolor them

18  whatever color you'd like.

19  Q.  Okay, number 27, please.

20  A.  This was used to demonstrate the ability -- and there's,

21  by the way, thousands of tutorials around the internet that

22  people put up for the benefit of the Photoshop community, I

23  suppose, on how to do all kinds of alterations I'm

24  demonstrating today and even more, and one of them that's very

25  popular is how to remove or insert what appears to be blood

86

1    into an image.

2        So the image you're seeing now is the one I started

3    with, with an abrasion and some blood apparently transferred to

4    a piece of cloth below this persons's elbow.  And with probably

5    about 7 or 10 minutes of alterations, all evidence of that

6    blood is eliminated.

7    Q.  Okay.  Number 28, please.

8    A.  This image here is completely -- this is the image the way

9    I downloaded it, and what it appears to be is a severe injury

10   to an individual's arm connected with war, and the reality is

11   when I click off white portion they put at the bottom, this was

12   downloaded from CNN's web site, connected with a story about

13   how makeup artists in Hollywood make realistic injuries using

14   makeup for Hollywood movies.

15   Q.  Okay.  Number 29, please.

16   A.  Now, this image is used to demonstrate, again, how you can

17   leave all the composition in the image the way it was.  The

18   lighting, the shadows, the expressions on this individual's

19   face have been unaltered, so if they were real in the initial

20   digital image, they are utterly real now.  And all I've done --

21   Q.  And vice versa.  If they were unreal, they are unreal now?

22   A.  Exactly.  So this person who now appears to be posing

23   topless in somewhat of a wooded area, I didn't alter a single

24   thing about the lighting, the shadows, et cetera, on this

25   image, and yet what you're looking at is not a girl who is

87

1   14-years-old, but the reality is you're looking at, this is the

2   starting image, or almost the starting image, and now if you

3   notice this female's right breast has just protruded outside,

4   out of the left side of the image.  And then finally, we have

5   the starting image with an obviously, fully developed female

6   breast, large, dark colorer nipple, et cetera, which is not

7   indicative of a minor as opposed to what the image, modified

8   image, appears to be, which is that of a topless minor posing,

9   in this scenario.

10   Q.  Number 30, please.

11   A.  This image, again, appears to be Dakota, age 13, posing

12   naked in front of the camera or at least topless with a date of

13   March 25th, 2004.  That data was inserted by me.  However, the

14   yellow print in the upper left and lower right-hand corner of

15   the image was in the starting image.  In addition, the

16   background you see there is also different.  The pattern

17   background you see behind this apparently half naked minor was

18   actually inserted by me.  The background in the starting image

19   is this plain red background that you see now.  And in fact,

20   the starting image is the one you're looking at now where this

21   apparent minor is completely clothed.  And why this is

22   different than the other images is because the content that was

23   used to give the viewer the impression that it was an under-

24   developed minor who was topless, is actually this image you're

25   now seeing in front which is -- I didn't alter this apparent

88

1   adult female's breast at all.  She happens to be a somewhat

2   flat-chested, more so than the other ones you've seen, adult.

3   I merely took the image of her breasts from this image you see

4   here, didn't retouch them at all, and pasted them into the

5   image of the minor.

6        So, you have an apparent adult whose body parts are

7   just merely superimposed over a minor, and now your eye tells

8   you that's the chest of a minor and the breasts of a minor,

9   when it isn't.  Those are the breasts of adult that are

10  superimposed here and trick your eye into thinking it's a

11  minor.

12  Q.  Number 31, please.

13  A.  This is an example, upon first look it appears to be a

14  scan of a print photograph with a paper clip in the corner of

15  this minor female standing up in front of a couch in a room

16  somewhere.  The real -- in fact this is one of -- you can

17  execute the same steps I did that are in the tutorial that's in

18  Defendant's Exhibit 37.  There is a tutorial specifically in

19  that, it just so happens in that version of Photoshop magazine

20  which teaches you how to take a digital image and convert it to

21  look like a scan of a print photograph.

22        And now, as I move down the levels here, you now see a

23  different version of this female that has what appears to be a

24  swimsuit on, a one piece bathing suit.  And the reality is

25  again, that that's not even the starting image.  We now have a

89

1    color version of that image of an apparent minor female with a

2    swimsuit on and as we remove that, you will see now we have a

3    version with light coming in from an apparent bad use of flash

4    in the photography.

5    Q.  In an effort to try to convey the impression that this is

6    a photograph?

7    A.  Exactly.  And then now we have that flash is removed.  And

8    now we have it converted to a drawing, which obviously the user

9    who comes across this image would not be able to know that

10   that's a drawing.  They would have to guess whether it's a

11   photograph that has been altered in Photoshop, or a drawing

12   that was made from someone's imagination.  And now you see the

13   starting image, obvious pubic hair in the lower region of her

14   body, an obviously fully developed female adult breast, as

15   opposed to -- and I'll click back -- the starting image which

16   I've just superimposed, which now looks like a print that was

17   scanned in of a minor posing in front of a couch.

18          And then, where I got the paper clip from was this

19   image you see here, I simply found this on the internet, took

20   that paper clip and then copied it into this image that you see

21   here, right in the corner.  Which leads your eye to believe

22   that there's a paper clip there.  And then the swimsuit, as you

23   can see, is just taken off of a retail manufacturer web site

24   and then I just cut that swimsuit out and pasted it right over

25   the other image that I have.

90

1   Q.  There is not an Exhibit No. 32 on our compilation,

2   Defendant's Exhibit No. 33, but you do have an Exhibit No. 32.

3   Would you click to that, please.

4   A.  Yes, I spent about a half hour last night and created an

5   exhibit which again appears to be a print photograph that's

6   been stapled to a piece of wood.  And you see the staple there

7   and what you really have is not a print photograph nailed,

8   stapled to a piece of wood.  It's actually just this image I'm

9   about to show you, that I started with, that I've copied

10  several times.  There it is, that single image with an apparent

11  staple between two pieces of wood and then what I did was just

12  copied it over and over again and made that pattern that you

13  see there.  I altered some portions of the pattern that are not

14  covered by the image so that your eye wouldn't immediately see

15  it as a repeating pattern and then I just threw a shadow

16  underneath it to give the appearance of depth.  So now what you

17  appear to see is someone who has, either with a digital camera

18  or regular camera, photographed an image that was stapled to a

19  piece of wood, when in fact none of that actually exists.  That

20  starting image was a flat digital image that was just

21  downloaded off the internet.

22          MR. SMALLWOOD:  Your Honor, subject to

23  cross-examination we would offer Defendant's Exhibits 1 through

24  33 with the deletions, which I believe there is no 7, 12 -- 7

25  or 12, Your Honor.

91

1        THE COURT:  All right.  Without objection they will be

2   admitted.

3   Q.  (By Mr. Smallwood)   Mr. Boland, with respect to how a

4   viewer of digital images might gain some sort of knowledge from

5   the content of an image, do file names, web site addresses,

6   come-ons, advertisements, anything of that nature, add anything

7   or give a viewer of these type of images any reason to believe

8   or know what's contained on the internet?

9   A.  No, they don't.  File names I'll take first.  File names

10  are completely arbitrary.  I can take a file, any one of the

11  images I created, any document that I've drafted, a letter, et

12  cetera, and at will, I can alter the name of that file as many

13  times as I'd like.  So if I were to send you a document that

14  says nuclear secrets dot D-O-C, that has no connection to

15  whether that document actually contains nuclear secrets.  There

16  is no technological rule that a file name has to be named based

17  on its contents.

18        So, even Defendant's Exhibit 40, the Government's

19  report, acknowledges the fact that they have a bunch of file

20  names related to the images that they claim match in this

21  database from the computer of the defendant and even with that

22  information, they have the file name, they've looked at the

23  image, they agree with what I just said, that they can't verify

24  that that's an actual minor or her age even with that

25  information.  So I think it's not really in dispute with

92

1    experts on either side of that issue.

2    Q.  In the course of conducting your investigation and

3    creating these exhibits, did you locate a quote/unquote "child

4    porn site", that turned out to be exactly the opposite?

5    A.  Yes, in fact -- I don't happen to be connected to the

6    internet right now, but the reality is if you were to type in

7    the web address child porn dot com, what you would find is a

8    coalition of adult entertainment companies that have -- are

9    using that web site to combat child porn.

10          In addition, there's sites like whitehouse dot com

11    which would lead the unknowing user to believe that they are

12    going to get information about the president and the White

13    House, et cetera, but at whitehouse dot com is one of the

14    highest rated and most frequently visited adult porn web sites

15    on the internet.  And the list pretty much goes on and on.  The

16    number one auction site on the internet is not auctions dot

17    com, it's ebay, which is not even an English word and has no

18    connection to the content of the site which is auctions.

19          So web site addresses do not add anything to a

20    person's knowledge as to whether they're downloading an image

21    that is -- contains a real minor or doesn't contain a real

22    minor, the web site address simply doesn't provide anything,

23    even if the site was called actual child porn images dot com,

24    it's irrelevant because you can name a site whatever you want.

25    Q.  Are you aware of any representations made by the United

93

1   States Government as to web sites in and effort to inform the

2   public of how unreliable representations or names are on the

3   internet?

4    A.  Yes.  In preparing for my testimony in the prior cases,

5   and I'll mention it again here, I came across several articles,

6   one of which was by the SEC and they created a fake company

7   called McWhortle Enterprises, created a web site for the

8   company specifically to lure people to attempt to invest in

9   that company and when they tried to invest, the SEC would send

10  them an e-mail and say, we just set this up to warn you, don't

11  believe what you see on web sites, don't believe the domain

12  names, you were fooled by the content of our site so we're just

13  trying to, as a public service, let you know, don't go around

14  believing what see on a web site.

15         So they recognize that anyone who relies on a web site

16  address for that dictating what the content is would be

17  foolish.

18   Q.  You are in receipt, Mr. Boland, are you not, of Judge

19  Holmes' order of April 12th, 2004, you either received it that

20  day or the next day?

21   A.  I did, yes.

22   Q.  And you are aware of what the Judge has asked us to

23  address in that order?

24   A.  Yes.

25   Q.  And a part of what the Judge asked to us address is the

94

1  issues raised by the Marchan case or Marchand case.  Are you

2  likewise familiar with the Marchand case?

3   A.  I am.

4   Q.  I believe we need to go to our Defendant Exhibit 29, if

5  you would, again.

6       With respect to Judge Holmes' order of April 12th and

7  the Marchand case, do you have any testimony relevant from this

8  exhibit.

9   A.  Yes, the technology that was referred to in that opinion,

10  the Court relied upon the fact that lighting and shadows and

11  expressions in the images they viewed with their eyes, were in

12  their minds utterly real.  And this one exhibit alone

13  demonstrates to you that you can have an image with lighting

14  and shadows and in fact an expression that is utterly real and

15  yet it's obviously, according to the Free Speech Coalition

16  definition of virtual child pornography, it's clearly not an

17  actual minor and it's not the product of the sexual abuse of a

18  minor.  It's an adult whose body has been very easily changed

19  to appear to be a minor.  So all the factors that were present

20  in Marchand that they were relying on to say we can tell these

21  are real images, they are present in this image and yet it's

22  not an actual minor.

23   Q.  Is the software referenced in the Marchand case the same

24  software that you've been using for this presentation?

25   A.  No, that's a completely different classification of

95

1   software.  And I agree with Detective Holloway, that the type

2   of software that Hollywood uses and video game manufacturers

3   use to create the different individuals in the football games

4   that they have or the adventure games, that software is not

5   anywhere near having the ability to fool even the average user

6   that what they've created on a completely blank screen is in

7   fact a real person.  Namely, hair and skin tones are, they

8   haven't been able to recreate those such that you wouldn't be

9   fooled.  However, that's just one mechanism by which you can

10  create virtual child pornography.  So as to Marchand talking

11  about that, I don't have any expertise in that, that particular

12  software or any versions of it, but I'm well versed enough to

13  know that I would agree, and I've agreed in my prior testimony,

14  that that kind of software can't create realistic human beings

15  from scratch on a blank screen.  But as you see here, that's

16  not what I'm doing.

17   Q.    Are you -- is there anything in the Marchand case that

18  indicates that there was any presentation of expert testimony

19  with respect to the Photoshop software that you've used here?

20   A.  No, there was nothing in there regarding this software or

21  in any of the other cases that are similarly found that juries

22  can decide this, or that the technology hasn't reached that

23  level, there's never been any expert testimony using Photoshop

24  in a case I've ever read.

25   Q.  Do you consider yourself fairly well up to speed on these

96

1  cases over the country?

2   A.  Absolutely, I've had to have been because I've testified

3  in three prior cases in the last five weeks.  So I've been

4  reading them constantly to see if there's been an opinion

5  either way that's come out in preparation for my testimony.

