1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

~~~~~~~~~~~~~~~~~~~~

PETER LORA, VICTORIA BLOOM, et al.,


Plaintiffs,


vs.    Case No.  1:07 CV 2787



DEAN BOLAND,


Defendant.

~~~~~~~~~~~~~~~~~~~~

Deposition of

VICTORIA BLOOM

March 3, 2009
 9:00 a.m.


Taken at:

Law Office of Jonathan E. Rosenbaum, Esq.

230 Third Street

Elyria, Ohio


Donnalee Cotone, RPR, CLR



2



1  APPEARANCES:

2

3      On behalf of the Plaintiffs:

4          Law Office of Jonathan E.

5          Rosenbaum, by

6          JONATHAN E. ROSENBAUM, ESQ.

7          230 Third Street

8          Suite 104

9          Elyria, Ohio  44035

10          (440) 322-7972

11          jerosenbaum@alltel.net

12

13      On behalf of the Defendant:

14          Law Office of Dean Boland, by

15          DEAN BOLAND, ESQ.

16          18123 Sloane Avenue

17         Lakewood, Ohio  44107

18         (216) 529-9371

19         dean@deanboland.com

20              ~ ~ ~ ~ ~

21

22  ALSO PRESENT:

23         Peter Lora

24

25              ~ ~ ~ ~ ~


                              3


1              I N D E X

2

3  EXAMINATION OF VICTORIA      4      6

4  BLOOM

5  BY MR. BOLAND

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1      VICTORIA BLOOM, of lawful age,

2  called for examination, as provided by the

3  Federal Rules of Civil Procedure, being by me

4  first duly sworn, as hereinafter certified,

5  deposed and said as follows:

6        EXAMINATION OF VICTORIA BLOOM

7  BY MR. BOLAND:

8      Q.   Okay.  Ma'am, if you could please

9  state your name and spell your last name for

10  the record.

11      A.   Victoria Bloom.  B-L-O-O-M.

12      Q.   And I don't want to know the

13  contents of it, but have you had a conversation

14  with Mr. Rosenbaum about what we're doing, what

15  we're here for today?

16      A.   Yes.

17      Q.   I'm going to ask not too many

18  questions.  I have a few on my computer and a

19  few on this piece of paper, but if there's any

20  question that you don't understand, please let

21  me know that.  I'm going to assume if you

22  answered the question, you understood what I

23  was asking, all right?

24      A.   Okay.

25      Q.   Could you give your -- I'm not

1  going to go over too many of the same questions

2  that we asked just to be written questions just

3  to be efficient.

4          Is there anything about those

5  interrogatories that since the time you wrote

6  those answers that you need to change or add

7  anything to?

8  A.   No.

9  Q.   Okay.  And the requests that were

10  made for productions of documents, are there

11  any new documents that you've come across that

12  are responsive to those requests that you know

13  of?

14      A.   You're talking about the

15  information that we were to provide?

16          MR. ROSENBAUM:  I think he wants to

17  know in addition to that.

18      Q.   Anything in addition to that?

19  A.   No.

20  Q.   That's all.  And any of the

21  admissions, that's the third category of

22  information in those interrogatories, are there

23  any of those now that you feel looking back on

24  those answers that you need to change or add to

25  in any way?

6

1      A.   No.

2      Q.   I'm going to talk to you about how

3  you first came to know that there was any

4  image, as far as you were told, that involved a

5  minor that was related to you.

6           In fact, for the record, which one

7  of the minor plaintiffs are you the guardian of

8  for the purposes of this case?  What's her name

9  or his name?  I don't even --

10     A.   [Edited for filing] dmb

11     Q.   And how are you related to [Edited for filing]dmb?

12     A.   I'm her [Edited for filing]dmb.

13     Q.    Okay.  And how old is [Edited for filing]dmb now?

14     A.   [Edited for filing]dmb.

15     Q.   And is she aware that this

16  litigation is going on?

17     A.   No.

18      Q.    Is she aware of -- have you

19   discussed anything about this case or these

20   images with her?

21      A.    No.

22      Q.    Okay.  Has anyone else, as far as

23   you know, discussed this case with her?

