1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

~~~~~~~~~~~~~~~~~~~~~

PETER LORA, VICTORIA BLOOM, et al.,


            Plaintiffs,


        vs.      Case No.  1:07 CV 2787


DEAN BOLAND,


            Defendant.

        ~~~~~~~~~~~~~~~~~~~~~

            Deposition of

            PETER LORA

        March 3, 2009
        9:00 a.m.

        Taken at:
    Law Office of Jonathan E. Rosenbaum, Esq.

        230 Third Street

        Elyria, Ohio

Donnalee Cotone, RPR, CLR

2

1  APPEARANCES:

2

3      On behalf of the Plaintiffs:

4          Law Office of Jonathan E.

5          Rosenbaum, by

6          JONATHAN E. ROSENBAUM, ESQ.

7          230 Third Street

8          Suite 104

9          Elyria, Ohio  44035

10          (440) 322-7972

11          jerosenbaum@alltel.net

12

13      On behalf of the Defendant:

14          Law Office of Dean Boland, by

15          DEAN BOLAND, ESQ.

16          18123 Sloane Avenue

17        Lakewood, Ohio  44107

18        (216) 529-9371

19        dean@deanboland.com

20            ~ ~ ~ ~ ~

21

22  ALSO PRESENT:

23        Victoria Bloom

24

25            ~ ~ ~ ~ ~


                              3


1            I N D E X

2

3   EXAMINATION OF DEPONENT      4      6

4   BY MR. BOLAND

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          PETER LORA, of lawful age, called

2    for examination, as provided by the Federal

3    Rules of Civil Procedure, being by me first

4    duly sworn, as hereinafter certified, deposed

5    and said as follows:

6          EXAMINATION OF PETER LORA

7  BY MR. BOLAND:

8      Q.   Sir, could you state your name and

9  spell your last name for the record, please?

10     A.   Peter Lora, L-O-R-A.

11     Q.   And you are one of the plaintiffs

12  in this matter, correct?

13     A.   Yes.

14     Q.   Along with Miss Bloom, who is here.

15  And for the record, you've been sitting in the

16  room here while I asked questions just

17  previously to Miss Bloom, correct?

18     A.   Yes.  Yes.

19     Q.   A lot of these questions will be

20  repetitive, but we have to do this just for

21  purposes of the record.

22          What's your current address, sir?

23     A.   15717 Clifton Boulevard.

24     Q.   And how long have you lived there?

25     A.   Two years.

1    Q.   What city is that in?

2    A.   Lakewood.

3    Q.   Okay.  And one of the minor

4  plaintiffs in this case is your child, right?

5    A.   Yes.

6    Q.   What's her first name?

7    A.   [Edited for filing] dmb

8    Q.   And how old is she now?

9    A.   [Edited for filing] dmb

10   Q.   Okay.  And the allegation in the

11  complaint is that a court exhibit was made

12  involving a portion of her image, and that

13  image was downloaded from iStockphoto.com.  Do

14  you know who placed that image on iStockphoto?

15   A.   I did.

16   Q.   And when did you put it there,

17  month and year?

18   A.   It was uploaded January 24th, '04.

19   Q.   And were there other images of

20  Sarah that were uploaded to iStockphoto?

21   A.   Yes.

22   Q.   About how many?

23      A.    Maybe 20 total.  15, 20.

24      Q.    And anywhere -- any other sites on

25   the Internet where pictures -- that you


                                6


1   uploaded pictures of your daughter?

2       A.    There was a short time where I was

3   trying to sell images on a site called

4   dreamstime.com.  I am -- I don't recall if I

5   ever put any images of her on there.

6       Q.    And what was the purpose of putting

7   the images on any of those sites?

8       A.    It's stock photography to be used

9   for websites or advertisements.

10      Q.    And the particular image that's

11   referenced in complaint in this case, do you

12   know how many times that was downloaded by

13   persons through any means, iStockphoto or that

14   other site that you mentioned?

15      A.    I'm aware of six times total.

16      Q.    Do you know the people who

17   downloaded that image?