6   Q.  Is there anyway that any citizen, including an expert such

7  as you or someone who is not a five or a six might be a nine or

8  a ten on that scale, is there anyway that anyone, by visually

9  inspecting a digital image, to know if that image contains

10  actual minors or not?

11  A.  There is no way.

12   Q.  Is there any type of software application, or filters, or

13  any other technical abilities or technical expertise that

14  exists in the industry which can be applied to these type of

15  images to give anybody any knowledge as to whether they are

16  viewing actual or virtual children?

17  A.  There is no software or hardware available that can enable

18  a citizen to look at an image on their screen and determine

19  whether it contains an actual minor.  It just doesn't exist.

20   Q.  And is there any type of software which exists or method

21  by which any citizen by reading the name of a web site or

22  description of a web site, to enable that person to know if

23  they would be viewing images of actual or -- virtual or real

24  children?

25  A.  No, the name of a web site or a file name, since they are

97

1    arbitrary and can be changed at the whim user of the file, or

2    the creator of the file, or someone who just is handling the

3    file, as well as the web site owner can make their web site

4    name whatever they like.  As a result of that, those names

5    don't advance an individual's knowledge even one step as to

6    whether what they are looking at contains an actual minor or

7    not.

8    Q.  Have you ever worked as an employee of a prosecution?

9    A.  Yes, I have.

10   Q.  When did you do that?

11   A.  From 1996 to 2000, I was an assistant prosecuting attorney

12   for the Cuyahoga County Prosecutor's Office.

13   Q.  And did you work on any famous cases in the State of Ohio?

14   A.  I did.  For the last year that I was there, I was part of

15   the team that defended the State of Ohio in the Dr. Sam

16   Shepherd civil lawsuit brought by his estate.  Among other

17   things that I did for the case, I was tasked with preparing,

18   modifying, altering and getting ready for trial the entire

19   electronic evidence display that we used throughout the ten

20   trial.

21         MR. SMALLWOOD:  Your Honor, if I have not offered any

22   exhibits heretofore, I would offer them at this point in time

23   and would pass the witness.

24         THE COURT:  All right.  Mr. Greer, your witness, sir.

25         MR. GREER:  Thank you, Your Honor.

98

1                    CROSS-EXAMINATION

2   BY MR. GREER:

3    Q.  Now, sir, first as to authentication of an image or of a

4   digital image --

5        MR. SMALLWOOD:  Your Honor, I'm going to object to

6   this.  We're not here to determine authentication, we're here

7   solely on a Constitutional issue, whether or not this statute

8   is vague or overbroad.  I think authentication is a jury issue

9   and it's irrelevant.

10       THE COURT:  I thought you learned earlier not to

11  object until you heard the whole question.  You never know.

12       MR. SMALLWOOD:  I'm a slow learner.

13       THE COURT:  There is nothing educational about the

14  second kick of a mule, right?

15       MR. SMALLWOOD:  That's right.

16       THE COURT:  All right.  Why don't we hear what the

17  question is and then we'll see where we are.

18   Q.  (By Mr. Greer)  As to authentication, you don't contest

19  that an individual who would come into court, purportedly, and

20  have interviewed an actual minor from an image would be in a

21  better position to testify than you as whether or not that

22  image of that minor was an actual image versus a virtual image?

23       MR. SMALLWOOD:  To which I'll object, Judge, that's

24  not the issues before the Court.

25       THE COURT:  Overruled.  He can answer the question.

99

1   A.  I will do you one better, Mr. Greer.  I think if you bring

2   that actual person who can testify they interviewed the minor

3   in the image, that's the best form of authentication that can

4   be made of that image and certainly better than an individual

5   who doesn't know the person depicted in the image, they can't

6   authentic it at all, obviously.

7   Q.  (By Mr. Greer)  Now you, being an expert in this field,

8   purportedly, you talk about Free Speech, a very important case

9   in this area, and you're aware of the two provisions in 2256

10  Title 18 that were struck down, correct?

11  A.  I am, yes.

12  Q.  And are you aware of subsection (c) that survived that?

13  A.  I believe that's the section regarding morphing, morphing

14  of existing images of children, for example.

15  Q.  Right.

16  A.  Is that what your referring to?  I'm trying to do it from

17  memory.

18  Q.  Yes, morphing.  What is morphing?

19  A.  I don't know what the Supreme Court though morphing was.

20  I will speculate they mean taking a picture of an actual minor

21  and then somehow altering that actual minor to appear as if

22  they are involved in some sexual situation with another minor,

23  or an adult, or whatever.

24  Q.  Like the face of an Olsen twin?

25  A.  That would be correct, yes.

100

1   Q.  Like you did?

2   A.  How do you mean?

3   Q.  Did you take the face of an Olsen twin and put it on an

4   adult body?

5   A.  Let's be clear.  I took digital images that I did not have

6   any participation in the creation of them.  What purport to be

7   images of the Olsen twins are what I downloaded off the

8   internet.  If they are really the Olsen twins or not, I can't

9   be the one to tell you, I didn't create those initial images.

10  That's just the starting image which to me appears to be the

11  Olsen twins, but I can't tell you that it is.

12  Q.  And in your mind, the images of the apparent minors that

13  you used in your examples, you have no reason to believe that

14  they are not images of a real minors, correct, versus virtual

15  images?

16  A.  I can't give you an opinion as to whether they are actual

17  minors or not.  That was the whole point of my testimony with

18  Smallwood.  I don't know.  I can tell you they appear to be

19  minors, that's the best I can do.  That's all I can say.

20  Q.  You used what you believe to be, appeared to be minors and

21  put them in apparent sexually explicit conduct with adults;

22  correct?

23  A.  I used images that appeared to be minors, yes, that's

24  correct.  If you're qualifying it with what appears to be

25  minors, you're correct.

101

1   Q.  And who you thought minors, correct?

2   A.  I don't have any thought, I don't know, I can't advance my

3   knowledge.  I can tell you they appear to be minors.

4   Q.  And you created that on your computer?

5   A.  I did.

6   Q.  And you brought that computer across state lines to

7   Oklahoma, correct?

8   A.  I did.

9   Q.  Now, sir, as to the factors and I believe -- forgive me if

10  I'm mispronounce, but the Martian case or Marchand case that

11  you testified to earlier?

12  A.  Yes.

13  Q.  You are familiar with that, correct?

14  A.  Yes, I am.

15  Q.  And the different factors that the Court used in that

16  case, you recited those factors, correct?

17  A.  I went over a summary of them.  I don't know if I recited

18  them all, but…

19  Q.  And can you tell me again what your opinion is as to those

20  factors and their relevance or nonrelevance to whether or not

21  someone would know they were viewing an image of an actual

22  versus a virtual child?

23  A.  The relevance is this:  The court in Marchand was

24  examining elements of digital images and making a determination

25  that because they saw what they thought were realistic light

102

1  sources, realistic shadows, utterly real expressions on the

2  minors' face, I think was the quote they made, that convinced

3  them that what they were looking at were actual minors.  And my

4  demonstration with the exhibit I used was, that is not

5  technologically an appropriate way to analyze whether a digital

6  image contains an actual minor because I obviously created one

7  that had all those Marchand factors, but wasn't an actual

8  minor.  And they could have easily been doing that in that

9  case, looking at an image similar to the one I produced and yet

10  convicting that defendant.

11  Q.  And since we can never actually get into the mind of a

12  defendant at any given moment to know what he or she is

13  thinking, let's say at the time that they are downloading these

14  apparent images, would it's be reasonable to look at

15  circumstantial evidence surrounding that downloading to

16  determine, to help determine what may have been in that

17  defendant's mind when they were downloading that image?

18  A.  I would say that it would be reasonable to look at any

19  information which advances that defendant's knowledge about

20  whether the image contains an actual minor.  Any information

21  like that would be reasonable to look at, yes.

22  Q.  And you are familiar with 404(b) evidence, aren't you?

23  A.  Yes.

24  Q.  You used it as a prosecutor, didn't you?

25  A.  I think there were a couple of times, yes, where we --

103

1  well, I don't remember if we were successful, but we no doubt

2  argued to a judge for the ability to use that type of evidence,

3  yes.

4   Q.  I think this is one of the cases that was not reversed.

5  Let me refer to it.  State v. Jackson, do you recall that case?

6  A defendant found guilty of aggravated murder and attempted

7  murder.  You were the assistant prosecutor, Michael Horne was

8  the assistant prosecutor and Richard Bell?

9   A.  Yes, I do.  We tried that case twice.  We had a mistrial

10  the first time and the second time finally a conviction.

11  Q.  Correct.

12   A.  I don't remember which prosecutor I was with.  I was

13  second chair on that trial both times.

14  Q.  Have you ever tried a case by yourself as a state

15  prosecutor?

16  A.  Yes, not murder cases, but other cases --

17  Q.  How many times?

18  A.  That was a murder case, the major trial division handles

19  those.  I was not ever in that division, so I was second chair

20  on those, both those murder cases.

21   Q.  And you recall in that case using 404(b) evidence to show

22  that a defendant's prior access to firearms was relevant to

23  show his opportunity in relation to the murder?

24   A.  I'll have to rely on whatever it is you're reading there.

25  I have no recollection, specifically, of 404(b) in that case.

104

1  All I can remember is there was a defendant, there was a murder

2  and I tried it twice.  It was quite a few years ago.

3   Q.  Yes, sir.  Do you remember using a confession in that

4  case?

5   A.  I vaguely -- I vaguely recall that the defendant made a

6  confession to someone else, not to police officers, but to a

7  girlfriend or something like that, that we were attempting to

8  use, and maybe we were successful in using it, I don't recall.

9   Q.  Thank you.  So certainly you understand the importance of

10  a defendant's own words, that would be pretty potent evidence

11  of what may have been in his or her mind at a given time,

12  correct?

13   A.  Well, in that case it was evidence of what he did, so

14  that's how we were using it.  It certainly is evidence of what

15  he did if he told someone that he committed a murder.

16   Q.  If someone -- all right, if someone told you I downloaded

17  child pornography, what would that mean to you?

18   A.  That would mean to me that the person downloaded an image

19  that to them appeared to be child pornography, because there's

20  no way they could know.  They certainly aren't saying that they

21  know they downloaded child porn, because as I told you, it's

22  impossible for them to know that unless they participated in

23  the creation of that image.

24   Q.  So from all that, is you answer that you think that

25  they -- you would mean that they believe that they downloaded

105

1   child pornography, whether or not it was or not?

2    A.  No, my answer would be they downloaded something they --

3   that appears to be child porn.  They could have easily been --

4   There's two things they could have done.  They could have been

5   exercising a First Amendment right according to our Supreme

6   Court or they could have been committing a felony.  Which one

7   they did, they don't know and I can't tell you.

8    Q.  Have you ever come across a case where in your vast

9   experience where an individual has confessed to downloading

10  virtual child pornography?

11   A.  No, I don't know how they would do that.  How would they

12  know what they were downloading until they were later told by

13  law enforcement what it was.  So, I've never heard of such a

14  case.

15   Q.  And have you heard of a case where a defendant has

16  admitted to downloading child pornography?

17   A.  Have I, just like in the media, heard of a case?  Is that

18  what you're referring to?

19   Q.  No, in your experience at all.

20   A.  I believe in the Marchand case, as a matter of fact, there

21  was some confessional statements made by that defendant

22  indicating that he had downloaded child porn and he knew that

23  they were actual minors or something like that.  I'm trying to

24  recollect the whole case.

25   Q.  I understand.  And although not the entirety of the

106

1   evidence of what may have been in that defendant's mind,

2   certainly it would be a factor to consider in determining what

3   the defendant may have been thinking he was downloading at the

4   time?

5   A.  As to what he's thinking?

6   Q.  Or as to what he thought he was downloading at the time.

7   A.  Yes, if he's saying I think I have child porn, then that's

8   what he thinks.

9   Q.  Are you aware Mr. Shreck made that statement?

10   A.  I am not.

11   Q.  So is that now a factor in your consideration in this

12   case?

13   A.  Not at all.

14        MR. SMALLWOOD:  Judge, I object to that.  He's

15   indicated that he was not aware of that.  How can it be a fact.

16        THE COURT:  Sustained.

17   Q.  (By Mr. Greer)  Sir, do you recall writing an article, The

18   Cutting Edge, I believe?

19   A.  That's actually a column that I write on law and

20   technology for about the past eight years or so for the

21   Cleveland Bar.

22   Q.  I apologize.

23   A.  But not --

24   Q.  Do you recall writing that body of work?

25   A.  Yes, I try to crank one out once a month.  It's often a

107

1   challenge to find new topics after that period of time.

2   Q.  Now in regards to that article, The Cutting Edge, you had

3   indicated the difficulty of post Free Speech, did you not, in

4   determining whether or not an image was actual or virtual?