24      A.    No.

25      Q.    Or the existence of any court

                              7

1   exhibits?

2      A.    No.

3      Q.    Okay.  And do you intend to keep it

4   that way in the future?

5      A.    As best of my abilities.

6      Q.    Okay.  And in this case, your

7   allegation in the complaint is that court

8   exhibits were made that involve an image of

9   [Edited for filing]dmb, correct?

10      A.    Correct.

11      Q.    Is that fair to say?

12          Okay.  And do you know how many --

13  how many court exhibits are you alleging were

14  created that involve a portion of [Edited for filing]dmb's

15  image?

16     A.   One.

17     Q.   And how was that court exhibit

18  used?  What are you alleging, how that was

19  used?

20     A.   What I was told, it was used in

21  quite a few different trials and that they were

22  being used in training some sorts of photoshop

23  training classes.

24     Q.   Okay.  And who told you that?

25     A.   Mike Sullivan.



                            8



1     Q.   Mike Sullivan.  And that's the

2  Assistant United States Attorney for the

3  Northern District of Ohio?

4     A.   Yes.

5     Q.   The prosecutor.

6          And what training seminars did he

7  tell you they were being used in?  What cities?

8  First let's start there.  What city was a

9  training seminar occurring where an image of

10  [Edited for filing]dmb was being used?

11      A.   To the best of my knowledge, it was

12  in Ohio, but I couldn't tell you the exact

13  places.

14      Q.   Now, is it that Mr. Sullivan never

15  told you the exact cities, or that he told you

16  those cities but you just can't recall today?

17      A.   I can't recall them.

18      Q.   But Mr. Sullivan would probably

19  know what cities those were, is that --

20      A.   I couldn't tell you that.

21      Q.   Okay.  And Mr. Sullivan, Mike

22  Sullivan, also told you that these were being

23  used in courtrooms.  Did he say which

24  courtrooms this court exhibit involving [Edited for filing]dmb

25  was used?

9

1      A.   He did, and I don't recall those,

2   but I probably have them written down

3   somewhere.

4      Q.   Well, there's a bunch listed in the

5   complaint.  Are there other courtrooms besides

6   the ones listed in the complaint that you're

7   aware of where this exhibit involving [Edited for filing]dmb

8   might have been used?

9      A.   No.

10      Q.   And do you know in the -- in the

11   court cases that are mentioned in the complaint

12   whether an exhibit involving [Edited for filing]dmb was

13   actually displayed in the courtroom in those

14   cases?

15      A.   Yes.

16      Q.   In which ones?

17      A.   I don't recall the date -- the

18   names or the places.

19      Q.   Okay.  Very well.  That's fine.

20          And how -- when did you-- you

21   mentioned in the interrogatories, I believe,

22   that you first knew of a court exhibit that was

23   being used anywhere in the United States

24  involving a portion of [Edited for filing]dmb's image in

25  October of 2004.


                            10


1           Do you remember giving that

2  answer --

3      A.   Yes.

4      Q.   -- in the interrogatories?

5      A.   Yes.

6      Q.   So I'm going to break this up into

7  sort of three different points in time.  Prior

8  to October of 2004, when you were told that an

9  exhibit that was being used somewhere, do you

10  have any -- had you suffered, you personally,

11  any damages from any conduct like you allege in

12  the complaint prior to October of 2004?

13      A.   No.

14      Q.   Okay.  Between October of 2004 and

15  today, can you describe for me what harm has

16  come to you personally from the conduct that's

17  alleged in the complaint?

18      A.   Terrible angst, fear for the future

19   of the consequences for [Edited for filing]dmb.

20      Q.    What --

21      A.    Disrespect for mankind.

22      Q.    What consequences are you afraid

23   for for the future for [Edited for filing]dmb?

24      A.    That she would somehow find out

25   about it or that someone that she knows would

                                11

1   see it.

2      Q.    Okay.  And do you know -- this

3   isn't mentioned in the complaint, but do you

4   know where copies of this exhibit involving

5   [Edited for filing]dmb are located right now?  Who has copies

6   of them?