18      A.    Just one.

19      Q.    Other than that one, do you know

20   the others?

21      A.    No.

22      Q.    Do you know what those other folks

23   did with that image?

24      A.    No.

25      Q.    Have you suffered any damages from


7


1   how that image was used by people other than

2   the way you're claiming it was used in this

3   case?

4      A.    Have I suffered?  I'm sorry.  Could

5   you repeat the question.

6      Q.    Other than the allegations in this

7   case about how the image of your daughter was

8   used, putting it aside for a second, the other

9   five people who downloaded, have you suffered

10   any damages from how they've used those images?

11      A.    No.

12      Q.   Are you aware of how they've used

13   the image?

14      A.   No, I'm not.

15      Q.   And when did you first become aware

16   that your daughter's image had been used in a

17   court exhibit?

18      A.   Around October of '04, I believe.

19      Q.   And who made you aware of that?

20      A.   Charles Sullivan.

21      Q.   And how did he do that?  By phone?

22   In person?  E-mail?

23      A.   In person.

24      Q.   Where was that meeting?

25      A.   At my home.

8

1      Q.   And --

2      A.   Previous address.

3      Q.   At a previous address?

4      A.   Yes.

5      Q.   And what was that address?

6      A.   17506 Neff Road, Cleveland.

7      Q.    And did he show it by himself?

8      A.    No.  Debra Hughes was with him.

9      Q.    And what did he tell you.

10     A.    He told me that the image was used,

11   manipulated and used in the defense of child

12   pornographers, and I don't recall if he

13   described the image at that time.

14     Q.    Did he show you the court exhibit?

15     A.    No.  Absolutely not.  I refused to

16   see it.

17     Q.    Has he ever shown you that exhibit?

18     A.    No.

19     Q.    Did he describe for you what he

20   thought it looked like?

21     A.    It was described to me at one

22   point.  I don't recall if it was him that

23   actually described it.

24     Q.    Did you have more than one meeting

25   with Charlie Sullivan?

9

1    A.   Yes.

2    Q.   All right.  After this first

3  meeting at the Neff Road address, where did you

4  meet him next?

5    A.   I met him and Michael Sullivan at

6  the Federal Courthouse, I guess it is.

7    Q.   And when was that meeting?

8    A.   I don't recall.  It was

9  maybe -- maybe a month after the first meeting.

10    Q.   So approximately November/December

11  of '04, somewhere around there?

12    A.   Give or take, yes.

13    Q.   And what was the purpose of that

14  meeting?

15    A.   To discuss in more detail the use

16  of the images.  And I really don't recall the

17  exact conversation that happened.

18    Q.   And -- go ahead.

19    A.   I -- that's -- that's all I can say

20  for sure.

21    Q.   And did they describe for you how

22  the court exhibit or the exhibit involving your

23  daughter's image was being used?

24      A.    It was in defense of child

25   pornographers.  That's the way it was described

10

1   to me.

2       Q.    So they didn't say, like,

3   physically where it was being used?  A

4   courthouse, in advertising?

5       A.    They said in courthouses in at

6   least four or five different states or cities.

7   I don't recall the exact locations.

8       Q.    Okay.  And again, at this second

9   meeting, they -- did they show you a copy of

10   the court exhibit that they were referring to?

11      A.    No.  I refused to see it.

12      Q.    Well, let me ask you this.  Did

13   they offer to show it to you?

14      A.    They did offer, yes.

15      Q.    And you declined?

16      A.    Yes.

17      Q.    And to this day, have you seen that

18   court exhibit?

19    A.    No.

20    Q.    And you've had it described to you

21  by someone, though?

22    A.    Yes.

23    Q.    Either Michael or Charlie Sullivan?

24    A.    Yes.

25    Q.    Now, what did they tell you they

                              11

1  intended to do after that meeting, the second

2  meeting?  What was their next step?

3    A.    They said that they were -- I'm

4  trying to remember how they worded it, but

5  basically that they were going after you.