5   A.  Well, I don't know which article -- I've written on it a

6   couple of times.  I wouldn't say that's an accurate statement

7   of my opinion.  It's always been impossible to determine if

8   what you're looking at on the internet, whether it's a digital

9   I image from MSNBC which claims to be from the Iraq War,

10  there's no way any of us looking on their web site can say to

11  reasonable degree of scientific certainty or otherwise, that

12  that's an actual image, unaltered, from the Iraq War.  So, the

13  U.S. Supreme Court didn't create a new thing in digital

14  imaging, they just captured what they -- what their opinion

15  was, protected images which are those that appear to be real,

16  but aren't, and the proscribed ones which have always been

17  proscribed, so...

18  Q.  You take us through a hypothetical in that article, if you

19  recall, about a detective being questioned on the witness

20  stand.

21  A.  Yes, I recall, generally, that article, writing that.

22  Q.  Okay.  And you had indicated it's a discourse between the

23  attorney, purportedly the prosecutor or maybe the defense

24  attorney and the detective and it goes, "Do you know the

25  identity of the child in this image?"  The detective says no.

108

1  And you say "Statistically in the overwhelming majority of

2  child porn cases, no local victims exist."

3       If there was evidence that, as I said earlier, those

4  victims were identified as actual minors, then that would

5  answer that potential problem in that hypothetical, correct?

6   A.  I don't understand what the -- what is the potential

7  problem you're pointing out?  I'm not understanding you.

8   Q.  That was a terrible question.  I apologize.

9       In the hypothetical, the detective indicates he does

10  not know the identity of a child in the image.  What was the

11  purpose of you writing that question and that answer.

12   A.  That question and that answer relates to authentication,

13  not the issue of whether a defendant can tell whether a minor

14  is in an image, that's after a Court has determined, yes,

15  there's a way a defendant could have known this, so therefore

16  let's go to trial.  Now the detective's on the stand in that

17  hypothetical and is being asked to authentic a digital image

18  and declare from the witness stand that it in fact includes an

19  actual minor.  And the point of that hypothetical is because

20  there are, in the overwhelming majority of cases, no local

21  victims, that law enforcement professional is going to be left

22  guessing that it's a minor or being allowed to offer hearsay

23  about what some other law enforcement professional told him or

24  her, that it's a minor, or some such other type of testimony

25  that I regarded in the hypothetical as questionable under the

109

1   Rules of Evidence.

2    Q.  Have, in your experience, have you ever created an image

3   of a virtual child?

4    A.  Using the definition that was in the Ashcroft case, every

5   one of the images you just saw were virtual child pornography.

6   That's the definition I'm going by is the Supreme Court, unless

7   there's another one you want me to use.

8    Q.  Yeah, I want you to use the definition -- well, let me ask

9   it a different way.

10        When you take the child -- when you take the face, the

11   head of an actual minor, or the body and face of an actual

12   minor and insert it into another digital image where it makes

13   it appear as if that minor is performing sexually explicit

14   conduct, do you agree or disagree that that's still a violation

15   of the law today?

16    A.  My reading of that Section (c) you referred to is if a

17   person has an image in front of them that they know is an

18   actual minor and then, depending on what the court meant by

19   morph, morphs that into a sexual situation, my opinion was,

20   would be that that Section (c) would come into play, because

21   the individual knows that's an actual minor.

22    Q.  And if one can never get into the mind of an individual, a

23   defendant or suspect at that time, what factors do you see as

24   relevant in determining what -- whether a defendant believed

25   that he was a downloading an actual image versus a virtual

110

1   image?

2    A.  The way this statute could be applied to a defendant is

3   this way.  An individual who's in the image, him or her

4   herself, with the minor, they clearly know that that's an image

5   of child pornography, they're in the image.

6          Secondly, if there was circumstantial evidence of

7   witnesses or others that this person captured the image with

8   either their film camera or their digital camera.  Clearly you

9   now have circumstantial evidence that they know that the image

10  they possess is a minor because they captured it.

11         So those are two circumstances I can think of where

12  knowledge could be established.  It simply can't be established

13  by a person downloading images off the internet that come from

14  who knows where.  They can't ever know.

15   Q.  However, could a factor that law enforcement looks to be

16  the number and nature of web sites that this individual had

17  visited during the period of time that these images were

18  downloaded?  Could that be a factor in determining what a

19  defendant -- whether a defendant knowingly downloaded child

20  pornography?

21   A.  It can't.  Technologically it doesn't advance that

22  defendant's knowledge one step, because as I mentioned to you,

23  before I told you or testified earlier, if I'd have said to

24  you, Mr. Greer, let's go to your home computer and I want you

25  to go to child port dot com, you might be concerned about, hey,

111

1   Mr. Boland, I don't think I'm going to do that, I'm an

2   Assistant U.S. Attorney and I don't want whatever comes up on

3   that home page to hit my computer.  You obviously would assume

4   that that site contains illegal material when it doesn't.

5   Likewise, if you went to a web site that virtual child porn dot

6   com, you might still be worried, I think reasonably so, that

7   just because the website's named virtual child porn dot com,

8   you as an Assistant U.S. Attorney, don't want to take the

9   chance that an actual minor involved in a sexual situation gets

10   downloaded to your computer.  That's my point.  You cannot

11   trust web sites.  So if an individual went to ten different

12   sites that all imply that these are actual minors on those web

13   sites, it doesn't change the -- it doesn't advance their

14   knowledge one bit about whether what they downloaded was an

15   actual minor.

16    Q.  Do you think it's reasonable to assume that someone who

17   went to ten web sites, none of which the name "virtual" was in,

18   and all of which contained the name "child pornography" or

19   "kiddie porn", do you think it's reasonable to assume that that

20   person was looking for child pornography?

21    A.  I have no way to really answer that question as to whether

22   it's reasonable to assume that they are looking for the real

23   child pornography, because the reality is they could know that

24   individuals who create virtual child pornography are never

25   going to market it as virtual child pornography.  They want to

112

1   market it fraudulently, of course, as the real thing.  So this

2   individual might well know I've got to go to sites that imply

3   it's the real thing to find the virtual stuff because no one's

4   going to advertise it -- no one's going to advertise I have

5   virtual child porn because they are recognizing, as I think is

6   a reasonable assumption, that the majority of people searching

7   for child porn on the internet would prefer the real thing.

8   These individuals want reality, they don't want the fake stuff.

9   So anyone who creates virtual child porn is not going to market

10  it that way.  So knowing that, going to sites that imply it's

11  actual minors that -- who knows what that person was thinking.

12  They're trying to get virtual stuff on that site, who knows

13  what they are thinking.  I can't say.

14  Q.  Is that a no?

15  A.  It's the answer in the transcript.  I can't say.

16  Q.  What if you had that evidence coupled with the defendant's

17  admission that he downloaded child pornography, would those two

18  factors come into play together?

19       MR. SMALLWOOD:  Judge, I'm going to object to that, as

20  it assumes a state of facts not evidence.

21       THE COURT:  Mr. Greer, where-- I mean, we're going to

22  have an argument section of this and not to derogate the

23  witnesses skills as a lawyer, but that's kind of my department.

24       What we're doing here is to talk about the facts and

25  then what can be adduced about the capability of the

113

1    technology.  This witness is here with some specific orders

2    from the Court as set out in our April 12th, 2004, order, and

3    one of the direct orders to this witness was to be prepared to

4    address all of the issues in United States vs. Marchand.  And

5    clearly the preparation of these exhibits was done in response

6    to that court order that he be prepared to address it, but

7    that's a factual inquiry and not a legal inquiry.  You can pick

8    his brain in the hall, if you want.  But for our purposes,

9    let's keep it to the facts.

10         MR. GREER:  I will, Your Honor.

11         THE COURT:  All right.

12   Q.  (By Mr. Greer)  Sir, the Defendant's Exhibit 33 that has

13   the variety of different images that you testified to?

14   A.  Oh, yes, the contact sheet I see what you're saying.

15   Okay.

16   Q.  Do you recall the questions about that and testifying to

17   that?

18   A.  Yes.

19   Q.  Are any of those images, were any of those images created

20   by you from blank space, nothing?

21   A.  No.

22   Q.  Have you ever created an image, a virtual image of a child

23   from nothing?

24   A.  No.

25   Q.  Ever?

114

1  A. No.

2  Q. Have you -- I'm sorry.

3  A. No, I have not.

4  Q. Have you ever heard of any other experts in your field

5  creating a virtual child from nothing?

6  A. No.

7  Q. And why is that?

8  A. I agree with Detective Holloway, the technology is not

9  advanced enough, for purposes of a demonstration here or the

10  educational things I do with the software and using these

11  images, the technology is not to the point where you can take a

12  blank screen and paint with any kind of a program, and make an

13  image of a child that would fool even the most casual observer.

14  It just -- that technology is not here.  That's the technology,

15  as you had asked me before, which was exclusively dealt with in

16  Marchand, but the technology for Photoshop to do what I've

17  demonstrated has been around for eight or ten years now.

18  Q. And your technology requires the existence of some sort of

19  image first, correct?

20  A. Yes, to do what I've done, I had starting images in all

21  the examples, that's correct.

22  Q. It does not have to do with creating a virtual image from

23  nothing, correct?

24  A. Well, you're mixing your words here.  Creating an image

25  from nothing.  Yeah, creating a digital image from nothing, a

115

1  blank screen, that's not what I'm doing, correct.

2   Q.  You're starting with some sort of image and making some

3  modifications to it in some form or fashion?

4   A.  Yes.

5       MR. GREER:  One moment, Your Honor.

6       THE COURT:  All right, go ahead.

7       MR. GREER:  I will pass the witness, Your Honor.

8       THE COURT:  All right.  Mr. Smallwood.

9       MR. GREER:  Very briefly.

10                  REDIRECT EXAMINATION

11  BY MR. SMALLWOOD:

12   Q.  Given your testimony here and the exhibits that have been

13  offered and introduced in this hearing, assuming that I wanted

14  with all my heart and soul to see images on a computer screen

15  that showed actual children engaging in explicit sexual conduct

16  in violation of this statute, assuming I wanted to do that more

17  than anything in the world, I accessed a web site or something

18  on the internet that purported to show me those images that I

19  wanted, what could convince me or what could I do to make

20  certain to myself that I was in fact looking at actual minor

21  children engaged in explicit sexual conduct?

22   A.  There's nothing you can do.

23   Q.  Absent being the person who captured the image or

24  participated in the image, there is no ability that anyone has

25  to be able to make that determination?

116

1   A.  There's no ability to have to know.  They can guess, flip

2   had a coin, speculate all they want, but to know what they are

3   looking at is an actual minor, again, I refer to this Exhibit

4   35.  I was fooled by that cover and someone could easily --

5   perhaps Demi Moore's face isn't even the face that belongs on

6   the that body, I can't tell you.  I'm looking at it just like

7   you are and all evidence of any alteration is erased from that

8   image.  It's same for any user on the internet.  I can believe

9   this is Demi Moore on the front of this Exhibit, but I don't

10   know and I'll never know.

11   Q.  That doesn't make it so?

12   A.  It doesn't make it so, no.  And you could tell me it is

13   her, you could even tell me you captured the image.  I'm still

14   relying on you or relying on the Star magazine, but I don't

15   know.

16   Q.  Regarding the images that you have created and the

17   exhibits that we have offered in this courtroom, partially at

18   any rate, at the Court's direction, do you have any information

19   that would lead you to believe that any of the images that you

20   used to create this were actual children or virtual children?

21   Do you have any way to know that won't way or the other?

22   A.  No, I don't and in fact these were created to demonstrate

23   the technology and to be in conformance with the Court's order

24   to -- and also for some educational purposes, a selection of

25   these images is used at my CLE programs to caution both judges

117

1 and lawyers about the use of digital images and some of the

2 concerns therein. So these have multiple purposes, not only

3 educational but they're technological demonstrations as well as

4 now trying to conform as best I could, to Judge Holmes' order.

5 Q. Your -- the definition that you have been using in this

6 hearing of the virtual child pornography, we have on an easel,

7 is that -- did you create that?

8 A. Did I create the definition?

9 Q. No, no, the exhibit or the document.

10 A. Yes, I excerpted that directly from Ashcroft vs. Free

11 Speech Coalition, that definition is contained in the first

12 paragraph of the syllabus of that opinion.

13 Q. And is that the definition you have been using in

14 testifying here today?

15 A. Yes, and in my previous cases, I assume the Supreme Court

16 definition is the one that controls so that's what I go by.

17     MR. SMALLWOOD: Pass the witness.

18     THE COURT: Anything further, Mr. Greer?

19     MR. GREER: Yes, Your Honor.

20     THE COURT: Go ahead.

21     MR. GREER: Thank you.

22          RECROSS-EXAMINATION

23 BY MR. GREER:

24 Q. Sir, counsel asked you about the defend -- or about an

25 individual, the impossibility of them actually knowing that an

118

1    image they downloaded was actual, was an actual child or a

2    virtual child, correct?

3     A.  Yes, I recall that question.

4     Q.  And you agree -- or your response was it would be

5    impossible for a layperson to determine that?