7      A.    I wished I did know.

8      Q.    Okay.  Do you know, do you have a

9   list in your mind or written down anywhere of

10   where copies of this might be?

11      A.    In my mind, I picture them being in

12   your hands and in different courts throughout

13  the United States hands, and who knows from

14  those courts who could have got a hold of them.

15      Q.   And do you have any information

16  that I -- that I'm still in possession of a

17  copy of any exhibit involving a portion of

18  [Edited for filing]dmb's image?

19      A.   No.

20      Q.   Okay.  And other than those courts,

21  can you tell me who else might have a copy of

22  an exhibit that was created as part of these --

23  what you allege in the complaint, who else

24  beside a court personnel might have a copy of

25  that exhibit?


                          12


1       A.   In my mind, anybody that was

2   working in that court could have got a hold of

3   it, plus the FBI.  They probably have copies of

4   it.

5       Q.   And outside of court personnel and

6   the FBI, can you identify anyone else who might

7   have a copy of that exhibit?

8     A.   No.

9     Q.   Okay.  Now, from today going

10  forward, what are the damages that you're

11  claiming will occur to [Edited for filing]dmb as a result of

12  the creation of this exhibit?

13     A.   Psychological damages.

14     Q.   And how would those come about?

15     A.   If anybody that she knew or she saw

16  those images.

17     Q.   And in the interrogatories, you

18  gave me a list of people that you have told

19  about the existence of these images.  Do you

20  remember giving those answers?

21     A.   Yes, I do.

22     Q.   Is there anyone else that you need

23  to add on to that list?

24     A.   No, I don't.

25     Q.   And those people, who have they

13

1  told about the existence of these images?

2      A.    Nobody that I know of.  They all

3  promised that they wouldn't.

4      Q.    Okay.  And other than those people

5  that you told, is there anyone else that you

6  have information that might know?  So we have

7  court personnel, the FBI, and people you've

8  told.  Is there anyone else out of those three

9  groups other than those three that you're aware

10  of that knows about the existence of those

11  images?

12      A.    No.  No.

13      Q.    Okay.  Now, one of the questions in

14  the interrogatories that you responded to was

15  that you had suffered -- let me back that up

16  for a second.

17          I asked you about various

18  categories of damages.  And my recollection

19  is -- and I'm not trying to play a guessing

20  game.  I'll pull it up just to be sure -- but

21  that you don't have -- you have not suffered

22  any damages in this matter except for

23  financial.  Is that accurate?

24      A.    No.

25      Q.   Okay.  What other damages besides

14

1  financial damage have you suffered as a result

2  of the conduct alleged in the complaint?

3      A.   Psychological.

4      Q.   Okay.  Can you describe what you

5  mean by psychological damages?

6      A.   Because it's caused me great amount

7  of anxiety and fear that I can bring up right

8  now.  Remember.

9      Q.   And you don't have -- the anxiety

10  and fear you talked about, you discussed with a

11  counselor, right?

12      A.   Yes, I have.

13      Q.   And that's a counselor that you're

14  already seeing prior to --

15      A.   Yes.

16      Q.   -- October of 2004?  And what was

17  the reason you're seeing the counselor?

18      A.   It's personal.

19      Q.   So in this case you're claiming

20   psychological injury, so I'd like to know why

21   you're seeing the counselor.

22      A.   It has nothing to do with the case.

23      Q.   Are you refusing to answer the

24   question.

25         MR. ROSENBAUM:  Answer.


15


1         MR. LORA:  I can leave if you're

2   not comfortable.

3      A.   Because of difficulties with my

4   daughter, who is a drug addict.

5      Q.   Does your daughter live with you?

6      A.   No.

7      Q.   Okay.  Is she the mother of

8   [Edited for filing]dmb?

9      A.   Yes.

10      Q.   And for how long prior to October

11   of 2004 have you been seeking psychological

12   counseling?

13      A.   Me personally?

14    Q.    Yes.  Just you.

15    A.    Not very long.  Maybe a couple of

16   months.

17    Q.    And how many times have you

18   discussed with that counselor your anxiety and

19   psychological effects of what you're alleging

20   in the complaint?