6    Q.    And did you have any further

7  conversation with Charlie Sullivan or Michael

8  Sullivan after that second meeting in any way?

9  Phone?  E-mail?  Letters?

10    A.    There may have been a phone call.

11  I honestly don't recall.

12    Q.    And do you know if they eventually

13  did anything with regard to their

14  investigation?

15      A.   I don't know.

16      Q.   Okay.  And when is it that you made

17  the decision to file a lawsuit in this case?

18      A.   As soon as I heard about it.

19      Q.   Okay.  And how did you go about

20  making that determination?  By the way, did you

21  have any prior relationship with the other

22  plaintiff in this case?  Did you know her prior

23  to this case?

24      A.   Who?  My Aunt Vicky?  Yeah.

25      Q.   So she's your aunt?

12

1      A.   Yeah.

2      Q.   And did you have a discussion with

3  her about whether to file a lawsuit?

4      A.   Sure.  Yes.

5      Q.   And what -- tell me about that

6  discussion.

7      A.   We decided that what happened was

8   wrong and it was a violation of our rights and

9   personal -- personal rights.  And we decided to

10   try to sue.

11       Q.   Okay.  And what was your next step

12   after you made your decision to sue?

13       A.   I contacted Mr. Rosenbaum, and here

14   we are.

15       Q.   Okay.  At the time you contacted

16   Mr. Rosenbaum, can you describe for me what

17   type of damages you personally had suffered at

18   that point?

19       A.   I have suffered immense

20   psychological damage, which I have not sought

21   treatment for; financial, loss of sales on

22   iStock; my passion for photography is gone.

23       Q.   Is that it?

24       A.   That's about it that I can say

25   right now.


                                    13


1       Q.   Well, let's go over a few you

2   mentioned.  Have you suffered any physical

3   injury?

4       A.   No.

5       Q.   Any damage to your reputation as a

6   result of the conduct alleged in the complaint?

7       A.   No.

8       Q.   Okay.  You used the phrase before,

9   immense psychological injury.  Explain how that

10  manifests itself.

11      A.   One of my greatest joys was being

12  with my daughter, playing, taking pictures of

13  her growing up, and now I can't point the

14  camera in her direction without thinking about

15  this.

16      Q.   And when did that start where you

17  were unable to --

18      A.   The minute I heard about it.

19      Q.   And so have you taken any

20  photographs of her in any way since that time?

21      A.   I have.

22      Q.   And how many would you say you've

23  taken since then?

24      A.   I can't give you an exact number,

25  but a portion of what I would have normally

                                    14

1  taken.

2      Q.   And have you uploaded any of those

3  images to the Internet for sale since then?

4      A.   No.

5      Q.   Are any of images of your daughter

6  still available of your daughter for sale?

7      A.   Yes.

8      Q.   And how many images are available

9  for sale on the Internet?

10      A.   Maybe five.

11      Q.   And where are they available?

12      A.   All on iStock.

13      Q.   Now, other than this experience you

14  described pointing the picture at

15  your -- camera at your daughter and how it

16  affects you, what other ways has this, as you

17  put it, immense psychological damage sort of

18  occurred to you?

19      A.   I've been forced to see my daughter

20  in a way that no father should ever have to see

21  his daughter.  I have to wonder now what's

22  happening with these images and what could

23  possibly happen with any other image that I

24  ever take of her because I shoot digital

25  camera.  Somebody hacks into my computer, takes


15


1  a picture.  Next thing I know, she's all over

2  the Internet.

3      Q.    Now, you're not alleging in this

4  case that anyone hacked into your computer to

5  take images?

6      A.    No, I'm not.  It's a what-if

7  possibility.

8      Q.    Let's talk about the image --

9  there's one image that's involved in this case

10  as part of a court exhibit, correct?

11      A.    Yes.

12      Q.    Let's talk about that court

13  exhibit.  I know you haven't ever seen it, but

14   whom are you alleging actually has possession

15   of a copy of that court exhibit involving the

16   portion of the image of your daughter?

17       A.   At this time?

18       Q.   Yes.

19       A.   Who has a copy of the innocent

20   image?

21       Q.   No.  The court exhibit that was

22   created.