6     A.  Let me qualify that.  It would be impossible for a person

7    who did not participate in the creation of the image to know

8    it's an actual minor.  So layperson, expert, whoever, that's

9    the qualification I'd make.

10    Q.  However, would it be possible for someone who downloaded

11    an image of a minor to have reason to know or an awareness or

12    notice or a belief or a grounds for belief warranting further

13    inspection that the image may be real versus virtual?

14    A.  That sounds like had a quote that came out of Marchand

15    regarding willful blindness, I believe that's what you're

16    referring to.  And they may have reason to know -- not reason

17    to know, scratch that.  They might have reason to believe

18    because web site claims that these images are real, but the

19    flaw in that logic is the final part of your comment which is

20    "warranting further investigation."  As I've testified and

21    Detective Holloway conceded, even further investigation of

22    these images, knowing the file name, and in fact the Government

23    claiming to know who submitted this image to a data base, that

24    further investigation, the Government still cannot determine

25    and know that that's an actual minor.  Certainly a citizen

119

1   can't either.  So the flaw in there is there's no further

2   investigation they can do, sir.

3    Q.  And if, in sticking with my question regards to a -- this

4   is a former jury instruction that this Court here has given

5   before in a case similar to this, you indicated that when I

6   asked about any grounds for belief warranting further

7   inspection or inquiry, I'm referring to a suspect when they

8   download an image, if they do no further inspection or inquiry

9   in relation to that image, but merely download other images

10   from other web sites of apparent child pornography and do not

11   further investigate those images, would that be relevant to you

12   in determining whether or not that person thought or believed

13   that they were downloading actual versus virtual child

14   pornography?

15        MR. SMALLWOOD:  To which I'll object, Judge.  The

16   thought or belief is not the issue.  It's knowledge.

17        THE COURT:  He can ask the question.  Go ahead.

18    A.  It would not be relevant because there is no further

19   investigation that an individual can do besides looking at the

20   image, which Detective Holloway and I agree, is not sufficient

21   to determine it's an actual minor; looking at the file name of

22   the image, which the Government and I agree, is still not

23   sufficient to determine it's an actual minor; or looking at the

24   name of the web site from which they downloaded the image,

25   which as I testified is infinitely malleable and also does not

120

1   guarantee knowledge that it's an actual minor.

2        So there -- the question is sort of two questions in

3   one.  There's no further investigation they can do, so it

4   really doesn't qualify as willful blindness.  It's not like

5   it's a box marked cocaine and they refuse to open it.  There's

6   nothing for them to open any further.  They have what they have

7   and that is insufficient information to give them knowledge, no

8   matter what.

9   Q.  (By Mr. Greer)  If they have what they have and they've

10  done that for over a year on hundreds of web sites that appear

11  to depict child pornography, is that probative to you to what

12  they thought that they were downloading?

13   A.  It isn't because it's still, without knowledge, appears to

14  be they are exercising their First Amendment right.  Once they

15  know that they have an image of an actual minor, they have

16  crossed the line.

17   Q.  Using your common sense, would that come into play as to

18  whether that person knew, based on the scenario I just gave

19  you?

20   A.  Actually, using my common sense it would indicate they

21  don't know, there is no way for them to know.  It's still the

22  same answer.

23        MR. GREER:  Thank you.

24        THE COURT:  All right, anything further?

25        MR. SMALLWOOD:  No, Your Honor.

121

1    THE COURT:  All right.  You stay step down.  Thank you

2  sir.

3    THE WITNESS:  Thank you, Your Honor.

4    THE COURT:  All right, Mr. Smallwood, anything

5  further, sir?

6    MR. SMALLWOOD:  We have nothing further, Your Honor.

7    THE COURT:  All right, Mr. Greer, anything further,

8  sir, on this?

9    MR. GREER:  No, Your Honor, thank you.

10    THE COURT:  All right.  At this time I would like to

11  recall Mr. Holloway.  If you could return to the stand, please

12  sir, I remind you you are still under oath.

13    THE WITNESS:  Yes, sir.

14                    DONALD HOLLOWAY

15  Called as a witness called by the Court, having been previously

16  sworn, testified as follows:

17                    EXAMINATION

18  BY THE COURT:

19    THE COURT:  Mr. Holloway, tell me about, and I

20  understand Mr. Greer's focus on those things that deal with

21  morphing and taking a head and moving it on to a body, but

22  let's start with this Defendant's Exhibit 29, for example,

23  which is, I would say topless, but it doesn't really narrow it

24  down a whole lot.

25    MR. SMALLWOOD:  Your Honor, he may not have --

122

1        THE WITNESS:  I don't have that up here.

2        THE COURT:  All right, if you could bring that

3   forward, please.

4        There's certainly a distinction between what passes as

5   a so-called morphing and what we've seen here today, that is

6   alterations of a body to make an adult into a minor.  Have you

7   previously seen this kind of a presentation that we've seen

8   today?

9        THE WITNESS:  I've seen demonstrations on how you can

10  cut and paste a picture on to another, which is what I term a

11  morphing.

12       THE COURT:  Right, that's the morphing part.

13       THE WITNESS:  Yes.

14       THE COURT:  But I'm talking about taking an adult,

15  that's not morphing, what we saw here, at least with respect to

16  this Exhibit 29 and several other of the exhibits, is actually

17  taking somebody who started as an adult and with respect to

18  shadows, effecting size reductions and color reductions, that

19  had the effect of changing an adult into a child.

20       THE WITNESS:  Right.

21       THE COURT:  Is that a demonstration you have seen

22  before today?

23       THE WITNESS:  I've seen similar things, yes.

24       THE COURT:  Okay.  Having seen this part of the

25  presentation, and I mean you do this and it's important work,

123

1   how is somebody supposed to know if you're looking at Exhibit

2   29 as the child presentation, that is as it currently exists,

3   how would one know or could one know, in that circumstance,

4   that it was a child or was an adult or was...

5          THE WITNESS:  To me it would have to go --

6          THE COURT:  Is it something that's knowable?

7          THE WITNESS:  I'm sorry.

8          THE COURT:  Go ahead.

9          THE WITNESS:  Yes, I think it's knowable, based on

10  what the person that's looking at the image at the time thinks.

11  If they think it's a child and it looks like a child, to me

12  their knowledge is yes, that is a child.

13         THE COURT:  But we know that Exhibit 29 is not a

14  child, right?  I mean --

15         THE WITNESS:  -- as far as we can tell, yes.

16         THE COURT:  Based on the testimony here today, right?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  We know that at least the starting image

19  that was modified was not a child, right?

20         THE WITNESS:  Yes.

21         THE COURT:  Does it become unlawful once it's modified

22  to look like a child, even though we know it's not a child?

23         THE WITNESS:  In my opinion, yes.  Once the picture

24  looks like a child, it's a violation of the child pornography

25  statutes.  And like I said, you have to take in the whole

124

1  totality of everything that's going on, just one image like

2  that in and of itself may not be a violation, but when you look

3  at the whole number of pictures, any other type of --

4      THE COURT:  No, understand that.  I'm just trying to

5  focus on this one issue, because the question -- what we're

6  doing here today is about enforceability of the law itself,

7  not -- we're not trying to retry the case or try the case in

8  advance and we sort of spilled over into that at various times.

9  But I'm not -- that's not my purpose here.  My purpose here is

10  to try to appreciate the legal requirements the statute

11  contemplates and then to figure out whether as a fact matter,

12  that the facts, there are circumstances under which it's simply

13  not knowable.

14      Now, you would agree that if you have a picture that

15  looks like Exhibit 29 and the possessor of that knows the child

16  involved, therefore they know that's a child, right?

17      THE WITNESS:  Yes, sir.

18      THE COURT:  Okay.  And that and that satisfies the

19  knowing element and that's a big part.  Now, suppose that this

20  person holds the same picture and knows that it's not a child

21  because they know it started as an adult and was massaged,

22  right?

23      THE WITNESS:  Yes.

24      THE COURT:  Now that's clearly they can't know it was

25  a minor because they know it wasn't a minor, right?

125

1        THE WITNESS:  Yes, following that logic, yes.

2        THE COURT:  They can't both know it's a minor and know

3    it's not a minor at the same time, right?

4        THE WITNESS:  Yes.

5        THE COURT:  So in that case, they can't be prosecuted

6    for knowing that they had pornography of a child, because in

7    fact they knew and they knew it was not a child?

8        THE WITNESS:  Yes, the person that did that to the

9    picture, I would agree with that, yes.

10        THE COURT:  Right, because they -- right.  So then the

11    question is, if you just have this picture, this is the only

12    thing that you've got in your collection and how do you know,

13    given what we've seen, whether this was started as an adult or

14    was a minor.  Is that a knowable thing, from your standpoint?

15        THE WITNESS:  Not under those circumstances, no, sir.

16        THE COURT:  All right.  And so how would we prove or

17    could we prove, with respect to that defendant?  It would then

18    be impossible, at least what I understand your testimony, it

19    would be impossible to prove beyond a reasonable doubt that

20    they knew they were possessing a picture of a minor, right?

21        THE WITNESS:  Once again I think you would have to go

22    back to the entire circumstances around that, just the picture

23    in and of itself may not be, but if you look at what the person

24    that downloaded it or kept the picture, what they thought it

25    was, then I believe at that point you can have a violation.  If

126

1    they actually thought it was a 12-year-old girl that was nude,

2    and the picture depicts what appears to be 12-year-old that's

3    nude, I believe at that point you have a violation.

4          THE COURT:  But we know that if the person who can

5    possess this picture, if you made the changes, right?

6          THE WITNESS:  Yes.

7          THE COURT:  And you agree that that person is not

8    subject to the statute because they knew it was an adult,

9    right?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  But if that person gives it to

12    somebody else who we agree doesn't know it, right?

13          THE WITNESS:  Right.

14          THE COURT:  Because they weren't there.

15          THE WITNESS:  Right.

16          THE COURT:  But they believe or would like to believe

17    that it is a minor, they are now guilty?

18          THE WITNESS:  I believe so, yes, sir.

19          THE COURT:  Because even though they can't know it and

20    don't know it, they believe it?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Or they would like to believe it, or

23    that's certainly what they went looking for?

24          THE WITNESS:  Yes.

25          THE COURT:  And so the statute, your view, on a

127

1  picture that a person who created it can't be prosecuted,

2  actually the next person in line can be because they don't

3  know?

4      THE WITNESS:  Yes, sir.  And to me a reasonable person

5  at that point if they receive information like that, they could

6  report it to the police and say I got this picture, it appears

7  to be a child and they could turn it over to the police which

8  is what I think any reasonable person would do instead of

9  keeping that picture and putting it with others or even keeping

10  that one picture, having the belief that that is an actual

11  child.

12      THE COURT:  Now part of the position of the United

13  States necessarily in prosecuting this case as previewed by

14  some of the examination that's gone on before, is to establish

15  that in fact minors were involved in it, right?

16      THE WITNESS:  Yes, sir.

17      THE COURT:  But if the person, if the picture,

18  hypothetically, if Exhibit 29 was of a minor, right?

19      THE WITNESS:  Yes.

20      THE COURT:  But the person who got it believed,

21  because they had seen this demonstration, believed that it was

22  a modified picture of an adult, is that person now innocent?

23      THE WITNESS:  I don't know, sir.

24      THE COURT:  Well, but I'm just saying before if they

25  believed it was a minor when it was really an adult, they were

128

1   going to go down for it, right?

2        THE WITNESS:  Yes.

3        THE COURT:  And now if they believe it was an adult

4   when it was a minor?

5        THE WITNESS:  Then I think you have to go with the

6   reasonableness of what the person is thinking as they are

7   looking at the picture, what do they will really think.  And if

8   they think it's a person that's an adult that's 23 years of

9   age, but in actuality it's an eight-year-old, I mean, you can

10  obviously tell the difference between a 23-year-old and an

11  8-year-old.  If you are dealing with a 23-year-old and a

12  17-year-old, then I guess a reasonable person could probably

13  confuse those, so you would have to look whole picture itself.

14       THE COURT:  And you would agree, at least with respect

15  to Defendant's Exhibit No. 29, that no reasonable person could

16  know that that was an adult or a minor, right, from what we

17  have seen?

18       THE WITNESS:  Yes, sir, that's what I would say.  As

19  far as that specific picture like that, yeah.

20       THE COURT:  And that knowledge certainly couldn't be

21  proven beyond a reasonable doubt, it couldn't be proven by any

22  burden of proof, right?

23       THE WITNESS:  No, sir, from that picture, looking on

24  this spreadsheet, I could not tell you how old that person was.

25  It could very well be an adult as far as I'm looking at it and

129

1    if it was a child, you know, it would be an older teen.

2          THE COURT:  But nevertheless a violation of the

3    statute?