21    A.    Probably seven or eight.

22    Q.    Seven or eight times?

23    A.    Yeah.  I guess at that.

24    Q.    And what's the cost per session for

25   you to see the psychologist?


16


1    A.    My -- it's covered by my insurance,

2   except for $30 copay.

3    Q.    And the seven or eight times that

4   you've discussed the allegations in this

5   complaint with that psychologist, would that

6   discussion have taken up the entire session

7   that you were with the psychologist?

8    A.    The majority of it.

9      Q.   And how long are those sessions

10   typically?

11      A.   An hour.

12      Q.   So about seven or eight hours of

13   time with a psychologist has been -- has

14   involved this discussion of the allegations in

15   this case?

16      A.   Yes.

17      Q.   Okay.  Now, you haven't suffered

18   any physical injury related to the allegations

19   in the complaint, correct?

20      A.   No.

21      Q.   And you did indicate in your

22   responses that you suffered some financial

23   injury.  Can you describe that, please.

24      A.   I believe that might have -- that

25   was in -- not me.  That was my son that put the

17

1   picture on there; put the picture on the

2   Internet in the first place.  I might have

3    answered that wrong.

4        Q.   That's okay.  Maybe I'm confusing

5    the answers.  There was a thing called a

6    request for admission.  Let me just make sure

7    it was you or not.  Right.  And I'm looking at

8    your answers here, and in one of them -- and

9    maybe I'm misreading it, so I'm going to just

10   to go ahead and --

11          Okay.  There was a request for

12   admission, and I asked you this question:

13          No, maybe I didn't ask it.

14          Have you suffered any financial

15   injury related to the allegations, you,

16   yourself, related to the conduct alleged in the

17   complaint?

18    A.   No.

19    Q.   Okay.  There was a question,

20   though, where I asked about [Edited for filing]dmb.  Has she

21   suffered -- I asked you to admit that she has

22   not suffered any financial injury from the

23   allegations in the complaint, and you denied

24   that.

25          So can you please describe for me

18

1   the financial damage [Edited for filing]dmb has suffered since

2   October 2004 to now.  What financial damage has

3   she suffered as a result of the conduct that

4   you allege in the complaint?

5        A.   She hasn't.

6        Q.   And she suffered no psychological

7   injury, correct?

8        A.   No.

9        Q.   Actually, no injury whatsoever has

10  she currently suffered?

11       A.   Not currently, no.

12       Q.   Currently.  She might suffer in the

13  future, is that your contention?

14       A.   Yes.

15       Q.   How about prior to October of 2004.

16  Prior to you getting a visit from the FBI and

17  them telling you about these exhibits with

18  [Edited for filing]dmb somehow involved, prior to that had she

19  suffered any injury at all regarding -- as a

20  result of the conduct you allege in the

21  complaint?

22      A.   No.

23      Q.   In October of 2004, how was it that

24  you were informed about a court exhibit that

25  might involve [Edited for filing]dmb?  On the phone?  E-mail?

19

1  In person?

2      A.   In person.

3      Q.   And who -- where did that take

4  place, at your home?

5      A.   It took place at my workplace.  And

6  Mike Sullivan and Debra Hughes came there and

7  explained it to me.

8      Q.   This can be kind of tricky because

9  there's two Sullivans here.  I just want to

10  make sure.  There's a Charlie Sullivan.

11      A.   Oh, Charlie Sullivan.  I'm sorry.

12      Q.   Yeah.  And that gets confusing

13  because their names are the same.  So Charlie

14  Sullivan, the FBI agent, and Debra Hughes came

15  to your workplace?

16      A.    Yes.

17      Q.    And where is that that you work?

18      A.    American Greetings.

19      Q.    And did they make an appointment to

20  come and see you or did they just show up at

21  the desk and they called you down?

22      A.    They called me to meet me there.

23      Q.    You knew they were coming?

24      A.    Yes.

25      Q.    And how long were they there


                            20


1   meeting with you in that occasion in October of

2   04?

3       A.    Oh, maybe 40, 45 minutes.

4       Q.    All right.  And when they showed up

5   there, who did the talking to discuss why they

6   were there?

7       A.    They both did.

8       Q.    And what did they tell you?  Why

9   were they there?