23       A.   The court exhibit, as far as I

24   know, you, Mr. Rosenbaum, possibly the FBI, the

25   courthouses where the -- where all this

16

1   happened.

2       Q.   Any other persons outside of that

3   list that you know of that have a copy of this?

4       A.   No.  No.

5       Q.   And what information supports your

6   comment there that I still have a copy of that

7   court exhibit?

8       A.   I don't know for sure, but I

9  do -- I am aware that images that are -- that

10  have ever been on a hard drive can still be

11  retrieved from that hard drive.

12      Q.   And you're aware that there's a

13  deferred prosecution agreement connected to

14  this case?

15      A.   I am aware.

16      Q.   Have you -- and I don't know the

17  contents of it, but have you discussed that

18  topic with Mr. Rosenbaum, that deferred

19  prosecution agreement?

20      A.   Not in any detail.  I'm not aware

21  of any details of it.

22      Q.   Very well.  Any other

23  issues -- now, the psychological injury you're

24  talking about, you've never sought

25  psychological treatment for it?


17


1      A.   No, I have not.

2      Q.   And have you ever in the past seen

3   a psychologist for any reason?

4       A.   No.

5       Q.   Okay.  And the next thing you

6   listed as damage was financial damage.  Can you

7   describe the dollar amount you're referring to

8   there that you've been harmed by what you

9   allege in the complaint?

10      A.   The dollar amount can't -- I don't

11  think it's possible for it to be determined

12  because as you upload images, you get exposure

13  on iStock.  The more exposure you get, the more

14  downloads you get.  The -- the amount of money

15  received from iStock per download has increased

16  over the years.  It's undeterminable, I think,

17  to give.  I don't think I could come up with an

18  exact or even a ballpark dollar amount.

19      Q.   Are you saying that the financial

20  injury is related to the fact that you have a

21  lower number of downloads now because of what

22  you're --

23      A.   Yes.

24      Q.   -- alleging happened in the

25  complaint?

18

1     A.   Yes.

2     Q.   How is what you're alleging in the

3  complaint caused you to have less downloads?

4     A.   Because my number of uploads has

5  decreased.

6     Q.   Why has that decreased?

7     A.   Because when I, like I said, when I

8  found out about this, it took my drive away.

9  It took my passion for photography away.  I

10  still contribute images here and there, but not

11  what I would have had this not happened.

12    Q.   I see.  So you've chosen or you

13  have not uploaded as many pictures as you think

14  you would have had this, what you allege in the

15  complaint not occurred, right?  That's what

16  you're saying?

17    A.   That's a fair assumption, yes.

18    Q.   Okay.  And because you've uploaded

19  less, people have downloaded less from iStock

20  and you've made less money?

21      A.   Right.

22      Q.   How much have you made -- well,

23  when was the first image -- time you've ever

24  loaded an image to iStock at all?  You know,

25  what was the month and year when you first did

19

1  that?

2      A.   It would have been --

3      Q.   And I'm just asking you for an

4  estimate.  I know you might be off by a month

5  or a year or something.

6      A.   It was late in the year 2003.

7      Q.   Okay.  And there are still images

8  up there today, some, that you've uploaded,

9  correct?

10      A.   Yes.

11      Q.   And some of your daughter as well?

12      A.   Yes.

13      Q.   And iStock, do they keep records of

14  how much you've earned with those downloads?

15      A.   Yes.

16      Q.   Okay.  So that's something you

17   could -- you could obtain as a list of all the

18   downloads and the dollar amount earned?

19      A.   Yes.

20      Q.   Okay.  All right.  So those are the

21   two damages, psychological and financial.  Any

22   other financial damage you've suffered other

23   than related to iStockphoto downloads and

24   uploads?  Any other place?

25      A.   Other than loss of work being here,


                           20


1   no.

2      Q.   Oh, being here for deposition,

3   court proceedings?

4      A.   Not being at work right now, yes.

5      Q.   And where do you work at?

6      A.   Tropical Fish Distributors in

7   Wickliffe.

8      Q.   Okay.  Now, your daughter,

9   let's -- one of the responses you made to the

10  discovery was, I asked you to admit that she

11  has not suffered financial damage and you

12  denied that.  So could you describe to me the

13  dollar amount of financial damage that your

14  daughter has suffered?