4          THE WITNESS:  Yes.

5          THE COURT:  If in fact a minor, right?

6          THE WITNESS:  Right.

7          THE COURT:  All right, anything further from this

8    witness based on my questions?

9          Mr. Smallwood, anything further of Mr. Holloway?

10         MR. SMALLWOOD:  I have one, if I could, Judge.

11         THE COURT:  Yes, go right ahead.

12                 CROSS-EXAMINATION

13   BY MR. SMALLWOOD:

14    Q.  Detective Holloway, based upon your responses to Judge

15   Holmes' questions, am I correct in that if one of your golfing

16   buddies asked you for some advice as to whether something pops

17   up on his screen that appears to be similar to Defendant's

18   Exhibit No. 29 and he knows, talked with you about what you do

19   for a living and, he knows a little bit about that, a little

20   bit about your expertise, am I correct in assuming that you

21   would tell him the safest thing for you to do is just throw

22   that stuff away and never look at it, don't get anywhere near

23   it?

24    A.  That would -- just for the one time, yes, that's what I'd

25   tell him to do.

130

1   Q.  Well, what about -- you say just for the one time.  What

2   about in the future?

3   A.  If it became a recurring thing and he kept talking about

4   that, I'd start wondering what he was doing.

5   Q.  Well, but your advice to a person who views any images

6   similar to Defendant's Exhibit No. 29 is to exercise your

7   discretion on the side of caution and don't exercise your First

8   Amendment rights to look at that stuff, because you might very

9   well, inadvertently, be violating the statute, if that was an

10  actual child?

11  A.  That is correct.

12  Q.  Okay.

13      MR. SMALLWOOD:  Pass the witness, Your Honor.

14      THE COURT:  Mr. Greer, any questions, sir?

15      MR. GREER:  Yes, Your Honor.

16      THE COURT:  Go ahead.

17          CROSS-EXAMINATION

18  BY MR. GREER:

19  Q.  And Detective Holloway, in regards to Defendant's Exhibit

20  No. 29, if that exhibit, you had found on a computer, on a hard

21  drive of a computer and had found several other photographs of

22  the -- or several other images of the same apparent minor in

23  the same scenario, would that have any bearing on your opinion

24  as to whether or not that image was an actual minor or not?

25  A.  Yes, it would.

131

1   Q.  Why?

2   A.  A series would be a collection of several different photos

3   of that same person in probably the same setting, that would be

4   something that would be harder to recreate due to the

5   backgrounds and the scenery and the actual person itself, it

6   would be difficult to get the same thing over and over like

7   that.  And that's why we look at backgrounds and see if the

8   background changes any, if they're in different types of

9   settings, you look at all of that.  The series would, to me,

10  would be harder to than an individual picture.

11  Q.  What about an MPEG movie of an apparent minor engaging in

12  sexually explicit conduct?  What if that were also on a

13  suspect's computer?

14  A.  Of the same person?

15  Q.  Yes.

16  A.  Yes, that would be extremely, if not, I would say

17  impossible to recreate that.

18  Q.  Did you find any MPEGs in this case.

19  A.  Yes.

20  Q.  Do you recall what that was entitled?

21  A.  Something along the lines of "dad do six" or something

22  like, along those lines.  I can't remember the exact title of

23  it.

24  Q.  Did you watch it?

25  A.  Yes.

132

1    Q.  Can you tell us what it appeared to depict?

2    A.  An adult male having sexual intercourse with a young

3    female.

4    Q.  Thank you.

5         THE COURT:  All right, anything further?

6         MR. SMALLWOOD:  Just a couple.

7         THE COURT:  Go ahead.

8                  RECROSS-EXAMINATION

9    BY MR. SMALLWOOD:

10   Q.  Detective Holloway, in reference to Defendant's Exhibit

11   No. 33, as well as all of the exhibits which I believe you

12   viewed, 1 through 32, can you tell this Court which of those

13   images depict the use of actual children and which don't?

14   A.  No. 1 appears to.

15   Q.  No, no, no, no.  Not what it appears to.  Which of those

16   images, you can say with certainty depict are using actual

17   children, not what appears, it clearly appears that way, but

18   how do you discern that they are actually using actual

19   children?

20   A.  Based on Mr. Boland's statements that defense Exhibit No.

21   1 contains pictures of one of the Olsen twins which are known

22   to be under the age of 18, I would say that one would be.

23   Q.  Do you know when that picture was taken?

24   A.  I have no idea.

25   Q.  Do you know how old the Olsen twins are?

133

1   A.  I believe they are 17.

2   Q.  How do you know that?

3   A.  There's a radio station that I listen to sometimes that

4   has a countdown clock 'til they turn 18.

5   Q.  What's their date of birth?

6   A.  I couldn't tell you that.

7   Q.  Do you know if Mr. Boland knows when these photographs

8   were taken?

9   A.  No.

10   Q.  Or these images were created?

11   A.  No.

12   Q.  Then he doesn't know how old they are?

13   A.  Yes, he does.

14   Q.  How does he know that?

15   A.  He said in his testimony that they were under the age of

16   18.

17   Q.  How would you know that any of these images were created

18   using actual children?

19   A.  They all were.  I mean, not all.  I mean, No. 22 was, No.

20   1, No. 13 --

21        THE COURT:  Mr. Holloway, let me ask you, let me just

22   try to…  If I understand what Mr. Smallwood is asking you is

23   if you were merely handed this contact sheet without reference

24   to any of the testimony, I believe is the question.

25        MR. SMALLWOOD:  A better question, by viewing this

134

1   contact sheet.

2          THE COURT:  Just by viewing the images themselves as

3   you've seen them on the contact sheet and on the screen,

4   whether in viewing them, any of these you would say that you

5   know, whether or not these involved actual children?

6          THE WITNESS:  As far as I'm aware, you cannot create

7   an image of a child virtually.  Therefore, the images to me

8   that appear to be kids, such as in Defense Exhibit No. 22, it

9   appears to be an actual child, as does Defense Exhibit No. 13,

10  appear to be actual children and I believe they are actual

11  children.

12  Q.  (By Mr. Smallwood)   Engaged in explicit sexual conduct?

13  A.  Yes.

14  Q.  But you saw how that was created?

15  A.  With using pictures of what are real kids.

16  Q.  But they weren't engaged -- there was no sexual

17  exploitation going on there, was there?

18  A.  But once that's construed to look like that, then you have

19  a violation.

20  Q.  That's your reading of the statute?

21  A.  That is the morphing, the way the morphing exception reads

22  and the definition that you have on the board of virtual child

23  pornography says by any means other than using real children.

24  There were real children used in this, therefore, to me, that

25  does not apply.

135

1   Q.  How do you know that's a real child?

2   A.  They can't be created like this.

3   Q.  Well, how do you know that's not a composite of hair and

4   eyes and nose and chin from four different children?

5   A.  The picture --

6   Q.  Pardon me, sir.  How do you know that by viewing this

7   document?

8   A.  They do not appear to be morphed in any way other than --

9   or they appear to be morphed.

10   Q.  I'm not talking about what it appears to be.  How do you

11   know, what gives you knowledge that the image in Defendant's

12   Exhibit No. 22 is an actual child?

13   A.  I can't say with a 100 percent certainty.

14   Q.  Can you say with any degree of certainty?

15   A.  99 percent, sir.

16   Q.  And what's that based upon?

17   A.  Just the fact of the technology is not there to create

18   these type of images, at this time, that I'm aware of and you

19   cannot create, you cannot create that type of image without

20   taking a picture of a real child and making it into a sexual

21   situation.

22   Q.  You saw all that this technology is capable of doing with

23   images that are not even human at all, did you not?

24   A.  I believe all of these were used with real images at the

25   beginning.  They started off as a real image.

136

1   Q.  Well what about Defendant's Exhibit No. 24, which is a

2   mannequin

3   A.  Then that would be one exception.  But however most, 90, I

4   don't know how many percent of these, but all these -- most of

5   these started with a real picture and they were changed.

6   Q.  You say a real picture?

7   A.  Yes.

8   Q.  How do you know that the image that anybody started with

9   was the picture of a real person?  How do you know that, or how

10  would anybody know that?

11   A.  The technology does not exist to create fake people on the

12  internet in a picture --

13   Q.  How do you know that these pictures of purported people

14  were not composites of half a dozen other body parts taken from

15  somebody else?  You've seen that done here.

16   A.  Then they were all from real kids.  I don't, I mean, I

17  don't know what you want me to say, but that's, the technology

18  isn't there to do that yet.

19         THE COURT:  Mr. Holloway, I think that what he's

20  saying is if we could direct our attention to Exhibit 22, for

21  example, and we saw the beginning of that picture of the

22  female's face, is whether even that face that was identified as

23  the starting picture that they used, whether in fact that

24  wasn't necessarily a picture that itself wasn't created from

25  other composite parts, that is a forehead and eyes, a nose and

137

1   a mouth?

2          THE WITNESS:  Okay.

3          THE COURT:  And built at that point.  Now, it

4   certainly, as I understand your testimony, is that it appeared

5   from what he identified as the starting image, that it appeared

6   that the starting image was a minor?

7          THE WITNESS:  Yes.

8          THE COURT:  But, I guess the question is, how do you

9   know that what he identified as the starting image, in fact

10   itself wasn't built from other components, all of which could

11   have been adults.

12   A.  I guess without -- I can't say a hundred percent, no.

13   Q.  (By Mr. Smallwood)   Well, can you say with any degree of

14   certainty on any of this in response to Judge Holmes' question,

15   any of these images?

16   A.  Not with a hundred percent, no.

17   Q.  Isn't it a fact that law enforcement regularly uses what's

18   known as progression software in an effort to find lost kids

19   who ostensibly disappeared at the age of 8 or 9 and they

20   attempt to advance them in age?

21   A.  Yes, I've seen those.

22   Q.  Does that, does that help you at all in this, in your

23   making this determination as to what's, what you can rely on

24   and what you can't?

25   A.  Once again, that started with a real picture.

138

1   Q.  Well, it may have started with a real picture, but what

2   ultimately was created?

3   A.  A likeness of that child at an older age.

4   Q.  But is that a real person?

5   A.  No.

6   Q.  Is that an actual child?

7   A.  No.

8   Q.  Because it's been altered, correct?

9   A.  That not true, sir.

10   Q.  The ultimate progression, the enhancement, computer

11   enhancement progression through say from an age of 8 to 14, the

12   14-year-old is an actual child?

13   A.  No.

14   Q.  It's wholly created as a result of the skill of a software

15   manipulator; is that correct?

16   A.  Yes.

17        MR. SMALLWOOD:  That's all I have, Your Honor.

18        THE COURT:  All right, Mr. Greer, anything further,

19   sir?

20        MR. GREER:  No, Your Honor.  Thank you.

21        THE COURT:  All right.  Thank you, Mr. Holloway.  I

22   appreciate your time.

23        THE WITNESS:  Do you want me to leave this up here?

24        THE COURT:  You can hand that back to these folks when

25   you get back down.

139

1          THE WITNESS:  Okay.

2          THE COURT:  All right.  Is there anything further on

3    evidence in this regard today?  Mr. Smallwood, anything further

4    on evidence, sir?

5          MR. SMALLWOOD:  No, there isn't, Your Honor.  Could we

6    approach the bench?

7          THE COURT:  Yes, go ahead, counsel approach.

8          (Whereupon counsel approached the bench and the

9    following proceedings were had out of the hearing of open

10   court.)

11         THE COURT:  Yes.

12         MR. SMALLWOOD:  Your Honor, I'm a little concerned for

13   my witness' welfare based upon the rather intimidating nature

14   of the Government's questions.  I'm going to ask if I might

15   inquire of these prosecutors at this point in time.  May I do

16   that, Your Honor?

17         THE COURT:  Sure.

18         MR. SMALLWOOD:  Are you going to arrest this guy?

19         MR. GREER:  No, I don't intend to arrest him.

20         MS. MORGAN:  Not now.

21         MR. SMALLWOOD:  Is he going to be charged?

22         THE COURT:  Well, he prepared these pursuant to a

23   court order.

24         MR. GREER:  He certainly did.

25         THE COURT:  And second of all, their witness just

140

1  testified that it can't be a violation because he knew they

2  weren't minors.

3       MR. SMALLWOOD:  That's correct, Your Honor.

4       THE COURT:  So, now if he's --

5       MR. SMALLWOOD:  I'm not worried about the ultimate

6  outcome of the case.

7       THE COURT:  If he's going to distribute these, now

8  that's what I was going to be concerned about, then that's a

9  whole different matter.

10       THE WITNESS:  He's not about to do that, Judge.

11       THE COURT:  I'm agnostic -- of course he's not.  But

12  I'm just saying I'm agnostic as to the legal position

13  articulated by Mr. Holloway at this time.  That is, if the next

14  person up doesn't know then what result obtains.  But we do

15  know this, and I think Mr. Greer and Ms. Morgan would concede,

16  that he -- your witness and he testified he knows it's not a

17  minor and therefore he can't be guilty of the knowing element

18  in this particular demonstration.  Moreover, as I say, it was

19  prepared expressly at court order.  So how else are we able to

20  delve into the constitutionality of the statute if you can't

21  look at the things necessary to test the issue.  That's a

22  little bit Orwellian result, it seems to me.