10      A.   They explained to me the use of the

11   image and discussed -- well, that brought along

12   fear right there, that there could be some

13   repercussions of it.  And so Debra Hughes was a

14   witness kind of person that told me not -- you

15   know, I don't know how to explain that.  They

16   gave me this little card so that I can get on

17   the Internet so I can check and see what the

18   status of everything is.  And I was afraid that

19   there could be some damages or some --

20      Q.   Hold on a second.  What's the card?

21   What are you referring to by a "card"?

22      A.   It's a card -- here.  It's a victim

23   notification system.

24      Q.   I see.  And it would allow you to

25   track what was happening --

21

1      A.   What was happening.

2      Q.   -- in their investigation?

3      A.   Yes.

4      Q.   Okay.  And what did they tell you

5   they were investigating?

6      A.   The person that downloaded images

7   and used them for pornographic reasons.

8      Q.   And did they explain to you how

9   those -- how [Edited for filing]dmb was involved in some type

10   of an image, her image?

11     A.   Yes.

12     Q.   And did they tell you it was for

13   someone's personal use or they were

14   using it --

15     A.   They said they were investigating

16   it.

17     Q.   They didn't say what it was for?

18     A.   They knew some of the things that

19   it was used for.

20     Q.   What did they tell you it was being

21   used for?

22     A.   That they were being used in courts

23   and training classes.

24     Q.   Charlie Sullivan told you it was

25   being used in training?

22

1    A.    Yes.

2    Q.    Okay.  And did they show you any

3  images during that meeting?

4    A.    They showed me the original image

5  and described.  I didn't want to see the other

6  one.

7    Q.    Did they offer to show you the

8  court exhibit that was created?

9    A.    They said they could if I chose to

10  look at it, but I didn't want to.

11    Q.    And did they have it with them

12  there?

13    A.    I don't know if they had it with

14  them there or not.

15    Q.    Okay.  So you've never actually

16  seen any court exhibit like the ones that are

17  described in the complaint?

18    A.    No.

19    Q.    You had the court exhibit described

20  to you by Charlie Sullivan?

21    A.    Yes.

22      Q.    Anyone else describe the exhibit to

23   you at any point?

24      A.    In paperwork that I'm not sure

25   where I got from --


                            23


1      Q.    Okay.

2      A.    -- there's descriptions of it.

3      Q.    And has anyone else that you've

4   told about this case occurring, have they seen

5   a copy of the court exhibit --

6      A.    No.

7      Q.    -- that you're alleging in the

8   complaint?  No?

9      A.    (Witness shaking head in the

10   negative.)

11      Q.    Okay.  And have you described this

12   court exhibit to those other people that you

13   listed in your --

14      A.    Yes.

15      Q.    -- discovery responses?

16      A.    Yes.

17      Q.    Okay.  And do you have any way of

18   knowing whether Charlie Sullivan's description

19   to you is accurate?

20      A.    By the descriptions in the court

21   papers.

22      Q.    I'm saying, you've never seen the

23   image to know if Charlie Sullivan is telling

24   you accurately what that image looks like?

25      A.    No.


24


1      Q.    Okay.  Now, who put the -- any

2   image of [Edited for filing]dmb on sale on the Internet

3   anywhere?  Do you know who that might be?

4      A.    It was my son.

5      Q.    And what's his name?

6      A.    Ron Bloom.

7      Q.    Where does Ron live?

8      A.    On Bosworth in Cleveland.

9      Q.    And Ron doesn't have custody of

10   [Edited for filing]dmb either, correct?

11      A.    No.  It's an uncle.  He's [Edited for filing]dmb's

12   uncle.

13      Q.    And did you have custody of [Edited for filing]dmb

14   at the time that image or any image was taken

15   of [Edited for filing]dmb and uploaded to the Internet?

16      A.    Yes.

17      Q.    You did?

18      A.    Yes.

19      Q.    And did you give permission for Ron

20   to take that picture?

21      A.    Yes.

22      Q.    Did you give permission for him to

23   put it on the Internet?