15      A.   I -- again, I cannot give a dollar

16  amount.

17      Q.   Has she suffered financial damage?

18  And I mean currently.  Not what might happen in

19  the future.  As of today, how much financial

20  damage has she suffered?

21      A.   I guess none.  Her -- I think I was

22  more referring to my being able to provide for

23  her.

24      Q.   But she herself --

25      A.   She herself has not, no.


                                21


1      Q.   Does she earn income now in any

2  way?

3      A.   No.

4     Q.    Has she ever in her life earned

5   income as an actress or a model or professional

6   of any type?

7     A.    No.

8     Q.    I also asked you to admit that you

9   had not suffered damage to your reputation, and

10  you denied that as well.

11          Can you describe how your

12  reputation has been damaged as a result of what

13  was alleged in the complaint?

14    A.    My -- again, the uploads, the -- I

15  guess it would be my reputation on iStock.

16    Q.    Okay.  And can you describe what

17  that reputation was before October of 2004,

18  when you first heard about this exhibit?

19    A.    Just up and coming contributor to

20  iStock.

21    Q.    And who -- who could I talk to that

22  would be able to describe for me your

23  reputation on iStock prior to '04 of

24  2000 -- prior to October of 2004?

25    A.    My cousin Ron.

22

1      Q.    Ron?

2      A.    Bloom.

3      Q.    Okay.  And that's the person who

4   uploaded those other images?

5      A.    Right.

6      Q.    Okay.  Anyone else?

7      A.    I can't give you any names, no.

8      Q.    Okay.  So that's the damage to your

9   reputation.  Do you have a dollar amount of

10   what that would equate to, that damage to your

11   reputation?

12      A.    That would go right along with the

13   financial damage for loss of sales.

14      Q.    And you can't calculate that?

15      A.    I can't calculate that.

16      Q.    Okay.  Is there someone that you

17   know of who could calculate that?

18      A.    Possibly somebody at iStock maybe.

19   I really don't know.

20      Q.    Okay.

21      A.    Part of the sales on iStock have to

22   do with exposure, and if you're not uploading

23   images, you don't get the exposure.  It's hard

24   to say.  It's very hard to say.

25       Q.   Have you uploaded images to iStock


                                23


1   ever, other than ones involving your daughter

2   somehow in the image?

3       A.   I don't understand the question.

4       Q.   Other than images of your daughter,

5   have there been other images that you've

6   uploaded to iStock in the past?

7       A.   Oh, yes.

8       Q.   Give me some examples of what kind

9   of stuff you upload.

10       A.   I'm currently uploading images of

11   tropical fish.  I'm taking pictures for our

12   company website and I submit them to iStock.

13       Q.   And are you having the

14   psychological issues using your camera

15   capturing images of stuff other than your

16  daughter for upload to the Internet?

17      A.    It's difficult to pick up the

18  camera without thinking about this.

19      Q.    And what was your income in October

20  of -- not October.  In 2004, what was your

21  income from photography in that year?

22      A.    In '04?

23      Q.    Yes.

24      A.    In '04, $363.10.

25      Q.    And you have a document in front of


                              24


1  you.  Where are you getting that from?  Is that

2  an iStock record?

3      A.    This is my -- iStock allows

4  you -- they track your sales throughout each

5  month -- well, day, month, and year.

6      Q.    Okay.  So in '04 you made about

7  $360 from iStock?

8      A.    Right.

9      Q.    And would you be able to get from

10  iStock the records of how much you earned

11   in -- every year from 2004 to the present from

12   downloads from iStock?

13        A.   I have that.

14        Q.   Oh, you have it with you?

15        A.   Okay.

16            MR. BOLAND:  Mr. Rosenbaum, if I

17   can get a photocopy of it.

18            MR. ROSENBAUM:  Well, that's what I

19   promised you.  We'll get that.

20            MR. BOLAND:  I don't want to ask

21   you a bunch of questions because I can read

22   that myself, and then if I have follow-ups, I

23   can send them to you.