23       MR. SMALLWOOD:  It certainly is, Judge, but I'm very

24  concerned by the comments of Ms. Morgan saying he's not going

25  to be arrested today.

141

1          MS. MORGAN:  You know, looking at this and seeing what

2    he's doing with kids.  If it turns out that he, as the Court

3    was saying, he's distributing these in other places --

4          MR. SMALLWOOD:  No not at all.

5          MS. MORGAN:  -- that might give us pause, but because

6    he testified here today with this, no.

7          MR. SMALLWOOD:  Okay.

8          MS. MORGAN:  He was here because the Judge told him to

9    do it.

10          MR. SMALLWOOD:  Okay.

11          THE COURT:  All right.  Does that give you --

12          MR. SMALLWOOD:  I was hoping they would say this

13    Judge.

14          MS. MORGAN:  We just want to make sure he doesn't go

15    out and do anything with them.

16          THE COURT:  Does his hourly rate change if he gets

17    arrested?

18          MR. SMALLWOOD:  Judge, I would be required to

19    represent him for free.

20          THE COURT:  I know there's office time and there's

21    court time, but when it says for jail time, is that a different

22    rate?  I'm betting if there is, it goes up, it doesn't go down,

23    right?

24          MR. SMALLWOOD:  I want my fingerprints off of that.

25          MR. LaSORSA:  Your Honor, that's one of the reasons

142

1  why he put that marker on the back.  We were very concerned --

2      THE COURT:  No, I understand that.  And I mean, we're

3  going to collect these things and then you can talk to Ms.

4  Morgan and Mr. Greer about how they want to deal with the,

5  perhaps putting them in an envelope and under seal and that

6  would be the end of it and leave one there that's available for

7  any appellate questions that arise and then take care of it.

8  But yeah, I don't think -- it was a legitimate question, I

9  mean, I realize that it causes some upset, but I didn't find it

10  illegitimate questioning to pursue aspects of this and I think

11  that these distinctions between what is morphing and what is

12  modification, that is the Exhibit 29 issue, are two very

13  different things.  And we'll get into that, but we don't need

14  to do that up here.  But you have assurances from the United

15  States insofar as your concern and you-all can work out the

16  evidentiary parts of maintaining a record.

17      Is that sufficient from your standpoint?  Does that

18  take care of any of those issues?

19      MR. SMALLWOOD:  Yes.  And I would like to represent to

20  the Court that this man has three young children, he's a family

21  man, I mean there's simply not going to be any problem by any

22  directive you give him about any of the items that he has

23  created.

24      THE COURT:  Well, I mean, you-all can work that out.

25  I mean, that's my only directive is that counsel can work it

143

1   out.  I mean look, we're all wrestling with the same issues.  I

2   mean, Detective Holloway is in a very tough situation.  He

3   knows this technology is coming.  As I tried to say in my

4   order, we all know the technology is coming.  How fast it's

5   coming, don't know.  Is it here yet?  You argue that it is,

6   they'll argue that it's not.  But we know that likely some day,

7   if not today, it's not that far away where we can't possibly

8   take the position and everybody is wrestling with that.  I

9   mean, where do you go from that, knowing that society has a

10  very legitimate interest in trying to regulate this kind of

11  conduct and do it in a way that at the same time doesn't cause

12  problems.  But that's what we're going to do in the argument

13  section, so that's previews of coming attractions.  All right.

14       MR. LaSORSA:  If the Court please, would the Court

15  give us some direction as to what the witness should do with

16  the images that are identical to that exhibit that he has in

17  his computer.  Now, he has downloaded those images, along with

18  all the other exhibits on to three disks, one for the Court,

19  one for counsel for the Government and one for our file.  But

20  I'm --

21       MR. SMALLWOOD:  They are still on his hard drive.

22       MR. LaSORSA:  They are still -- and some direction

23  from you may be appropriate with respect to, I mean we --

24       THE COURT:  I would download them on to a disk and

25  purge them from the hard drive and leave them here on disk with

144

1   the Court.

2        MR. SMALLWOOD:  Would Your Honor care to admonishment

3   to him from the bench?

4        THE COURT:  All right.  That will be fine.  Does that

5   make sense to you?  All right.

6        (Whereupon counsel returned to their respective places

7   and the following proceedings were had within the presence and

8   hearing of open court.)

9        THE COURT:  All right.  Let's turn our attention to

10  the disposition of the exhibits.  It would appear that the best

11  thing to do is for counsel to work out some matters that would

12  be put on disks, as well as the visuals put into a sealed

13  envelope and would remain under seal here.  With respect to

14  anything left on the hard drive, I would direct that that

15  simply be purged from your hard drive once we have effected a

16  record that will remain here and then purge that from your hard

17  drive and then we will proceed on that basis.

18        Anything else on this issue that we need to talk about

19  for purposes of the handling of the exhibits here?

20        MR. SMALLWOOD:  I don't believe so, Your Honor, as

21  long as we might have access to the Court if we reach a -- get

22  loggerhead about something.  I think we can --

23        THE COURT:  All right.  I don't anticipate there will

24  be any problem in that regard.  As I say, everybody has the

25  same interest here which is to develop a fact record that can

145

1   properly address these issues and in order to develop such a

2   fact record and to comply with the Court's order that such fact

3   record be developed on Marchand and its progeny, it's necessary

4   to create the very images that one might otherwise argue

5   constitutes a statutory violation.  So the Court so ordered

6   that, we now have it.  It's a little bit like the dog chasing

7   the truck, what's he going to do with it when he gets it.  But

8   here it is, so you-all will take care of that evidentiary

9   issue.  Does that work for the United States, Mr. Greer, Ms.

10  Morgan?

11        MR. GREER:  Yes, Your Honor.

12        THE COURT:  All right, does that work for you, Mr.

13  Smallwood?

14        MR. SMALLWOOD:  Yes, it does.

15        THE COURT:  All right, now, let's turn our attention,

16  if we could bring up the podium.

17        Ms. Holland, if you could provide this back to counsel

18  and that will be part of the retained and then here is the

19  other.

20        MR. BOLAND:  May I grab the computer?

21        THE COURT:  Yes, go right ahead.

22        All right, Mr. Smallwood, you are recognized, sir.

23        MR. SMALLWOOD:  Your Honor, I'll be brief because I

24  think the Court has read all of the written information and has

25  heard argument on this before.  I think it's clear as far as

146

1  our argument about the constitutionality of the statute, that

2  the statute does not explain how anyone is able to distinguish

3  between digital images that are proscribed and those that are

4  protected.  That is the vagueness inherent in this statute,

5  coupled with the technological evidence which this Court has

6  seen, which I trust this Court to find to be compelling.  What

7  is significant about --

8        THE COURT:  Now, you appreciate the concern vagueness

9  contemplates that the statute is void as a matter of law on its

10  face, right?

11        MR. SMALLWOOD:  We don't contend that, Your Honor.

12        THE COURT:  I understand that.  So how do you -- but

13  that's what a challenge for vagueness, is that a statute

14  doesn't put at citizen on notice and, therefore, on its face

15  can't be applied, right?

16        MR. SMALLWOOD:  It cannot be applied to anyone who was

17  not a creator of images that are viewed on the internet that

18  convey the idea or image of what might be a minor child.

19  Unless you were the creator of that image or had some sort of

20  independent knowledge of the specific identity and age of the

21  child involved, that statute is vague, because you cannot

22  conform your conduct.  Detective Holloway, when pinned down,

23  indicated that his advice to his friends, and to be quite frank

24  with you, Judge, my advice to my friends would be chill your

25  First Amendment rights when this stuff pops up, because you

147

1   can't know if you're exercising your First Amendment rights

2   under Ashcroft, or you're violating 2254.  That is a classic

3   definition of a statute that is chilling a person's exercise of

4   their First Amendment rights.  Ashcroft did not have -- the

5   Supreme Court nor the lower courts in the Ashcroft case did not

6   have benefit of the evidentiary presentation this Court has.  I

7   don't believe Marchand had.  I know Kimler didn't.  I don't

8   know of any witness who has testified to these types of images

9   and how they can being altered and how no one can have

10  knowledge of or reliability about what you're seeing, other

11  than this witness in this case and a few other cases that he

12  has testified in.

13          It likewise is overbroad based on the application of

14  this technological evidence to this statute because it clearly

15  loops in under Ashcroft the exercise of your constitutional

16  rights to expression and speech to view virtual child

17  pornography as defined by Ashcroft, while at the same time

18  appropriately prohibiting conduct involving the actual use of

19  minor children in explicit sexual conduct.  Those are classic

20  cases and this presents a classic case of an overbroad

21  statute -- I mean, of a vague statute as well as an overbroad

22  statute.  There has been no rebuttal to any of the testimony by

23  Mr. Boland that there exists no way that anyone, who was not

24  the creator of the image, can ascertain what they are looking

25  at and whether they're looking at an actual child or a virtual

148

1   child.  If there was any rebuttal evidence of the power of the

2   money of the United States Government, I can assure you, they

3   have had plenty of notice for this hearing, Judge, we would

4   have heard someone.  So what you saw today is cutting edge

5   technology gone totally unrebutted.

6          I believe we have addressed the considerations in the

7   Marchand case, Judge.  Once again, that case did not involve

8   any testimony similar to what the Court has heard today.  It's

9   my understanding that that argument was basically made by a

10  lawyer on behalf of his client with no evidentiary basis to

11  back it up, which we certainly have here.  I believe the

12  technology in Marchand was the POSER technology or is described

13  as POSER technology, which both Mr. Boland and Detective

14  Holloway agree is nowhere near the state-of-the-art that

15  Photoshop technology is.  So I think in the considerations and

16  the concerns that Marchand, that the judge in Marchand

17  indicated, could be an example of how a person might have

18  knowledge, I think, were totally dealt with here in a fashion

19  that makes Marchand inapplicable to the evidence that was

20  presented to this Court.  This Court has seen how easily an

21  image can be created that appears to be a photograph with a

22  staple in it or a paperclip, which we would indicate or perhaps

23  give some kind of an indication that this was a photograph or

24  was an older photograph, that wasn't a photograph at all that

25  the Court saw.  It was, I think that was Exhibit No. 32.  That

149

1   was totally created by the technology, which is readily

2   available, it costs 650 bucks, it's given away with certain

3   hard, hard computer purchases that you can make.

4         The exhibits that we presented to the Court dealt with

5   the fact that while this may be the latest version of this

6   particular hardware, it's been around for over 10 years.  It

7   was clearly available in much the same fashion in the summer

8   and fall of 2002, which are the critical dates in this

9   Indictment.  And if anything, Your Honor, although there hasn't

10  been anything about this, I think the Court might be able to

11  determine from some of the context of the indictment that Mr.

12  Shreck has a certain amount of technological expertise with

13  regard to computers.  If anything, that militates in favor of

14  our argument, any knowledge that he might have about how easy

15  manipulatable these images are, would cause him to have greater

16  doubt about what he was watching, rather than lack of doubt.

17  There's no question in my mind that if my 85-year-old mother

18  saw some of these images, after she got through taking care of

19  me for showing them to her, there would be no doubt in her mind

20  that she had been seeing minor children engaged in sexual

21  conduct, when in fact we all know that that simply wasn't the

22  case.

23         And I think what's critical about Detective Holloway

24  answering the Court's better articulated questions than mine,

25  there is no way that anyone, even an individual such as

150

1    Detective Holloway, who is greatly deposed to eradicating child

2    pornography and would like to be able to tell this Court that

3    he can ascertain real from visual images, is not able to do so.

4    Nobody is able to do so.  It's unrebuttable.

5          The Court has not -- or the Government, pursuant to

6    the questions from the Court and me, has failed to present any

7    evidence to this Court, in my opinion, that Mr. Shreck had any

8    way to know what he was viewing involved the use of real

9    children as opposed to virtual children.  The testimony is

10   clear based upon the disclaimers by the Government, both in the

11   exhibits presented hear, as well as the testimony from Mr.

12   Boland, that you simply cannot trust what you read or see on

13   the internet as giving you an accurate description of anything.

14          And I would take issue with the statement in Ashcroft,

15   despite the Supreme Court asserting it to the contrary, the

16   statement that is contained in Ashcroft that if this in fact

17   were the state of facts when Ashcroft was determined, that the

18   virtual creators of nonreal children pornography would run out

19   the real stuff.  Judge, that's just not so.  It's just exactly

20   the opposite.  It is precisely what Mr. Boland indicated to

21   you.  If I want to make some money while not violating the law,

22   what do I do as far as child pornography is concerned?