24      A.    Yes.

25      Q.    Where -- what locations on the

25

1   Internet was that image placed?

2      A.    iStock.

3      Q.    Anywhere else?

4      A.    Not that I'm aware of.

5      Q.    And how many -- you answered in the

6   interrogatories it was sold about five times,

7   the copy?

8      A.    Well, I have a paper and it was

9   nine.

10      Q.    Nine.  Very well.

11      A.    Nine times.

12      Q.    And who got the money from the sale

13   of those nine copies of the image?

14      A.    Ron.

15      Q.    Are there other pictures other than

16   the one that was used in the court exhibit of

17   [Edited for filing]dmb that are available -- that have ever

18   been available online to purchase?

19      A.    Yes.

20      Q.    Are they still available online to

21   purchase?

22      A.    A few of them.  Ones that we went

23   through that -- thought that there was more

24   than one person in it or that they couldn't be

25   manipulated in the wrong way.

1      Q.   And where are those images of

2   [Edited for filing]dmb still available online?

3      A.   iStock.

4      Q.   And other than purchases related to

5   this case, have other persons, even if you

6   don't know their identity, purchased copies of

7   the image that was referenced in this

8   complaint?

9      A.   Nine.

10     Q.   Nine other people.  And how have

11   they -- those nine other people used that

12   image?

13     A.   I don't know.

14     Q.   Have you suffered any damages from

15   how those other people might have used that

16   image?

17     A.   No.

18     Q.   Do you know the identities of those

19   people?

20     A.   No.

21     Q.   Are they in the United States, do

22   you know?  Do they live in the United States?

23      A.   No, I don't know that.

24      Q.   Okay.  And how many different

25   images of [Edited for filing]dmb has Mr. Ron Bloom put on the


27


1   Internet for sale?

2       A.   I don't know.

3       Q.   And the money goes to him?

4       A.   Yes.

5       Q.   Okay.  Is [Edited for filing]dmb aware that these

6   images captured by her uncle have been put on

7   the Internet for sale?

8       A.   Yes.  Yes.

9       Q.   And how was she aware of that?

10       A.   Because he took the images and told

11   her that he was putting them on the Internet.

12   And they've seen them on the Internet.

13      Q.   They have?

14      A.   Yes.

15      Q.   Can you tell me the commercial

16   value of any -- of the image of [Edited for filing]dmb that

17   you're alleging was used in a court exhibit in

18   this case?  What's its commercial value?  What

19   can it be sold for on the Internet, the image

20   that you guys uploaded?

21        A.   I honestly can't answer that

22   question because I really never got involved in

23   the sale -- you know, prices of the sales.

24        Q.   Does [Edited for filing]dmb have any income

25   currently in 2009?  Does she earn income from

                          28

1   any kind of job?

2        A.   No.

3        Q.   Has she ever, from 2004 to now,

4   earned income in some way?

5        A.   No.

6        Q.   She's not an actress?

7        A.   No.

8        Q.   She's not a child model?

9        A.   No.

10        Q.   I would assume she's just a typical

11   kid going to school doing whatever they do,

12  right?

13      A.    No.

14      Q.    She's not a movie star?

15      A.    No.

16      Q.    Or singer or professional of any

17  kind, correct?

18      A.    No.

19      Q.    All right.  I might have asked you

20  this one question, and so if I repeat it, I

21  apologize.  But I asked you to admit that

22  [Edited for filing]dmb has suffered no financial injury as a

23  result of the conduct alleged in the complaint,

24  and in your responses you denied that.

25          So just -- if I asked you before I

29

1  apologize, but what's the dollar amount of the

2  financial injury that [Edited for filing]dmb has suffered as a

3  result of the conduct alleged in the complaint?

4      A.    None.

5      Q.    And she's -- has she suffered any

6   damage to her reputation?

7       A.   That's to see, I guess.

8       Q.   I mean, currently, as of today.

9       A.   No.

10      Q.   Okay.  And no physical injury,

11  correct?

12      A.   No.  Correct.

13      Q.   As of today?

14      A.   Correct.

15      Q.   And as of today, no psychological

16  injury has she suffered?

17      A.   Correct.

18      Q.   And your financial injury as of

19  today has been none.  Is that accurate or no?