24   BY MR. BOLAND:

25        Q.   Now, the image used for the court


                              25


1   exhibit related to this case, can you give me a

2   dollar amount of its commercial value?

3        A.   Could you be more specific?

4        Q.   How much is it worth on the open

5  market to sell a copy of that image?

6      A.   It depends.  On iStock I could get

7  as much as, I want to say, if somebody bought

8  an extended license for one download, I could

9  have $45.

10     Q.   Has anyone ever bought an extended

11  license for that image?

12     A.   For this image, no.

13     Q.   And for that image, what's the most

14  it ever sold for anywhere?  On iStock or anyone

15  else.

16     A.   Total sales then for six downloads

17  was 80 cents.

18     Q.   And since then, the life of that

19  image being on the Internet, how much has it

20  earned?

21     A.   80 cents.

22     Q.   And when did you remove it from the

23  Internet?

24     A.   The day that Charlie Sullivan was

25  in my house.

26

1    Q.    So around about October of '04?

2    A.    Yes.

3    Q.    Okay.  And that day, did you remove

4  all pictures of your daughter from the Internet

5  iStockphoto website?

6    A.    All the images that I thought could

7  be manipulated.

8    Q.    So you left some images of her up

9  there on the Internet?

10    A.    I did.

11    Q.    And they're up there still today?

12    A.    Yes.

13    Q.    Now, other than court personnel,

14  myself, and the FBI, do you know of any

15  other -- can you give me the names of any other

16  persons who you know have a copy of the court

17  exhibit that you reference in the complaint?

18    A.    Other than court personnel?

19    Q.    The FBI, and me.

20    A.    No.

21    Q.    Okay.  Can you give me the name of

22  anyone outside of a courtroom to whom this

23   court exhibit was displayed?

24        A.   I cannot.

25        Q.   Can you give me a location where,

27

1   if you know, where this court exhibit was

2   displayed outside of a courtroom or to court

3   personnel?

4        A.   No.

5        Q.   And in your interrogatories you

6   indicated that you have no documents supporting

7   your claim for -- or any claim for damage to

8   your reputation.  Is that still true, because

9   we've had some time between now and then?

10        A.   Well, outside of, like I said, the

11   documents that I have showing the sales, I

12   don't know if they're directly linked.

13        Q.   And then as of today, there's no

14   financial damage -- no damages of any kind that

15   have been suffered by your daughter

16   related -- she doesn't know about this

17   litigation, does she?

18       A.    She knows nothing about it.

19       Q.    She's never seen the image -- seen

20   the court exhibit?

21       A.    Correct.

22       Q.    And you've never described it for

23   her?

24       A.    Correct.

25       Q.    And you have told some other people

28

1   or discussed this issue with some other people,

2   correct?

3       A.    Yes.

4       Q.    Have they discussed it with anyone

5   else?

6       A.    Not that I'm aware of.

7       Q.    And have you described this court

8   exhibit to them, these other people?

9       A.    No.

10       Q.    Well, what did you tell them was

11   happening?

12      A.   I told them that it was manipulated

13   into a pornographic image to defend child

14   pornographers.

15      Q.   Okay.  And you don't know if

16   they've told -- do you know if they've told

17   other people about this?

18      A.   They said that they wouldn't, but I

19   can't say for sure that they haven't.

20      Q.   And what steps have you taken to

21   try and protect your daughter from learning

22   about the existence of this court exhibit?

23      A.   Just keeping her out of it.

24      Q.   Are the other people you've told

25   about this court exhibit people that your

29

1   daughter knows?

2      A.   Yes.

3      Q.   Are they parents of children that

4   your daughter knows?

5      A.   Mostly family members.

6      Q.    Well, do they have children

7   themselves that might be your daughter's age?

8      A.    Yes.

9      Q.    Okay.  Now, along with your

10   daughter, you're married to her mother?

11      A.    I am not currently married to her

12   mother, no.

13      Q.    And does her mother know about this

14   lawsuit?