23   Obviously, I do not use real children, I create whatever I can

24   create using without exploiting children.  But do I tout it or

25   do I market it as that?  Of course not.  These people know the

151

1   mind set of the people who seek these things out.  It's going

2   to be always touted as involving real children and yet if they

3   get decent legal advice they'll never use real children,

4   they'll be able to market this stuff to the people who want to

5   look at the stuff, claiming it's real, while at the same time

6   being protected under the Ashcroft decision because they are

7   not using children in sexually exploitative manners.

8        Thank you.

9        THE COURT:  All right, Mr. Greer, you are recognized,

10  sir.

11       MR. GREER:  Thank you, Your Honor.

12       Your Honor, very briefly.  In my determination, based

13  on the prior research I've done and the testimony today that we

14  have heard, my understanding is that in determining whether a

15  law facially overbroad or vague, Your Honor's first task is to

16  determine whether that enactment reaches a substantial amount

17  of constitutionally protected conduct, and I would submit that

18  based on the evidence we heard today, even giving the benefit

19  of the doubt to defense counsel and their expert, that the

20  conduct that is reached by the testimony from Mr. Dean Boland

21  is so minimal that it would not reach a substantial amount of

22  constitutionally protected conduct, that being specifically

23  that there are so few people that could afford this type of

24  technology combined with the skill required for this type of

25  technology, at the present time, compared to the education that

152

1    would be not a necessity, but an advantage for this type of

2    technology and the relative ease of using a real child instead

3    of going through the task of using these other, this other more

4    expensive route of virtual child pornography.  I think that

5    that family of offenders --

6         THE COURT:  What is the expense that you see as being

7    occasioned?  I mean, I understand the expertise issue, but what

8    is the expense issue that you're...

9         MR. GREER:  Your Honor, my understanding was that the

10   latest addition of Adobe was between two and $3,000 priced, I

11   may be wrong on that, but that was my understanding.  And I

12   just think that that's prohibitive for someone that's in the

13   business of actually using real children, such that they would

14   not see a need to buy that technology, to gain the skill, to go

15   to school to get any education that would be helpful for that

16   purpose and trouble of manufacturing virtual child pornography

17   so as to violate the statute.  And if that has occurred, that

18   that conduct has reached such a small amount of people that I

19   don't believe it reaches the threshold finding for being

20   facially overbroad.

21        And Your Honor, further, in regards to the vagueness

22   issue.  Whether it is facially vague or not, the Court, I

23   believe, is to assume that the enactment or the statute

24   implicates no constitutional -- if the statute implicates no

25   constitutionally protected conduct, it should uphold the

153

1   challenge only if the enactment is impermissibly vague in all

2   of its applications.  Well, even counsel for defense agrees

3   that it is not vague of one who manufactures, actually

4   manufactures child pornography.  The Government would expand

5   that definition to people who believe that they are viewing

6   real child pornography and actually turned out, and subsequent

7   analysis shows that that is real child pornography.  So

8   certainly --

9        THE COURT:  Isn't that the cornerstone of your legal

10   argument?  That is to say, as testified by Detective Holloway,

11   that an image that we all know to be a virtual child can

12   violate the statute because the defendant wrongfully believes

13   it to be a real child, right.

14        MR. GREER:  Well --

15

16        THE COURT:  Is that a position, which was articulated

17   by the witness, but is that a position the United States

18   adheres to?

19        MR. GREER:  No, Your Honor, because I believe that the

20   statute -- well the current statute, even now, I think,

21   incorporates computer generated images that are

22   indistinguishable from actual images.  So I believe that the

23   legislature has, since the impending technology, and has

24   attempted to address it in the most recent version --

25        THE COURT:  But that's not this case.

154

1        MR. GREER:  Correct, Your Honor.

2        THE COURT:  All right.

3        MR. GREER:  Correct, Your Honor.  But I believe that

4   in regards to this case, there must be an actual minor

5   identified -- an actual minor not necessarily identified, that

6   is or appears to be engaging in sexually explicit conduct.  And

7   that can be accomplished through morphing, or through an actual

8   photograph, or through an actual digital photograph taken.

9   Several means.

10        THE COURT:  But we're not talking about -- I mean, I

11   understand the morphing argument, but I'm focused in particular

12   on Exhibit 29 and other of the exhibits in which the

13   demonstration was made of actually reducing the apparent age of

14   the subject.  That's not morphing, right?  You would agree with

15   that?

16        MR. GREER:  Yes, Your Honor, I would agree that that

17   is --

18        THE COURT:  I mean, I understand the notion of sort of

19   cut and paste of morphing.  This is taking the same person and

20   reducing hip size and so forth to make them appear to be a

21   minor.  Now, if you start with an adult and then the appearance

22   of being a minor is achieved through the means that we saw

23   today, and then somebody possesses that image believing it to

24   be a minor, has that person violated the statute?

25        MR. GREER:  I don't believe under the law at the time

155

1  relevant here, that that would be true, that that person would

2  be violating the law.  I don't think that would be accurate.

3      THE COURT:  Even though they believed, absolutely,

4  that it was a minor.

5      MR. GREER:  They can believe to their hearts content,

6  but the fact is if it's not an actual minor under that statute

7  at the time, then I don't believe it's violative of the

8  statute.

9      THE COURT:  Okay.  Now, how do you prove -- which the

10  Court is, that's the position of the United States that is

11  different than what Detective Holloway testified to, right?

12      MR. GREER:  Yes, sir.

13      THE COURT:  I'm not trying to have you throw him out

14  of the sled, but he's out now.  Well, in this case, how is it

15  that you intend to prove knowledge as opposed to belief?

16      MR. GREER:  Your Honor, in this case, we would intend

17  to prove knowledge through the defendant's, first his admission

18  that he downloaded child pornography, as one element.  Another

19  element or factor would be the--

20      THE COURT:  Did he know it at the time to be child

21  pornography?

22      MR. GREER:  That's what we -- that's what we assume

23  from the statement, "I downloaded child pornography."

24      THE COURT:  But if he doesn't know where the creation

25  of the image was from, can he know that?

156

1    MR. GREER:  I think he can have reason to know that

2    and I think that would be a fair definition of whether he

3    knowingly violated that statute.  I think that if he --

4        THE COURT:  How would he know if neither Detective

5    Holloway, nor the expert witness could know.  You would agree

6    that with respect to Exhibit 29, you couldn't know either?

7        MR. GREER:  I would agree with that.  But Detective

8    Holloway and the Court and counsel are looking at these

9    photographs in a vacuum.  Looking at the facts of Mr. Shreck's

10   case, we're looking at a series of images taken from the hard

11   drive or from the computer equipment of Mr. Shreck, which that

12   element in and of itself is difficult to achieve a consistent

13   picture that appears real.  So we have that element.

14       THE COURT:  But how does he know?  I mean, there's no

15   question, or at least for purposes of this discussion, it would

16   be assumed arguendo, that there was an intent and desire to

17   download child pornography, right?  I mean that's -- and that's

18   why I say I'm accepting that for purposes of discussion only.

19   But for purposes of discussion, the intent exists.  All right?

20   Now, at the expense of relying on old law school hypotheticals,

21   you go to the hospital to kill somebody, you go to their room

22   in the hospital and you shoot them in the head.  You find out

23   later they actually died an hour earlier, right?  Can you

24   charged with murder?

25       MR. GREER:  No.

157

1       THE COURT:  Can you be charged with attempted murder?

2       MR. GREER:  Good question.

3       THE COURT:  You missed that hypothetical in law

4   school.

5           Absolutely, all of the elements are perfect of

6   attempting to murder that person, notwithstanding.  There's no

7   elements that requires they be alive at the time.  That's this

8   case, that is to say, if there is, not this case meaning this

9   defendant specifically, but this case for purposes of making

10  some determination about the statute, and that is a case in

11  which one assumes that there was an intent and desire to

12  download child pornography.  That doesn't change the fact that

13  one of the elements is you knew, right?

14      MR. GREER:  Yes, sir.

15      THE COURT:  This it was child pornography.  So those

16  things that might be probative of your desire, that is your

17  motive, your interest, your hope that you were getting child

18  pornography, that doesn't -- not probative of the question of

19  whether you knew it, if it's unknowable, right?  If it's

20  unknowable.

21          And that's what this evidentiary proceeding is, is to

22  determine whether it is knowable, objectively knowable that

23  when you take down those images from a defendant's collection,

24  whether it is objectively knowable and therefore subject to

25  proof beyond a reasonable doubt that this was a minor, right?

158

1       Now based on this presentation, is it an objectively

2   knowable fact, distinct from what the desire was, what the

3   belief was, what the hope was.  Certainly, if intent to possess

4   child pornography were the crime, then those are all probative

5   of that question.  But then that's different than the question

6   of whether he knew or could know.  And as Ms. Morgan noted in

7   the last proceeding, there's serious problems if it is

8   determined that it is not knowable facts, right?

9       MR. GREER:  Yes, Your Honor.

10      THE COURT:  I mean there's serious prosecution

11  problems and that's why we went to the old instructions.  And

12  it's not to say these will be the instructions, that'll be

13  something we will all work out together, but we brought out old

14  instructions in a case that the U.S. Attorney was involved in

15  for the purpose of testing whether under these instructions the

16  United States can prove beyond a reasonable doubt the elements

17  of the offense.

18      So how is it that you would prove the elements of the

19  offense under these circumstances.  That is, that such visual

20  depictions were of minors, right, the defendant knowingly, that

21  the productions were of minors engaged in sexually explicit

22  conduct?

23      MR. GREER:  Excuse me, Your Honor.

24      THE COURT:  All right.

25      MR. GREER:  I'll address --

159

1      THE COURT:  And that the defendant knew, as that term

2   is defined later in these instructions, that at least one of

3   the performers in such visual depiction was a minor engaged in

4   sexually explicit conduct, right?

5      MR. GREER:  And I think the only way to --

6      THE COURT:  He just hoped it, right?

7      MR. GREER:  Well, I think the only way to-- for that

8   offense to be provable by the United States would be to define

9   knowingly and knew in terms of the defendant must have had

10  knowledge or reason to know.  Because I think reason to know

11  opens the door to the factors in Marchand of whether a series

12  of photographs were downloaded, the number of web sites

13  visited --

14     THE COURT:  Well, that certainly goes to his desire,

15  right, that it be child pornography, right?  How does that go

16  to the question of whether he knew, had actual knowledge,

17  right?

18     MR. GREER:  If there --

19     THE COURT:  The knowledge that the visual depictions

20  were in fact of minors engaged in sexually explicit conduct.

21  If he -- would you agree that if he possessed Exhibit 29 that

22  he could not be charged?

23     MR. GREER:  I would agree.

24     THE COURT:  All right.  Because you can't know that

25  that's a minor and in fact we happen to know it's not a minor.

160

1          MR. GREER:  Correct.

2          THE COURT:  Right?

3          MR. GREER:  Yes, sir.

4          THE COURT:  So if he can't be charged for 29, then if

5     he doesn't have actual knowledge of the minor involved in the

6     tape, or the picture, I mean.  It's just photographs, right?

7          MR. GREER:  Just digital images.

8          THE COURT:  Just digital images.

9          MR. GREER:  And -- well, yes, sir.

10          THE COURT:  All right.  So he's charged with digital

11    images.  If he can't know, if it's not knowable that the image

12    on the digital image is a minor, how can he know something

13    that's not knowable?

14          MR. GREER:  I don't think he can know something that's

15    not knowable, but I think it is knowable in the fact that he

16    would have reason to know, based on the factors in Marchand.  I

17    don't mean to repeat myself, Your Honor, but based on -- that

18    would be my argument, is based on the factors in Marchand, they

19    don't go to necessarily his desire, but his knowing, his

20    knowing behavior up to that point and throughout the dates of

21    the alleged offense.

22          Also, the fact that there are known victims, I think

23    is relevant to his knowledge if those are sites that he has

24    gone to consistently.  I think that could be a factor for the

25    Court to consider if that were to come into evidence.  And

161

1  also, I think his statement is not the only piece of evidence

2  and could survive if it was the only piece of evidence, but I

3  think it is probative as to what he had reason or knowledge to

4  know at the time and I think that should be the definition of

5  knowingly in regards to this case.

6          THE COURT:  Is it your intention to put on expert

7  testimony in connection with establishing the knowing element

8  here?

9          MR. GREER:  Your Honor, I believe the only form of

10  expert testimony we would intend to produce would be an

11  individual who would have compared the Innocent Images images

12  from their database with the actual images that were downloaded

13  on Mr. Shreck's computer in making a determination as to

14  whether or not they had been altered in any form or fashion.

15  And I think that goes to authentication.

16          So, I don't know that we would have any expert

17  testimony on the front end as to the defendant's intent other

18  than the circumstantial evidence that would come out through

19  Detective Holloway and Detective Beatty.

20          THE COURT:  Let me ask this, as an aside matter.

21  Marchand states "The Government may prove that a person acted

22  knowingly by proving beyond a reasonable doubt that that person

23  deliberately closed his eyes to what otherwise would have been

24  obvious to him.  One cannot avoid responsibility for an offense

25  by deliberately ignoring what is obvious."