20  I'm not trying to trick you.

21          I guess I should ask it that way.

22  Please give me the dollar amount of the

23  personal injury you've suffered.

24      A.   None.

25      Q.   And your psychological injury is

1    the seven or eight sessions, the cost of those

2    sessions talking to your psychologist about

3    this incident?

4        A.    If we're talking about financial,

5    yes.

6        Q.    And how -- and that's the $30 copay

7    times seven or eight sessions, correct?

8        A.    Correct.

9        Q.    And the first person to ever let

10   you know -- well, let me back that up.

11           You didn't suffer any, yourself,

12   psychological injury related to this prior to

13   October of 2004 when the FBI told you about

14   these exhibits?

15       A.    No.

16           MR. BOLAND:  Okay.  I don't think I

17   have any further questions, Mr. Rosenbaum.

18           MR. ROSENBAUM:  Okay.

19           MR. BOLAND:  If you want to tell

20   her about her option to review that.

21           MR. ROSENBAUM:  You have the right

22   to review a copy of that to make sure that the

23   reporter has accurately taken down your

24   answers, or you can waive that right if you

25   want to.


                                    31


1           THE WITNESS:  Well, I would like to

2    review it.

3           MR. BOLAND:  This is off the

4    record.

5

6           (Deposition concluded.)

7                 - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

32

1               CERTIFICATE

2   The State of Ohio,   )

3                     SS:

4   County of Cuyahoga.  )

5

6               I, Donnalee Cotone, a Notary Public

7   within and for the State of Ohio, duly

8   commissioned and qualified, do hereby certify

9   that the within named witness, VICTORIA BLOOM,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotype in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19         I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25


                        33


1         I do further certify that I am not

2   a relative, counsel or attorney for either

3   party, or otherwise interested in the event of

4   this action.

5         IN WITNESS WHEREOF, I have hereunto

6   set my hand and affixed my seal of office at

7   Cleveland, Ohio, on this _____ day of

8   _____, 2009.

9

10

11

12

13           _____

14           Donnalee Cotone, Notary Public

15           within and for the State of Ohio

16

17   My commission expires February 7, 2012.

18

19

20

21

22

23

24

25

34

1           SIGNATURE OF WITNESS

2

3

4

5

6          The deposition of VICTORIA BLOOM,

7   taken in the matter, on the date, and at the

8   time and place set out on the title page

9   hereof.

10          It was requested that the

11   deposition be taken by the reporter and that

12   same be reduced to typewritten form.

13             It was agreed by and between

14   counsel and the parties that the Deponent will

15   read and sign the transcript of said

16   deposition.

17

18

19

20

21

22

23

24

25

35

1                    AFFIDAVIT

2   The State of Ohio,   )

3                   ) SS:

4   County of Cuyahoga   )

5

6

7

8       Before me, a Notary Public in and for

9   said County and State, personally appeared

10   VICTORIA BLOOM, who acknowledged that he/she

11   did read his/her transcript in the

12   above-captioned matter, listed any necessary

13   corrections on the accompanying errata sheet,

14   and did sign the foregoing sworn statement and

15   that the same is his/her free act and deed.

16       In the TESTIMONY WHEREOF, I have hereunto

17   affixed my name and official seal at this_____

18   day of _____ A.D. 2009.

19

20

21      _____

22      Notary Public

23

24      _____

25      My Commission Expires:


                                36


1       DEPOSITION ERRATA SHEET

2

3   RE:      PETER LORA, VICTORIA BLOOM, ET AL.,

4           VS.  DEAN BOLAND

5

6

7   Job No.:        19023-DLC

8   Deponent:       VICTORIA BLOOM

9   Deposition Date:    MARCH 3, 2009

10

11  To the Reporter:

12  I have read the entire transcript of my

13  Deposition taken in the captioned matter or the

14   same has been read to me.  I request that the

15   following changes be entered upon the record

16   for the reasons indicated.  I have signed my

17   name to the Errata Sheet and the appropriate

18   Certificate and authorize you to attach both to

19   the original transcript.

20

21

22

23

24   _____

25   VICTORIA BLOOM