15      A.    Her mother has been made aware.

16      Q.    And what was her mother's reaction

17   when you told her about this lawsuit and this

18   court exhibit?

19      A.    She expressed -- the only thing she

20   expressed concern about was Sarah's safety and

21   her not finding out.

22      Q.    And has Sarah's safety been in

23   question at any point during this litigation?

24      A.    Not to this point, no.

25      Q.    Okay.  And have you discussed with

1  her mother what you -- how to deal with the

2  fact -- not the fact. How to deal with your

3  daughter in the event that someone you've told

4  tells your daughter about this exhibit?

5      A.   I have not discussed that with her

6  mother, no.

7      Q.   Are you concerned about that?

8      A.   Am I concerned about?

9      Q.   The people you've told somehow

10  accidentally giving this information to your

11  daughter at some point in her life.

12      A.   At some point in her life it could

13  happen.

14      Q.   Do you intend at some point to sit

15  down with your daughter and explain to her that

16  this court exhibit exists?

17      A.   Not if I don't have to.

18      Q.   Even when she's over 18?

19      A.   I would rather she didn't know

20  anything about this.

21      Q.   With this knowledge, you're just

22  going to leave it blanked out as long as you

23  can?

24      A.   Yes.

25      Q.   And would it be your preference


31


1  that the court personnel, the lawyers, the FBI

2  agent, myself, all keep this information to

3  ourselves as well?

4      A.   I -- I would prefer that.

5      Q.   Would that be best for your

6  daughter?

7      A.   Yes.  Absolutely.

8      Q.   You think that would be best for

9  your aunt's ward?

10      A.   That's for her to decide.  That's

11  my opinion is the best thing.

12      Q.   Your opinion, right.

13      A.   Yes.

14      Q.   Okay.  Let me break things up in

15  time.

16          Prior to October of 2004, had you

17  suffered any damages from conduct that you

18   alleged in the complaint prior to October of

19   '04?

20       A.   I wasn't aware of it then, so no.

21       Q.   Okay.  From October '04 to now,

22   you've suffered psychological and financial

23   damages, which you've described, right?

24       A.   Right.

25       Q.   Any other damages from October '04


32


1   to now?

2       A.   Not that I can think of.

3       Q.   Okay.  And from now going forward

4   into the future, do you have any way to

5   calculate damages that you think you'll suffer

6   somewhere in the future?

7       A.   Well, this is going to live with me

8   as far as I can tell forever.  I'll never

9   forget this.  And as far as financial damages,

10   like I said, there's no way to tell.  It's

11   expediential.

12       Q.   Because of the iStock -- I mean,

13   the photography, damage to your photography?

14       A.   Right.  Right.

15       Q.   Now, have you ever made a living as

16   a photographer; like that was your sole income?

17       A.   No.

18       Q.   And when did you take up

19   photography as a hobby, let's say?

20       A.   In my teens.

21       Q.   What year would that have been?

22       A.   Probably 1980 something.  I don't

23   know.  Mid '80s.

24       Q.   Okay.  And talking about your

25   daughter, prior to October of '04, had she


                         33


1   suffered any damages from the conduct alleged

2   in the complaint?

3       A.   No.

4       Q.   And from '04 to now, what damages

5   has she suffered as a result of the conduct

6   alleged in the complaint?

7      A.   I can't say.

8      Q.   And --

9      A.   I don't know if my paranoia and

10   behavior has affected her in any way.  I can't

11   say.

12     Q.    Have you sent her to psychological

13   counseling?

14     A.    No.

15     Q.    And she's totally unaware this is

16   happening?

17     A.    Yes.

18     Q.    And prior to the FBI coming to chat

19   with you about this exhibit, were you aware of

20   any of the court cases that they later told you

21   about where this exhibit was used?

22     A.    No.

23     Q.    Since the FBI came and told you

24   about this exhibit existing, have you

25   learned -- have you discussed those court cases

34

1  with any of the court personnel who were

2  involved in them?  You know, have you gone to

3  these courthouses and discussed it with them?

4      A.   No.

5      Q.   Okay.  Are you aware of any

6  location on the Internet where this court

7  exhibit is available for download?