162

1      Is it, based on the evidence adduced today, is it

2  obvious that an image that apparently looks like a minor is a

3  minor and you're turning a blind eye by not -- and if not, what

4  inquiry could you possibly do with respect to that image, if

5  you couldn't communicate with the creator of the image.  And

6  even then, are you satisfied that the creator of the image

7  didn't take an image that itself was created upstream, right?

8      MR. GREER:  Your Honor --

9      THE COURT:  I mean, we don't know.  We learned today,

10  I'm sure you-all know it, I don't know it, that there are web

11  sites where aspiring parents put their children up wearing

12  bikinis.  We don't know if that aspiration doesn't mean that

13  they're not, they themselves aren't doctoring the photographs

14  because their goal is to secure some financial gain from having

15  this child receive some kind of a contract as a model, right?

16      MR. GREER:  Yes, Your Honor.

17      THE COURT:  Temptation is great, right?  And so they

18  commence some doctoring themselves, so that when somebody with

19  evil in their heart takes that image and uses it as part of a

20  sexually explicit presentation, they are actually using a

21  doctored image in the first place, right?

22      MR. GREER:  Yes, sir.

23      THE COURT:  Which may or may not be a child, right?

24      MR. GREER:  Yes, sir.

25      THE COURT:  So even in that case, you find the person

163

1 who put the image of the person, the image from the person in

2 the model site into a sexually explicit situation, you find

3 that person, he or she confesses that that's what he or she

4 did, we're still not satisfied, nor have we established beyond

5 a reasonable doubt, that the person who put that image on there

6 didn't create it from composites upstream, right? And yet the

7 person who now has it in their possession is supposed to know

8 that that's an actual minor, right?

9          MR. GREER: Not as to one image, no. I don't agree

10 with that. I think, yes, they should know as to hundreds of

11 images including a vid -- I forgot to mention possible 404(b)

12 evidence as to a videotape of an actual person, a relative of

13 the defendant's that was obtained -- excuse me, manufactured by

14 the defendant. Also a video, MPEG video I did not mention in

15 my have argument that was found on the defendant's computer

16 with -- entitled daddy and a 6-year-old, or something that

17 would seem to say to a normal individual, reasonable person,

18 that this might be child pornography especially when that movie

19 is watched and it appears to show --

20          THE COURT: Is the video the subject of the

21 Indictment?

22          MR. GREER: No, Your Honor, just potential 404(b)

23 evidence.

24          THE COURT: Does the video include a character who is

25 on one of the photographs? That is, for purposes of

164

1   identifying --

2           MR. GREER:  I --

3

4           THE COURT:  It's just a video?

5           MR. GREER:  Yes, sir.  I don't believe it is -- it is

6   not of an identifiable minor as far as we know, Your Honor, no.

7   Or of a minor in a digital image in the indictment.

8           THE COURT:  And you didn't charge the video?

9           MR. GREER:  No, Your Honor.

10          THE COURT:  Now.  That video is not the video that's

11  been viewed by the Court, this is other videos?

12          MR. GREER:  Right, this--

13          MR. SMALLWOOD:  I don't believe it is, Your Honor.

14          THE COURT:  All right.

15          MR. GREER:  It is not.  This is just a downloaded

16  video on the defendant's computer, unrelated to the videotape

17  that was earlier talked about involving the granddaughter.

18          THE COURT:  But would you agree that the notion here

19  of something that would have been obvious, that is the turning

20  the blind eye exception, that if in fact it's not knowable,

21  then it can't be obvious, right?

22          MR. GREER:  Hypothetically, if it's not knowable it

23  can't be obvious, but I think in this case --

24          THE COURT:  Right.  And of course the judge in that

25  case believed it to be knowable --

165

1          MR. GREER:  Yes.

2          THE COURT -- and therefore could form the basis of a

3     claim that the defendant turned a blind eye.  And so we circle

4     back to this fundamental fact question as to whether or not

5     it's knowable, right?

6          MR. GREER:  I agree, yes, Your Honor.

7          THE COURT:  All right.  What else, anything further

8     from the United States, Mr. Greer?

9          MR. GREER:  If I could just have one moment, please?

10          THE COURT:  Sure.

11          MR. GREER:  No, Your Honor, thank you.

12          THE COURT:  All right.

13          Mr. Smallwood, anything further, sir?

14          MR. SMALLWOOD:  No, sir, not unless the Court has a

15     question.

16          THE COURT:  All right.  I think that the order that

17     the Court entered describes the fundamental problem that we

18     have, and we had some colloquy with Ms. Morgan at the last

19     proceeding about it which is what caused us to go back and

20     review the instructions.  I'm trying to fully appreciate what

21     it is that the United States would adduce at trial by which to

22     prove these elements of the offense charged.  Let me ask at the

23     outset, Mr. Greer, and particularly, Ms. Morgan, because this

24     was your case, was it not, Ms. Morgan?

25          MS. MORGAN:  It was.

166

1          THE COURT:  Is there any evolution in the law -- and

2    I'm not trying to hold you to this for purposes of trial, but

3    at least as of this point today, that would cause us

4    specifically not to use these instructions?  I mean, they're

5    not particularly exotic instructions, but the essential

6    elements of the offense charged and the knowingly and knew

7    defined and the proof of knowledge defined.

8          MS. MORGAN:  I'm not aware of anything that would

9    change the instructions that the Court gave previously.  In

10   fact I had planned when we were submitting our requested

11   instructions to have the Wollet instructions included.

12         THE COURT:  As the instructions.  Okay.

13         MS. MORGAN:  So in answer to your question, no, I'm

14   not aware of any changes in the law that would cause them to be

15   different.

16         THE COURT:  All right, because what I would like to do

17   is I would like to fully understand in the context of the

18   evidentiary hearing and the record as it currently stands, in

19   light of that, I would like to appreciate with particularity

20   what it is that would be adduced at trial that would establish

21   these elements of the offense, and that is in particular that

22   the defendant knew.  I understand the intention of the United

23   States is that you believe that you'll have evidence that will

24   demonstrate that in fact these are actual minors, is that

25   right, sir?

167

1        MR. GREER:  Yes, Your Honor.

2        THE COURT:  All right.  So we're assuming again,

3   arguendo, certain things, but in light of the evidentiary

4   presentation today, what evidence would be adduced at trial

5   that the defendant knew that at least one of the performers in

6   such visual depiction was a minor engaged in sexually explicit

7   conduct?  Because it may be that the evidence is appropriately

8   offered and received for purposes of that knowledge.

9   Alternatively, it may be that while the evidence identified and

10   proposed by the United States is admissible, it is not

11   necessarily probative of that specific element.  That is, there

12   is a distinction between the desire and hope of downloading

13   child pornography and actually what would go to the question of

14   knew that it was child pornography and how is that established.

15   As I understand it, you're not having expert testimony in that

16   regard.

17        So what I would like to do is in two weeks time to

18   receive from the United States a particularized description of

19   the -- And what is two weeks from tomorrow, Ms. Holland?

20        THE CLERK:  That would be April the 30th.

21        THE COURT:  April the 30th.  And then ten days after

22   that would be?

23        THE CLERK:  That would May the 10th.

24        THE COURT:  May the 10th.  And by May the 10th, the

25   defendant can respond to the detailed description of what

168

1    evidence would be adduced for purposes of knowing and under the

2    instructions that were set out in the April 12th order, and

3    then we will set this matter down for a hearing.

4            This is the same issue, but it's now down to the

5    fundamental facts of is this something that can be proved in

6    light of the evidence that was adduced today.

7            I continue to have some hesitation as viewing this as

8    matters of overbreadth or vagueness, except to the extent

9    articulated that it is vague as to anybody who didn't actually

10   prepare the image himself or herself using a real child.  That

11   peg may go in that hole, but I'm having some real trouble

12   seeing it as vagueness or overbreadth.  I guess I continue to

13   see it more as described by Ms. Morgan who has done more of

14   these cases than anyone I know, that if you simply take the

15   knowing element out of it, it becomes unprovable because you

16   can't prove that someone knows something that is unknowable.

17   They may want to.  That may be their hope and dream, but if

18   they can't possibly know it, then they can't be proved to have

19   known it.

20           So but I think, you know, I'll give further

21   consideration to the vagueness and overbreadth as articulated

22   here and in light of these proceedings and you can, if you wish

23   to submit further authorities in that regard, we would do so by

24   the same dates, based on the evidence today.  But in

25   particular, by those dates I want to see what it is and how it

169

1   is that the United States would undertake to prove that

2   something is knowable or that was known under these

3   instructions and have the defendant have the opportunity to

4   respond to it, because if the statute is ultimately going to

5   fail some day, as Detective Holloway anticipates, I guess, is

6   fair to say, that some day it will fail because some day

7   absolutely it will be unknowable, under the technology, but I

8   tend to believe that if some day, whether that's here or not, I

9   don't know, but if some day it is to fail, it will become

10  impossible to apply because people can't know it.  That's when

11  it fails.

12          Now, I understand other questions of concern about the

13  chilling effect under the First Amendment, but that, to me, is

14  directly related to this notion of notice of conduct and the

15  knowing element.  You are supposed to know what is criminal

16  conduct.  That's why it's an element of the offense.  If you

17  can't know it, then you can't be charged with having known it

18  and incarcerated.

19          So we will do it by those dates.  We'll set the matter

20  down for a hearing in the middle of May.

21          Ms. Holland, do you have the --

22          MR. SMALLWOOD:  Your Honor, in that regard I'm going

23  to be out of town the 10th through the 21st of May.  If we

24  could just set it sometime other than those.

25          THE COURT:  All right.  Do we have something after

170

1    that time?

2         THE CLERK:  Friday, May the 28th at 9:00.

3         MR. SMALLWOOD:  That will be fine, Judge.

4         THE COURT:  Friday, May the 28th at 9:00 o'clock, does

5    that work?  Let me see what...

6         Let me ask you if we can move that up to Tuesday the

7    25th?  Is that workable for you-all --

8         MR. GREER:  Yes, sir.

9         THE COURT:   -- at 3:00 o'clock on that day?

10        MR. SMALLWOOD:  Yes, sir.

11        THE COURT:  Mr. Greer, Ms. Morgan, does that work for

12   you-all?

13        MR. GREER:  Yes, Your Honor.

14        THE COURT:  Okay.  We'll put it down for that time,

15   for Tuesday the 25th at 3:00 o'clock.  And as I say, any

16   additional authorities that we have, and I do very much

17   appreciate the submission by the United States of the United

18   States vs. Marchand case, it certainly was very helpful in

19   preparing for these proceedings today.

20        All right, anything further today on behalf of the

21   United States, Mr. Greer?

22        MR. GREER:  No, Your Honor, thank you.

23        THE COURT:  Anything further today, Mr. Smallwood?

24        MR. SMALLWOOD:  No, Your Honor.  Do I understand

25   correctly that the 25th is argument only, you do not anticipate

171

1   any evidence?

2       THE COURT:  If from the papers it appears that we need

3   to do something else, then we will either so direct or we'll

4   have a phone conference and talk about where we are as a

5   result.

6       MR. SMALLWOOD:  We don't anticipate putting on any

7   evidence, obviously.

8       THE COURT:  I'm anticipating proceeding, and I would

9   like Mr. Greer to sit down with you so that it can be presented

10  in a way that makes perfect sense, that is, how they intend to

11  prove it.  And it's basically accepting a proffer for these

12  purposes, again, accepting a proffer of what they intend to

13  demonstrate beyond a reasonable doubt at trial to establish

14  that element.  And we're not -- I'm not intending to, at this

15  stage, challenge whether or not it will be convincing in that

16  regard, but rather to identify what witness will say what for

17  what purpose to demonstrate that they know.  And I think that

18  it might really be in everyone's best interest, if once you

19  have finished that, even before you put that in the papers, to

20  review it with counsel.

21      I'm trying to prepare a record that everybody at least

22  as a fact matter would agree upon would be the case and at

23  least we can agree on what the parties do agree on and we can

24  agree on what the parties don't agree on, but at least everyone

25  is clear about where the points of divergence are and where the

172

1   points of agreement are.  All right, does that make sense?

2       MR. SMALLWOOD:  Yes, sir.

3       MR. GREER:  Yes, sir.

4       THE COURT:  All right.  Anything further, Mr. Greer?

5       MR. GREER:  No, Your Honor.

6       THE COURT:  Anything further, Mr. Smallwood?

7       MR. SMALLWOOD:  No, sir.

8       THE COURT:  All right.  We'll be adjourned.

9       (Recess).

10

11       A TRUE AND CORRECT TRANSCRIPT.

12

13      CERTIFIED: _____
                Glen R. Dorrough
14               United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25