8      A.   I am -- no, I am not.

9      Q.   And we already discussed, outside

10  of court personnel, the FBI and me, you're not

11  aware of anyone else who has a copy of this

12  image?

13      A.   I am not aware of anybody, no.

14      Q.   Okay.  And do you have any

15  information to indicate that I still have a

16  copy of that court exhibit somewhere on some

17  computer?

18      A.   I don't have direct information,

19  no.

20      Q.   Okay.

21          MR. BOLAND:  I don't think I have

22  any further questions, Mr. Rosenbaum.

23          MR. ROSENBAUM:  Do you want to read

24  yours, too?

25          THE WITNESS:  If I could, yes,

                    35

1  please.

2

3          (Deposition concluded.)

4               - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

1                CERTIFICATE

2  The State of Ohio,   )

3                    SS:

4  County of Cuyahoga.  )

5

6          I, Donnalee Cotone, a Notary Public

7  within and for the State of Ohio, duly

8  commissioned and qualified, do hereby certify

9  that the within named witness, PETER LORA, was

10  by me first duly sworn to testify the truth,

11  the whole truth and nothing but the truth in

12  the cause aforesaid; that the testimony then

13  given by the above-referenced witness was by me

14  reduced to stenotype in the presence of said

15  witness; afterwards transcribed, and that the

16  foregoing is a true and correct transcription

17  of the testimony so given by the

18  above-referenced witness.

19       I do further certify that this

20  deposition was taken at the time and place in

21  the foregoing caption specified and was

22  completed without adjournment.

23

24

25

37

1       I do further certify that I am not

2  a relative, counsel or attorney for either

3  party, or otherwise interested in the event of

4  this action.

5       IN WITNESS WHEREOF, I have hereunto

6  set my hand and affixed my seal of office at

7  Cleveland, Ohio, on this _____ day of

8   _____, 2009.

9

10

11

12

13            _____

14            Donnalee Cotone, Notary Public

15            within and for the State of Ohio

16

17   My commission expires February 7, 2012.

18

19

20

21

22

23

24

25

38

1            SIGNATURE OF WITNESS

2

3

4

5

6          The deposition of PETER LORA, taken

7   in the matter, on the date, and at the time and

8   place set out on the title page hereof.

9          It was requested that the

10  deposition be taken by the reporter and that

11  same be reduced to typewritten form.

12           It was agreed by and between

13  counsel and the parties that the Deponent will

14  read and sign the transcript of said

15  deposition.

16

17

18

19

20

21

22

23

24

25

39

1                    AFFIDAVIT

2   The State of Ohio,   )

3                  ) SS:

4   County of Cuyahoga   )

5

6

7

8        Before me, a Notary Public in and for

9   said County and State, personally appeared

10   PETER LORA, who acknowledged that he/she did

11   read his/her transcript in the above-captioned

12   matter, listed any necessary corrections on the

13   accompanying errata sheet, and did sign the

14   foregoing sworn statement and that the same is

15   his/her free act and deed.

16        In the TESTIMONY WHEREOF, I have hereunto

17   affixed my name and official seal at this_____

18   day of _____ A.D. 2009.

19

20

21      _____

22      Notary Public

23

24      _____

25      My Commission Expires:


40


1       DEPOSITION ERRATA SHEET

2

3  RE:      PETER LORA, VICTORIA BLOOM, ET AL.,

4       VS. DEAN BOLAND

5

6  Job No.:        19023-DLC

7  Deponent:       PETER LORA

8  Deposition Date:    MARCH 3, 2009

9

10  To the Reporter:

11  I have read the entire transcript of my

12  Deposition taken in the captioned matter or the

13  same has been read to me.  I request that the

14  following changes be entered upon the record

15  for the reasons indicated.  I have signed my

16  name to the Errata Sheet and the appropriate

17  Certificate and authorize you to attach both to

18  the original transcript.

19

20

21

22

23  _____

24  PETER LORA

25